# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

**Sealed**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| V. ) | CAUSE NO. |
| ) | |
| THOMAS J. BUCK, ) | |
| ) | |
| *Defendant.* ) | |

FILED
SEP 06 2017
U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

1:17-cr-0172 TWP-TAB

# INFORMATION

The United States Attorney charges that:

## COUNT ONE
(Securities Fraud)
[Title 18, United States Code, Section 1348]

### Background

At times material to this Information:

*Relevant Persons and Entities*

1. The defendant THOMAS J. BUCK, a resident of Carmel, Indiana, was a registered financial advisor employed by Merrill Lynch, Pierce, Fenner & Smith, Incorporated, now a division of Bank of America ("Merrill Lynch"), a global investment firm, from approximately October 1981 until March 2015 when he was terminated for cause. In this capacity, BUCK counseled thousands of clients of Merrill Lynch, including Clients A, B, and C, on how to manage and invest their money, including advising clients on the buying and selling of particular securities registered on national exchanges, specifically, among others, AbbVie Inc.,

1

Ford Motor Company, General Electric Company, Intel Corporation, Medtronic, Inc., all of which are issuers with a class of securities registered under Section 12 of the Securities Exchange Act of 1934.

2. Merrill Lynch was a broker-dealer registered with the United States Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority, Inc. (FINRA), with an office in Carmel, Indiana, among other places across the country.

3. BUCK was the leader a team with two other financial advisers, four or five registered investment advisors, seven or eight registered client advisors, and one non-registered client advisor under the designations "The Buck Group" and "The Buck Team" (The Buck Group). During approximately January 2012 through March 2015, the Buck Group's customer base comprised approximately 800 households with more than 3,000 customer accounts and approximately $1.3 billion assets under management at or near the time of BUCK's termination from employment.

### *Merrill Lynch's Cost Structures*

4. BUCK offered The Buck Group's services to clients through Merrill Lynch's cost structures. In general, Merrill Lynch clients are offered commission and fee-based cost options, among others.

   a. The ***commission-based option*** charged clients an amount of money for each transaction made on the client's account, such as buying and selling securities. Thus with limited exceptions, the number and size of transactions completed directly affected the commissions yielded.

b. The *fee-based option* charged clients a set percentage of the client's total assets under management at Merrill Lynch regardless of the number and dollar value of transactions made on their account. The fee could range as high as 2.75%. The specific percentage within that range for a given client depended on the client's total assets under management, the type of securities in the account, and negotiations between the client and the financial adviser.

5. Commissions have been the traditional cost structure in the financial advising industry. In recent years, however, the industry has offered clients a fee-based alternative in part because such an alternative may be cheaper for the client. To that end, Merrill Lynch had encouraged its financial advisers, including BUCK, to evaluate whether a fee-based alternative might be appropriate for their clients, particularly by informing clients about the amounts they paid annually in commissions, comparing those amounts to what clients would have paid under a fee-based alternative, and encouraging clients to choose the lowest cost option consistent with their investment objectives.

6. Accordingly, in recent years, approximately 70% of all revenue from Merrill Lynch's Indiana-based financial advisers came from clients on a fee-based cost platform. However, during the same period, approximately 80% of the revenue from BUCK's clients still came from commissions.

### *BUCK's Compensation*

7. Merrill Lynch paid its financial advisers, including BUCK, a portion of the revenue generated from clients' accounts, which was largely made up of the commissions and

fees that clients paid. In general, the more revenue that a financial adviser generated, whether from commissions or fees, the greater that adviser's compensation.

### *Rules and Compliance Systems*

8. <u>Risk Management System ("RMS")</u>. Merrill Lynch employed internal security measures to monitor the activity of its representatives and brokers, including measures to ensure clients were not being overcharged. Merrill Lynch's Risk Management System ("RMS") was one such measure. The RMS was an internal, largely automated electronic communications system that analyzes, among other things, the production credits that Merrill Lynch advisors were being awarded over a period of time (usually one year). Commissions paid by individual clients were one subset of these production credits. If the RMS determined that the annual production credits exceeded certain thresholds, then a Merrill Lynch compliance professional responsible for internal supervisory monitoring functions would notify the client's financial adviser and require the financial adviser to explain the apparently high production credits paid by the client and confirm that the client has been informed of any available lower-cost options, such as using a fee-based cost structure as opposed to commissions, and has rejected those options.

9. <u>Prohibition on "Discretion."</u> It was against New York Stock Exchange (NYSE) Rule 408 and a violation of Merrill Lynch policy for a registered financial advisor to exercise discretion in a non-discretionary customer account. Accordingly, Merrill Lynch required that its financial advisers obtain client consent for each trade.

## The Scheme to Defraud

### *Overview of the Scheme*

10. Beginning in or before 2012, the exact being unknown, through March 2015, BUCK devised, intended to devise, and executed a scheme to defraud by overcharging certain clients for his financial advising services and misleading those clients, Merrill Lynch, and its compliance systems regarding those overcharges by concealing the overcharges. The object of the scheme was to generate increased revenues from clients, which in turn increased his personal compensation and professional reputation.

### *Manner and Means*

11. As part of the scheme to defraud, in violation of NYSE Rule 408 and Merrill Lynch policy, BUCK exercised discretion when placing certain trades on certain client accounts without obtaining authorization from the client. As a result, certain clients on a commission-based cost platform, which comprised 80% of BUCK's clients, paid commissions on these trades.

12. As further part of the scheme to defraud, BUCK made false and materially misleading representations to his clients about the total amount the clients were paying Merrill Lynch in annual commissions.

13. As further part of the scheme to defraud, BUCK intentionally failed to inform certain clients that a fee-based option was available, and that the fee-based option could be cheaper than the commissions the client was paying.

14. As further part of the scheme to defraud, and to mislead Merrill Lynch regarding the overcharging of his clients, BUCK made or caused to be made false and materially

5

misleading statements to Merrill Lynch in response to inquiries by the RMS. On numerous occasions and related to numerous investor client accounts, after receiving a notice from the RMS that a client's account had excessively high production credit velocity during the prior year, BUCK informed or caused a member of his staff to inform Merrill Lynch's compliance managers in writing that he made his clients aware of the cheaper fee-based option, and that the clients intentionally opted to keep their accounts in the commission-based cost structure, when in fact, as BUCK well knew, he did none of this.

## CLIENT A

A. For example, on or about September 16, 2014 and again on or about December 31, 2014, Merrill Lynch's RMS identified a commission-based account of Client A that had excessive production credit velocity during the prior year. Specifically, the RMS noted that a commission based account of Client A had a production credit velocity that equaled approximately 4.39% of Client A's assets in that account during the prior year. Merrill Lynch compliance personnel notified BUCK of this fact and inquired why the account had not been moved to the cheaper fee-based cost structure. On or about January 26, 2015, BUCK instructed a client associate to reply to Merrill Lynch compliance personnel that the client's portfolio was reviewed with the client on or about January 20, 2015 and that BUCK had discussed a fee-based option during previous reviews. This statement, for example, was materially misleading however because as BUCK well knew, BUCK failed to discuss the fee-based option with Client A as he had represented to Merrill Lynch compliance personnel.

B. During the applicable time, BUCK caused trades of publicly traded stocks over the national exchange within Client A's accounts, including:

| DATE OF TRADE | TRADE DESCRIPTION | PUBLICLY-TRADED STOCK | QUANTITY |
|---|---|---|---|
| 01/16/15 | Sell | ABBVIE INC. | 2,000 |
| 02/13/15 | Buy | FORD MOTOR COMPANY | 5,000 |

**CLIENT B**

C. As another example, on or about August 29, 2014 and again on or about September 16, 2014, Merrill Lynch's RMS identified a commission-based account of Client B that had excessive production credit velocity during the prior year. Specifically, the RMS noted that the production credit velocity for a given account of Client B equaled approximately 3.82% of the assets in that account during the prior year. Merrill Lynch compliance personnel notified BUCK of this fact and inquired why the account had not been moved to the cheaper fee-based cost structure. On or about September 19, 2014, BUCK instructed a client associate to reply to Merrill Lynch compliance personnel that the account was reviewed with the client on or about September 4, 2014, that BUCK had discussed the fee-based option in the past, and that the client was not interested in at the time. This statement was materially misleading, however, because as BUCK well knew, he had not discussed the fee-based option with Client B as he had represented to Merrill Lynch compliance personnel.

D. During the applicable time, BUCK caused trades of publicly traded stocks over the national exchange within Client B's accounts, including:

| DATE OF TRADE | TRADE DESCRIPTION | PUBLICLY-TRADED STOCK | QUANTITY |
|---|---|---|---|
| 01/12/15 | Sell | ABBVIE INC. | 500 |
| 02/03/15 | Buy | GENERAL ELECTRIC COMPANY | 1,000 |

**CLIENT C**

E    As a final example, on or about June 30, 2014 and again on or about July 9, 2014, Merrill Lynch's RMS identified a commission-based account of Client C, as described above, that had excessive production credit velocity during the prior year. Specifically, the RMS noted that Client C's account had production credit velocity that equaled approximately 3.09% of the assets in that account during the prior year. Merrill Lynch compliance personnel notified BUCK of this fact and inquired why the account had not been moved to the cheaper fee-based cost structure. On or about July 11, 2014, BUCK instructed a client associate to reply to Merrill Lynch compliance personnel that the account was reviewed with the client on or about May 12, 2014, that BUCK had discussed the fee-based option with the client in the past, and that the client was not interested in at the time. This statement was materially misleading, however, because as BUCK well knew, he had not discussed the fee-based option with Client C as he had represented to Merrill Lynch compliance personnel.

F. During the applicable time, BUCK caused trades of publicly traded stocks over the national exchange within Client C's accounts, including:

| DATE OF TRADE | TRADE DESCRIPTION | PUBLICLY-TRADED STOCK | QUANTITY |
|---|---|---|---|
| 11/11/14 | Buy | INTEL CORPORATION | 1,200 |
| 01/20/15 | Buy | MEDTRONIC, INC. | 400 |

## The Charge

15. Paragraphs 1 through 14, above, are incorporated fully herein by reference.

16. Beginning in or before 2012, and continuing until in or around March 2015, in Carmel, Indiana, which is in the Southern District of Indiana, and elsewhere, the Defendant,

**THOMAS J. BUCK,**

did knowingly and intentionally execute, and attempted to execute, a scheme and artifice to defraud, and to obtain, by means of materially false or fraudulent pretenses, representatives, promises, and omissions, money or property in connection with the purchase and sale of securities on or about the dates described above of AbbVie Inc., Ford Motor Company, General Electric Company, Intel Corporation, and Medtronic, Inc., among others, all of which were issuers with a class of securities registered under Section 12 of the Securities Exchange Act of 1934.

All of which is in violation of Title 18, United States Code, Section 1348.

JOSH J. MINKLER
United States Attorney
Southern District of Indiana

STATE OF INDIANA     )
                     )  SS:
COUNTY OF MARION     )

Cynthia J. Ridgeway, being first duly sworn, upon her oath deposes and says that she is an Assistant United States Attorney in and for the Southern District of Indiana, that she makes this affidavit for and on behalf of the United States of America and that the allegations in the foregoing Information are true as she is informed and verily believes.

_____
Cynthia J. Ridgeway
Assistant United States Attorney

Subscribed and sworn to before me, a notary public, on this 6th day of September, 2017.

_____
Guey Jen Yang
Notary Public

My Commission Expires:

June 27, 2022

My County of Residence:

Hendricks

10