# EXHIBIT 2

**IN ARBITRATION PROCEEDINGS BEFORE**

**FINRA DISPUTE RESOLUTION**

| | | |
|---|---|---|
| **IN THE MATTER OF ARBITRATION BETWEEN:** | ) | |
| | ) | |
| **JANICE J. COMPTON** | ) | |
| | ) | |
| **CLAIMANT,** | ) | |
| | ) | **CASE NO. 20-_____** |
| **vs.** | ) | |
| | ) | |
| **MERRILL LYNCH, PIERCE, FENNER &** | ) | |
| **SMITH, INC., THOMAS J. BUCK and** | ) | |
| **JOHN DOE(S),** | ) | |
| | ) | |
| **RESPONDENTS.** | ) | |

## STATEMENT OF CLAIM

Claimant Janice J. Compton ("Janice" or "Claimant") brings the following claims for damages against Respondents Merrill Lynch, Pierce, Fenner & Smith, Inc. (CRD #7691) ("Merrill" or "the Firm"), Thomas J. Buck (CRD #1024868) ("Buck"), and the unknown Merrill employees who participated in, aided and abetted, were consciously indifferent to, negligently failed to supervise, and/or were otherwise responsible in whole or in part, for Buck's infractions as described below ("John Doe(s)" or "Buck's Supervisors") (collectively "Respondents").

## I.  PRELIMINARY STATEMENT

This case involves a long-running fraud by one of Merrill's top brokers—a fraud that in certain respects is on-going even today. The fraud was orchestrated by Buck, the biggest producer Merrill had in the entire State of Indiana. Buck was fired in 2015 and is now in federal prison for securities fraud involving the very scheme at issue here. Simply put, Buck assumed discretion over the accounts of several dozen of his customers—customers who deeply trusted him—and then

proceeded to make unneeded and/or unsuitable trades in their accounts simply to generate commissions for himself (and Merrill). These trades frequently involved the short-term trading of relatively high-commission securities—securities normally held long-term. As to Janice Compton alone, Buck made over 1,100 trades in her accounts and generated commissions of approximately $1,400,000.

That Buck did all this is not legitimately in dispute. As part of his guilty plea in his criminal case, Buck admitted to running this scheme and Merrill, itself, has acknowledged that the many customer complaints that arose out of this scheme had "substantial merit." What remains a mystery is how Buck was able to engage in such a pervasive scheme for so long. By its nature, Buck's scheme generated numerous red flags and its operative infractions—over-charging for commissions, over-trading of long-term securities, and assumption of discretion—were *known* by Merrill compliance and management, but *never effectively acted upon*. The identity(ies) of exactly who protected Buck and allowed him to flourish remains a closely guarded secret. Indeed, upon information and belief, no Merrill management or compliance personnel lost their job due to the Buck debacle. Rather, the personnel who allowed, benefited from, and abetted Buck's fraud closed ranks, claimed that he was a lone wolf and today remain unscathed by their decisions to protect *Buck* instead of Merrill's own *clients.*

Janice Compton was one of those clients that Merrill's management and compliance personnel repeatedly failed.  Janice had been close friends with Buck and his family for nearly sixteen years when she opened her accounts with him in 2009. The substantial amount of money she received then—and the additional tens of millions of dollars she received thereafter—came as a result of her painful divorce. Even setting aside the emotional tumult caused by the divorce, Janice was ill-equipped to manage this money. All of the family's investments had been handled

2

by her husband, who was an expert in financial matters. In contrast, Janice had very limited investment experience and she therefore relied heavily on Buck. For the next five years, Janice allowed Buck to manage her money as he thought best, with Buck only keeping Janice generally apprised of the activity and performance in her accounts.

Her trust in Buck's friendship and honesty—and in Merrill's reputation as a premiere brokerage firm—proved to be misplaced. Serving as her investment advisor, Buck assumed discretion and control over Janice's accounts from the start, ultimately making over 1,100 trades, charging high commissions and frequently turning over positions that would normally be held long-term by a moderate to moderately conservative investor such as Janice. Hand and glove with this overtrading was Buck's deceit regarding the form of account that was most suitable for her— commission-based vs. fee-based. Buck repeatedly represented to Janice that she was better served in a commission-based account, when in reality her commissions were approximately three *times* more than what she should have paid under a fee-based arrangement. The severity of Buck's multiple breaches of fiduciary duty is reflected in the fact that he was prosecuted criminally for securities fraud by the U.S. Department of Justice and sentenced to 40 months in prison.

The damages Janice seeks in this case are very substantial and are intended to send a message: **No profits should come from putting clients last.** Janice's damages extend far beyond disgorgement of commissions and the interest thereon. Indeed, her single largest element of damage stems from Buck's mismanagement. Because Buck's primary goal in managing her accounts was to generate commissions for himself (and Merrill), Janice largely missed out on one of the longest bull markets in United States history. While Janice's accounts did generate an overall profit—making some $3.7 million dollars over five years—they made nowhere near what they should have made with simple, prudent management. Merrill will claim that Janice should be

3

satisfied with this profit. However, when Janice opened her accounts, she understood that they would be managed for her benefit—not Buck's. Janice had a right to expect that Buck would adhere to such a minimal fiduciary duty and is entitled to a recovery of all of her losses arising out of his failure to do so. The amount of such damages will be proved at trial but with interest, is expected to exceed $7 million. Finally—because Buck's scheme is fully actionable under both Indiana and federal RICO—treble damages, attorneys' fees and costs are not only available *but mandatory*. While the amount will be shown at trial, once just the compensatory damages are trebled, they alone will likely exceed $20 million.

Ironically, as large as they are, these figures are still barely noticeable to a firm the size of Merrill. However, they are very much warranted—given the scope of Buck's fraud, Merrill's years-long failure to stop it and Merrill's subsequent efforts to cover up both the involvement of others at the Firm and the full losses Buck's fraud caused to the customers who had most trusted him.

## II. THE PARTIES

1. **Claimant – Janice Compton.** Janice Compton is 61 years old. She graduated from college in 1981. After working for approximately 11 years, she left the workforce to raise her two children and has not been employed since 1992. In 2008—after nearly 25 years of marriage—Janice's husband asked for a divorce. As a result, Janice received cash and securities now worth more than $50 million dollars.

2. **Respondent Merrill Lynch.** Merrill (CRD #7691), has its main office in New York City and maintains branches all over the country, including the "Northside" Branch located in Carmel, Indiana—the suburb of Indianapolis where the relationship between Buck and the Comptons

began. Merrill is owned by Bank of America and is one of the largest financial firms in the country, with some 14,000 brokers. In the 2019 fiscal year, the firm generated some $91 *billion* in revenues and approximately $27.4 *billion* in profits. Despite its monumental failure to supervise Buck, to date Merrill has received no discernable regulatory penalty for its part in allowing Buck to defraud his customers.

3. **Respondent John Does a/k/a "Buck's Supervisors."** The John Doe Respondent(s), also referred to herein as "Buck's Supervisors" are unknown past or current Merrill employees who managed, supervised, surveilled, or otherwise aided and abetted Buck in his scheme. Among other things, Buck's Supervisors were obligated to ensure that Buck's sales practices conformed to the laws, regulations, and rules governing the securities industry. The Buck Supervisors include individuals who, though not tasked with his supervision, knew of Buck's fraud and provided assistance that helped his scheme to continue. The Buck Supervisors, upon information and belief, may include those who immediately supervised/surveilled Buck up through senior Merrill executives who knew of (or should have known of/or who consciously disregarded evidence of) Buck's misconduct and/or the supervisory lapses that allowed his fraud to continue for as long as it did.

4. **Respondent Buck – an overview of his long-running scheme to defraud**. Thomas Joseph Buck (CRD # 1024868) is 66 years old. Buck is currently a resident of the federal prison in Terre Haute, Indiana, where he is serving a 40-month sentence for securities fraud for the same acts that are at issue here. Buck's scheme—which he admittedly operated for years—was based upon his assumption of discretion in the accounts of dozens of his best customers. Selecting only customers who he knew would not question his actions—such as Janice—Buck proceeded

to buy and sell high-commission products simply to enrich himself. Account performance—if it was considered at all—was at most secondary.

5. Buck concentrated his trading on securities that paid high commissions but which drew less scrutiny from compliance—including municipal bonds, common stocks, master limited partnerships and certain new issue syndicate items.[1] Charging as much as he thought he could on these trades, Buck was able to generate total commissions of approximately 2%- 2.7% on each round trip. Since there was frequently more than one such roundtrip per year, Buck's trading generated far more income for him—and Merrill—than would have been received from a fee-based account.[2] While Merrill pushed its other brokers to switch to fee-based accounts, Buck's Supervisors knew that Buck had relatively few such accounts. Indeed, Buck's lack of fee-based accounts was well known since Merrill internally published each broker's daily production and Buck's production did not correspond to when fees were assessed. Merrill and Buck's Supervisors thus allowed Buck to gouge his selected customers year after year, knowing that these customers were being overcharged. They also knew—or consciously ignored—that Buck's rapid trading of bonds, stocks and other securities had no legitimate justification and that Buck had assumed discretion over certain accounts—buying and selling without obtaining prior authorization from the client.  This misconduct was not only known to Buck's Supervisors, it was even known outside of Merrill. This is apparent from the following article from AdvisorHub published just *four days* after Buck's termination:

---

[1] Upon information and belief, Buck had previously focused on "A-Share" mutual funds but switched vehicles for his on-going frauds because trading these high commission products brought too much actual and/or potential scrutiny.

[2] For customers with large accounts (such as Janice), the fee should have been far less than 1% of chargeable assets.

It has been well known among industry insiders that Buck and his team of 'heavy hitters' have taken liberties in making trades and executing transactions in clients' accounts without authorization. Buck's large book, comprised heavily of physicians, attorneys, and other professionals, has continued to remain primarily transaction based, even though the industry and, in particular Merrill Lynch, have made strong efforts and advancements in converting both existing and new assets into fee based relationships. How management at Merrill Lynch has continued to look the other way while Buck and his minions have continued to exploit their clients to pad their own pockets, raises several questions which will most certainly need to be answered before the final fallout of this major announcement comes to pass.

*(See Merrill Fires Barron's 100 Advisor: Tom Buck/#1 Indiana,* Advisor Hub, March 8, 2015, attached as **Exhibit A**.)

6. **Buck's Background at Merrill**. Buck began at Merrill in 1981, working in its "Northside" Branch in Indianapolis, Indiana as a financial advisor.[3] Buck was later promoted to "Sales Manager" for the branch—a position, ironically, that gave him a role in ensuring the Branch's compliance efforts. Upon information and belief, Buck used this position to gain insights into how to exploit weaknesses in Merrill's supervisory system and to help accumulate his book of business. Over time, Buck was enormously successful financially and became one of the top brokers in the whole Merrill system. Buck assembled, and operated through a tightly controlled a team that included additional supporting brokers and staff that numbered from time to time approximately 5-10 people.[4] In time, Buck's production put him in the top 25 within Merrill's entire stable of 14,000 brokers and he was easily its largest producer in the State of Indiana.

---

[3] This branch was also sometimes known as the "Carmel" Branch. Merrill also had a second large branch in Indianapolis – the "Downtown" Branch. These two branches sometimes had the same individual as Branch Manager. In addition, the Branch Manager of the Northside Branch sometimes also served as a Regional Manager, as well.

[4] Upon information and belief, a large percentage of each team member's income came from Buck and they were thus entirely dependent on him financially.

Indeed, for at least the last three years before his fraud became public, Buck ranked among the top 100 brokers in *the entire country*.[5] His customer assets reportedly totaled $1.3 *billion* and he generated revenues of $10 million annually. This phenomenal success enriched not only Buck, but also his branch, regional and district managers, as well as others, and put Buck on a first name basis with Merrill's top management.[6] Buck's out-sized production also made him immune to the scrutiny afforded to lessor brokers, and Buck was allowed to operate for years with blatant disregard for the securities laws and Merrill's own policies and procedures.

7. **<u>Merrill's investigation and termination of Buck.</u>** Following an investigation that purportedly focused on Buck's "high-activity brokerage accounts"—and included whether Buck: a) had lied to clients in order to keep them in commission-based accounts; b) engaged in "unauthorized trades," and c) had falsely marked orders as "unsolicited trades"—Merrill fired Buck on March 4, 2015. (*See* excerpts of the CRD Snapshot for Buck at pp. 17-18, attached as **Exhibit B**).[7] Merrill has since indicated in regulatory filings that this investigation

---

[5] In 2012 Buck was ranked 91st, in 2013 he was ranked 95th, and jumped up to 80th in 2014. *See* https://www.barrons.com/report/top-financial-advisors/100/2012; https://www.barrons.com/report/top-financial-advisors/100/2013; https://www.barrons.com/report/top-financial-advisors/100/2014.

[6] Merrill's senior executives in New York/New Jersey were even known to fly to Indianapolis to attend Buck's annual Christmas parties.

[7] Significantly, Merrill has largely acknowledged Buck's guilt, telling FINRA that:

> The firm concluded that client complaints against former financial advisor, Thomas Buck (terminated March 4, 2015), had *substantial merit*.

(*See* excerpts of Buck's CRD Snapshot, p. 18 **Exhibit B**) (emphasis added).

lasted for only a day.[8] This contention, however, is simply not plausible. Buck's scheme involved literally dozens of customers and had been in place—in one form or another—for many years. Moreover, it strains credulity that the decision to fire one of the Firm's largest producers could have been vetted up through Merrill's successive levels of management over the course of a day.

8.   Rather, the reality of Buck's firing was very different. Upon information and belief, Merrill's investigation into Buck unfolded over a substantial period of time starting back in 2014. In fact, Buck's awareness of this investigation can be inferred from changes in how he traded Janice's accounts during parts of 2014 and up until March 2015 when he was fired. In past years Buck had actively traded certain of Janice's accounts—placing multiple trades nearly every month. During 2014, however, his trading slowed and in 2015 it stopped altogether. This is a strong indication that Buck knew he was under scrutiny and no longer had the ability to make trades carte blanche in Janice's accounts.

9.   In addition, far from being done precipitously, Buck's termination was carefully orchestrated in order not to implicate those who had permitted Buck's long-running scheme. Amazingly, there were no consequences for Merrill management. None of Buck's direct supervisors, compliance officers or team members were fired as a result of Buck's scheme—or even publicly disciplined. Indeed, the primary compliance officer for the Northside Branch—Bob

---

[8] Buck's official Central Registration Depository Record ("CRD") reflects Merrill's statement that its internal review was initiated on "03/03/2015" and that Buck was discharged the next day on "03/04/2015." (*Id*. at p. 17.)

Smith—is still in place today, despite having the distinction that one of Merrill's largest producers committed a multi-year fraud on his watch.[9]

10. Instead of a thorough airing of how Buck was able to perpetrate his long-running fraud—despite the presence of Merrill's many supposed checks and balances—Merrill moved quickly to sweep all such questions under the rug. It did this both with Buck's customers who complained and with the Regulators who justifiably inquired as to what had happened. Buck's firing resulted in 36 *new* customer complaints against Buck.[10] (*See* the Summary of Buck's Termination Related Customer Complaints, attached hereto as **Exhibit C**). Among other things, these complaints included allegations of unauthorized trading, excessive trading, unsuitable trading and the misrepresentation/ omission of material facts. None of these complaints started as (or even later matured into) arbitrations. Rather, (except for Janice's) most were settled before the customer had any opportunity to investigate his or her claim. Indeed, about two-thirds of these complaints were settled within three months of filing. Even so, Merrill paid some $5.4 million to the customers who complained in order to avoid further

---

[9] The fact that Mr. Smith is still employed is actually a strong indication that Mr. Smith knew of and elevated Buck's violations—but was *ignored* by Merrill management. Terminating him under such circumstances for "missing" Buck's scheme was not possible since he could have gone public (or to the Regulators) with at least some of the names of those who enabled Buck. Upon information and belief, this same fear of mutual disclosure has protected the jobs and reputations of all of Buck's Supervisors, and has led to a highly effective cover-up of Merrill's supervisory failures as to Buck.

[10] Prior to his termination Buck already had three customer complaints, including two that were settled, at least one of which settled within pennies for the full amount demanded by the customer, i.e., $ 75,000 on a $75,131 claim. Merrill was thus long on notice that Buck was a compliance risk. Instead of upping its scrutiny of Buck in light of these red flags, it did exactly the opposite and deliberately averted its glance.

questions and to effectively buy their silence.[11] Upon information and belief, this amount was still a relative bargain for at least two reasons. First, Merrill could fund at least part of these payouts with money that belonged to Buck but which he forfeited when he was fired.[12] Second, Merrill paid settling customers only a fraction of their losses since, at most, Merrill's refunds were limited to a portion of the commissions Buck fraudulently generated. Losses for the *underperformance* of these customer's accounts—accounts which Buck "managed" for the purpose of generating commissions—were not even calculated or acknowledged, let alone paid.

11. Merrill also moved with lightning speed on the regulatory front, apparently convincing FINRA, the SEC and the government both that Buck acted alone and that Buck somehow successfully deceived Merrill's managerial, compliance and supervisory personnel for years— despite their affirmative duties to follow up on red flags and to check behind self-serving, exculpatory explanations.[13] Merrill worked to direct all regulatory focus towards Buck, went above and beyond in "co-operating" to show his most glaring infractions (e.g. lying to customers about the relative benefits of fee-based accounts) and quietly hid the fact that Buck's actions were known within the firm and were tacitly permitted/aided and abetted by Buck's Supervisors.

---

[11] Merrill's top five settlements for these customers were $719,014, $600,000, $565,000, $430,000, and $400,000, respectively.

[12] Upon information and belief, by virtue of being fired, Buck forfeited all his accumulated deferred compensation which is believed to have been several million dollars.

[13] In its negotiations with Janice over Buck's misconduct, Merrill, ironically, has claimed that *she* should have uncovered Buck's frauds even though their legions of compliance and other personnel supposedly failed to do so.

### III.  BACKGROUND

12. **Janice was unprepared for her new role as an investor**. Janice grew up in Indiana and went to college at Purdue, receiving a degree in management in 1981. For the next 11 years, she was employed by IBM in Indianapolis and Boston where, among other things, she worked on a team which marketed large mainframe computers. Janice threw herself into this work and, even after leaving IBM, continued for years as a volunteer to help schools better use technology. At IBM, Janice also met her husband, Bob Compton, whom she married in 1984 after he graduated from Harvard Business School. Bob became a venture capitalist working in both Boston and in Indianapolis. He was an early investor in a number of startups, and over time this work made the Comptons wealthy. In particular, Bob was an early investor in Exact Target, a company that went public in 2012 and was thereafter acquired in 2013 by Salesforce for $2.5 billion. (It was the proceeds from her sales of these Exact Target shares that generated most of Janice's current wealth.)

13. After the birth of her first child, Janice left the workforce and this time threw herself into caring for the couple's children. Their first daughter (Elizabeth) was born in 1992 and their second daughter (Meredith) was born in 1994. In addition to the normal challenges of managing a family, both girls experienced serious health issues. Meredith was born with club feet and required weekly cast changes and several operations. Elizabeth developed Type I diabetes in her pre-teens, which required constant monitoring, special diets, and frequent shots.

14. As fate would have it, in 1989 Janice and Bob moved to Carmel, Indiana to a house directly across the street from Buck's home. The families were neighbors for about eleven years and became close after the Compton's first daughter was born in 1992. The Bucks had daughters the same ages as the Comptons and their girls became inseparable. The families went to social

events together, shared meals together and even vacationed together. This continued even after the Comptons moved to Memphis, Tennessee in 1997. In fact, the Comptons and the Bucks took a trip to Africa together in 2006.

15. This friendship eventually led to a business relationship between Buck and Bob Compton, who opened his first accounts with Buck in 1999. These and all his other Merrill accounts were opened in Bob's name only. Janice had little involvement in or knowledge of Bob's accounts, other than to know that Bob was pleased with Buck's performance and considered Buck to be a good, cautious and knowledgeable financial advisor.

16. In 1997, the Comptons moved to Memphis so that Bob could run a company he had previously invested in. Janice, as homemaker and mother, immersed herself in her daughters' activities at their new school—volunteering as a Girl Scout Leader, starting a city-wide swim club for middle school students, and assisting with her daughters' after school teams. Janice also immersed herself in the community, starting and running two charitable organizations (Ali's Way, Inc. and Thunder, Inc.), serving on a school's board of trustees, and fundraising for Junior Diabetes Research Foundation, Ronald McDonald House-Memphis and the St. Jude Children's Research Hospital.

17. In 2008, Bob announced that he wanted to end their marriage of nearly 25 years. This betrayal up-ended Janice's life. At the time, the girls were 14 and 16 and Janice was effectively left as a single parent. Bob's exit also resulted in investment responsibilities being thrust upon Janice for which she was not prepared. As part of their division of assets, Bob split certain of his Merrill accounts with Janice in August 2009, transferring approximately $6,860,000 in securities and cash to a new account—also at Merrill—to be handled by Buck. Bob had strongly recommended Buck, telling Janice among other things that he was a "very good

conservative money manager." (*See* 3/23/2009 email between Bob and Janice, attached as **Exhibit D**). Janice, in turn, welcomed this advice. Given how little she knew about investing, it gave her comfort that a close friend—someone she thought truly cared about her and her girls—would be managing her money.

18. **Janice's new Merrill accounts**. On March 30, 2009, Janice signed the one-page document Buck's office sent for her to establish her account.  While she did not know it at the time, this was an inauspicious start since this one-page document gave Merrill *none* of the critical information it needed to adequately supervise Buck's management of Janice's account—information such as her risk tolerance, investment objectives, investment experience, income, net worth, etc.

19. The internal documents Merrill used to open at least three of Janice's accounts[14] are inaccurate, incomplete and/or contradictory in critical particulars – something that itself should have raised red flags with Merrill.  For example, for Account #8268, the source of the money used to open the account is listed as "personal savings" rather than as the result of her impeding divorce—a fact which would have flagged Janice's inexperience. In addition, the new account forms for accounts #8268 and #1050 both enormously exaggerate her investment experience and contradict each other. Janice's investment experience is listed as "15 years" for account #8268 and "20 years" for account #1050—even though these two accounts were opened within a few months of each other. If Merrill had only inquired, it would have learned that neither number was accurate, and she had no experience overseeing any sizable account. Perhaps most telling, however, is that Buck was able to make some 1,100 trades in Janice's accounts even though

---

[14] Though Janice had a total of five accounts at Merrill, even with prodding from undersigned counsel, Merrill has provided fulsome new account paperwork for only three of the five accounts.

Merrill's own documents listed her "Trading Frequency" as "seldom." Despite this designation, Merrill did not intervene with Buck or even call Janice asking why. This is emblematic of the degree of deference Merrill gave Buck—not only as to Janice's accounts, but upon information and belief, to all of Buck's clients, thereby allowing him to exploit them and perpetrate his years-long fraud.

20. Janice's exact risk tolerance and investment objectives evolved over time and varied by account. (Buck, for example, never sat down with Janice to create an Investment Policy Statement that would have better defined her tolerance for risk and goals). That said, Janice considered herself overall to be a moderate to conservative investor. This, however, did not mean that she had the same objectives for all of her money or accounts. Rather, she saw her money as comprised of different buckets. With some buckets she was willing to take more risk than others. As for her investment objectives, they could be characterized as at least short term and long term. Short term, Janice wanted to largely live off the income her accounts generated. Long term, she wanted the accounts to grow so that she could leave a legacy to her daughters and have the freedom to do such things as make charitable donations. She also did not want to have a chance at losing all of her money and thus wanted to keep a significant cash position. After communicating these goals, she largely left the mechanics of how they were managed to Buck.

21. Buck encouraged Janice to rely on him to manage her accounts and, given their close relationship, she was comfortable doing so. Buck thus decided what was bought and sold in the accounts without getting advance authorization from Janice—and without explaining to her the risks, benefits or even the rationales for the trades he made. This exercise of de facto discretion made Buck a *fiduciary* to Janice and imposed upon him (and Merrill) all the duties

that arise from such a relationship.[15] Janice let Buck manage her accounts not knowing that it was highly inappropriate for Buck to act without a written grant of discretion.[16] Janice would have granted Buck discretion if he had asked. Buck, however, did not ask because he did not want the additional scrutiny that is supposed to come with a discretionary account.  In addition, certain trades that would be lucrative to him would have been prohibited in a discretionary account altogether, such as purchasing Merrill-underwritten new issues.

22. Upon information and belief, Buck also assumed de facto discretion in the accounts of dozens of other customers. This assumption of discretion was part of Buck's overall scheme because it enabled him to more easily over-trade customer accounts in order to generate commissions.

23. As soon as Janice's first account was funded in August 2009, Buck assumed control. He proceeded to sell most of the securities that had been transferred into her account from Bob and then began a course of aggressive trading—selling long-term positions prematurely and trading other positions speculatively. He did so knowingly—in complete disregard for Janice's investment objectives and risk tolerances—and did so in order to generate commissions for himself and Merrill. While this trading contradicted Janice's listed objectives, it drew no effective scrutiny because of who Buck was. In little more than five years of trading, Buck generated more than $1.4 million in commissions on some 1,100 trades. Janice, however, never got a phone call from the branch manager or from a compliance officer asking her if she

---

[15] As fiduciaries, Buck and Merrill owed Janice the obligations to exercise the utmost good faith, care, loyalty, candor, and honesty in regard to her investments, including a duty to prudently manage her accounts in light of her actual investment objectives and risk tolerances.

[16] Janice does not claim that Buck's trades were "unauthorized" in the legal sense. She deeply trusted Buck and knew that he was managing her accounts. While after Buck was fired Janice complained about trades being "unauthorized", she did so in the layman's sense that trades occurred without any prior phone call – something that is not necessary when the advisor is operating with discretion, de facto or de jure.

understood Buck's strategy, approved his short-term trades of long-term securities, and understood that she could save substantially on commissions with a fee-based account.

24. Buck kept Janice only loosely apprised of what he was doing—explaining only in general terms what he wanted to do or what he had already done. Janice described these calls with Buck in her Victim's Statement that she submitted to the Court prior to Buck's sentencing:

> Every call from Tom Buck would start the same way. I would ask, "How are you?" And he would answer, "Well, I'm just sitting here looking at how great your accounts are doing." Then we would talk about what his daughters and wife were doing and I'd update him on what my daughters were up to. Only after that discussion would he discuss the next purchases and sales he wanted to make with my accounts. We never discussed anything regarding the risk of the trades or the commission involved. Why would I question the actions of someone who had been doing this for so long and with such success?

(*See* Janice's Victim Impact Statement at p. 2, attached as **Exhibit E**.) Although he would sometimes solicit her input, this was largely for show. Given Janice's trust in him—and her lack of confidence in herself—Buck knew that Janice would defer to him. From the period from August 2009 to his termination in March 2015, Buck maintained firm control of Janice's accounts.

25. **<u>Short Term Trading in Bonds.</u>** Short term trading in bonds was a hallmark of Buck's mismanagement. Buck essentially treated Janice's bond holding as his own private inventory—to be swapped/traded with the Firm or other of his customers at will. While bonds by their nature are intended to be held for the long term, Buck routinely sold them prematurely. Indeed, even using a relatively short 15-month holding period, Buck sold no less than 58 positions early, totaling over $15 million dollars. Following the tortured course of a single $200,000 position that Buck invested—and then reinvested four additional times over a 15-month

period—dramatically demonstrates this abuse. The following timeline reflects the five separate

bonds that Buck bought with this $200,000 between February 26, 2010 and May 17, 2011:

- o **2/26/2010** - Buck buys $200,000 of bonds issued by the Washington State HCF Auth. 4.625%.

- o **7/26/2010** - Buck sells this position five months later and invests $200,000 in bonds issued by the Omaha Pub Pwr Neb 4.5%.

- o **11/18/2010** - Buck sells this position some three months later in order to buy $200,000 in bonds issued by the NY Metro Trans. Auth. 4.5%.

- o **12/14/2010** - Buck sells this position after approximately 1 month in order to buy $200,000 in bonds issued by Tex. State Trans. 4.5%.

- o **5/17/2011** - Buck sells this position after five months in order to buy $200,000 in bonds issued by Brownsburg Ind. Swr Rev 4.625%.

In little more than a year, Buck thus used this $200,000 to make five different purchases and

four sales, generating commissions of approximately 2% on each purchase and .4% on each

sale—making more in commissions for himself than Janice did on the stated coupon.

Throughout this process, Merrill's Branch Manager and Compliance personnel are nowhere to

be seen.

26. Far from an outlier, this example is emblematic of how Buck traded bonds in Janice's accounts

for years. Below is a list of some of the other short-term bond trades in her accounts along with

the holding period:

| Holding | Buy Date | Sell Date | Holding Period |
|---|---|---|---|
| Chicago Bd. Of Ed. | 9/8/2009 | 12/21/2009 | 3.5 months |
| In. Health - Sisters | 11/24/2009 | 12/21/2009 | less than 1 month |
| Birmingham AL Wtr Works | 12/21/2009 | 5/20/2010 | 5 months |
| MI State Univ. | 5/20/2010 | 12/14/2010 | 7 months |
| AZ State Univ. | 1/24/2011 | 8/16/2011 | 7 months |
| Tex A&M Univ. | 2/25/2011 | 10/13/2011 | 7.5 months |

18

| | | | |
|---|---|---|---|
| Maine Health & Higher Ed. | 8/16/2011 | 10/20/2011 | 2 months |
| Memphis Shelby Cty., TN | 8/29/2011 | 12/2/2011 | 3 months |
| Anderson Cty., TN | 10/18/2011 | 2/22/2012 | 4 months |
| DC Rev. | 12/2/2011 | 2/10/2012 | 2 months |
| Port Authority of NY/NJ | 2/22/2012 | 6/21/2012 | 4 months |
| NJ State Trans. (zero coupon bonds) | 2/14/2012 | 5/25/2012 | 3 months |
| Metro PEA IL (zero coupon bonds) | 5/25/2012 | 6/18/2012 | less than 1 month |
| Metro ATL | 6/18/2012 | 7/12/2013 | 13 months |
| Leander TX (zero coupon bonds) | 6/21/2012 | 7/19/2013 | 13 months |
| Wisc. Health & Ed. | 10/1/2012 | 6/4/2013 | 8 months |
| Ind. Fin. Auth. Hosp. | 10/29/2012 | 6/4/2013 | 7 months |
| Cal Unified HS Dist. | 6/4/2013 | 9/27/2013 | 3.5 months |
| JEA FL Elec Sys. | 6/4/2013 | 9/27/2013 | 3.5 months |
| Univ. Al. | 6/4/2013 | 9/27/2013 | 3.5 months |

Indeed, there are at least 20 bonds that Buck sold so rapidly that Janice *never received* a single coupon payment.

27. **Short term trading in MLP.**  Master limited partnerships are intended to be long-term, income generating investments, both because they are designed to provide reliable income distributions and because of their complicated deferred taxation structure. Despite this fact, Buck engaged in the same pattern of short term, speculative trading as he did with bond trades:

| Holding | Buy Date | Sell Date | Holding Period |
|---|---|---|---|
| Kinder Morgan Energy | 7/29/2010 | 3/15/2011 | 7.5 months |
| Plains All American Pipeline | 3/12/2010 | 7/29/2010 | 4.5 months |
| Sunoco Logistics Partners | 3/12/2010 | 7/29/2010 | 4.5 months |
| Global Partners LP | 7/29/2010 | 11/1/2010 | 3 months |
| Williams Partners, LP | 11/1/2010 | 2/18/2011 | 3.5 months |
| Boardwalk Pipeline Partners | 2/18/2011 | 9/13/2011 | 8 months |
| Buckeye Partners | 2/2/2012 | 3/21/2012 3/22/2012 | 1.5 & 3.5 months |
| Buckeye Partners | 9/25/2012 | 12/13/2012 | 2.5 months |

| | | | |
|---|---|---|---|
| TC Pipelines | 9/13/2011 | 3/21/2012<br>6/18/2012 | 6 & 9 months |
| TC Pipelines | 9/25/2012 | 11/1/2012 | 1 month |
| TC Pipelines | 12/3/2012 | 12/13/2012 | 10 days |
| Regency Energy Partners | 7/24/2012 | 12/13/2012 | 4.5 months |

28. **Short-Term Holding of Equities.** Buck's pattern of short-term, speculative sales also extended to equities. Upon information and belief and among other things, Buck used the release of new Merrill research as an excuse to jump from position to position. The following is an abbreviated list of stocks that were purchased only to be sold months (sometimes only weeks) later:

| Holding | Buy Date | Sell Date | Holding Period |
|---|---|---|---|
| American Movil | 12/11/2009 | 2/19/2010 | 2 months |
| Progress Energy | 6/9/2010 | 9/2/2010 | 3 months |
| GlaxoSmithKlein | 6/9/2010 | 9/2/2010 | 3 months |
| PPL Corp. | 10/26/2010 | 11/15/2010 | less than 1 month |
| National Bank of Canada | 12/9/2010 | 2/16/2011 | 2 months |
| Seagate Technologies | 4/25/2011 | 7/25/2011 | 3 months |
| Honeywell | 7/25/2011 | 11/16/2011 | 4 months |
| HSBC | 7/27/2011 | 11/16/2011 | 4 months |
| AFLAC | 3/15/2012 | 5/22/2012 | 2 months |
| Caterpillar | 9/24/2012 | 10/17/2012 | less than 1 month |
| Telefonica Brazil | 6/18/2012<br>9/25/2012 | 10/17/2012 | 4 & less than 1 month(s) |
| Veolia Environmental | 5/15/2012<br>9/25/2012 | 10/17/2012 | 5 & less than 1 month(s) |
| CSX | 7/24/2012<br>9/25/2012 | 11/2/2012 | 3 & 1 month(s) |
| Cisco | 10/10/2013 | 12/18/2013 | 2 months |

29. In some cases, Buck purchased and sold Janice in and out of the same stock on multiple occasions:

     o   HSBC:
           i.   bought on 8/24/2010 – sold on 12/9/2010;
          ii.   bought on 7/27/2011 – sold on 1/10/2102; and
         iii.   bought on 7/24/2012 – sold on 9/20/2012.

     o   U.S. Bancorp:
           i.   bought on 1/26/2010 – sold on 9/2/2010; and
          ii.   bought on 3/15/2012 & 9/25/2012 – sold on 12/13/2012.

     o   Cisco:
           i.   bought on 12/11/2009 & 1/26/2010 – sold on 2/25/2011;
          ii.   bought on 1/26/2010 – sold on 11/17/2011; and
         iii.   bought on 10/10/2013 – sold on 12/18/2013.

     o   ArcelorMittal:
           i.   bought on 5/22/2012 – sold on 8/2/2012; and
          ii.   bought on 9/24/2012 & 9/25/2012 – sold on 11/1/2012.

30. The above are but a few examples of Buck's mismanagement of Janice's accounts. In short, Buck employed the same short-term, commission-generation strategy across her accounts. Buck employed no cogent investment strategy and executed trades merely to generate commissions. And all the while, Merrill and Buck's Supervisors, including his team members, knowingly looked the other way, allowing Buck's abuse and mismanagement to go on for years. Merrill and Buck's Supervisors incentivized Buck to commit his frauds and thereafter, as at least to Janice, ratified his and their misconduct. While Janice's accounts did generate an overall profit, had her accounts been properly and prudently managed—for her benefit rather than Buck's—she would have made significantly more. The amount of her losses for lack of prudent management will be the subject of expert testimony at the hearing, but it is currently believed to exceed $7 million with pre-judgment interest.

31. At the same time Buck was over-trading Janice's accounts, he was also lying to her about the benefits she would receive from converting to a fee-based account. On at least two occasions, Janice asked if she might be better off in a fee-based account, and both times Buck dissembled, telling her that she would in fact pay more in fees than she was paying in commissions. He also assured her that Merrill would proactively inform her when it might be the right time to switch to a fee-based account. In truth, Janice was paying as much as 3-4 times more in commissions than she would with an appropriate fee.

32. **Exact Target.** The only portion of her accounts over which Janice retained some control involved the Exact Target shares she received from Bob as part of their divorce. In a move designed to reduce her exposure to stocks and to save on taxes, Janice sold her position in Exact Target in the fall of 2012 for approximately $34 million and then re-established approximately half the position a month later for approximately $17 million (the "New Position").  The remaining $17 million or so in proceeds from this sale (minus approximately $5.8 million for taxes) was left in her account for Buck to manage. The following summer, Salesforce acquired Exact Target—resulting in the exchange of her New Position for approximately $25 million netting a pre-tax profit of approximately of some $7.7 million. Other than transferring $5 million of this money for Buck to manage, Janice largely kept the net proceeds—some $17 million in cash—as a reserve for safety.

33. **Merrill Lynch failed to supervise Buck.** The proof will show that Merrill and Buck's Supervisors knew—or were recklessly/willfully blind in ignoring—Buck's years of blatant misconduct. Upon information and belief, the proof will also show Merrill and Buck's Supervisors at least tacitly supported Buck's misconduct by, among other things, concealing its existence and ignoring their affirmative duties to supervise and therefore stop Buck.

34. Merrill's and Buck's Supervisors' duty to supervise Buck required them to, *inter alia*,

    i.    Establish procedures—and a system for applying those procedures—that would reasonably prevent and detect violations of the securities rules/laws by Buck;

    ii.    Supervise Buck with a view to prevent violations;

    iii.    Vigorously investigate red flags or other suggestions of irregularity/wrongdoing regarding Buck and/or his team through diligent inquiry by those with the knowledge and authority to conduct a thorough investigation, including going beyond the unverified and self-serving representations of the employee under review;

    iv.    Contact customers directly when the red flags concern issues in their accounts;

    v.    Provide the compliance department with the resources/power to effectively and independently police Buck and his Team; and

    vi.    Place adequate limitations on Buck to prevent a repetition of the misconduct once issues had been identified.

35. In order to surveil its brokers and detect possible violations of the securities laws/regulatory rules, Merrill should have employed both qualified and properly supported personnel plus sophisticated automated surveillance systems to generate reports commonly referred to as "exception reports." Such reports are supposed to look for and detect both violations of the securities laws/rules, as well as Merrill's own policies and procedures, and should have detected the very sales practice issues described herein, including Buck's assumption of discretion, premature sales of long-term securities, excessive commissions, speculative trading, improper use of a commission versus a fee-based platform, etc. To the extent that Merrill's compliance personnel and/or system of exception reports did detect Buck's improper activities, these red flags were ignored, suppressed and/or not acted upon. To the extent that Buck's improper practices were not detected, Merrill's personnel failed at (or were prevented from doing) their jobs and its systems were inadequately designed and/or implemented. Upon

information and belief, Buck's activities were lighting up Merrill's exception reports or were otherwise known (or apparent with reasonable diligence), yet Buck's Supervisors looked the other way, actively shielding Buck from any meaningful scrutiny for years while benefiting—directly or indirectly—from the vast revenues he generated.

36. Consistent with this dereliction of duty, at no time prior to Buck's termination did anyone in a management, compliance or supervisory capacity at Merrill contact Janice about the activity in her accounts or the fact that given the level of trading, a fee-based account would be a much cheaper option.

37. Given the long period over which his scheme ran and the huge sums of money it generated, Buck's Supervisors, upon information and belief, knew of, aided and abetted and/or ratified Buck's scheme. Buck's Supervisors at the branch, regional and executive levels had, among other things, strong monetary incentives to allow Buck to proceed and severe reputational dis-incentives to stop him. Upon information and belief, no person in the managerial/supervisory/compliance chain responsible for Buck was disciplined for their repeated failures to stop his misconduct.

38. **Merrill Lynch's Settlement Fraud.** Once Buck's fraud became public, Merrill failed to make its customers whole. Instead, it has misrepresented to customers the amount and scope of their losses in order to obtain advantageous settlements, partially reimbursing commissions while refusing to even acknowledge the losses caused by Buck's mismanagement of their accounts. Merrill has also sought to hide the network of people who enabled Buck to carry out his scheme in order to avoid further reputational damage to the firm and to the Buck Supervisors involved.

39. Buck was fired by Merrill on March 4, 2015. While Merrill contacted Janice shortly thereafter, it provided no explanation for his termination—leaving her to learn the grim truth from news

reports. So began a pattern that lasted the next four plus years (from 2015 to 2019) of Merrill concealing the extent of Buck's misconduct—and the true amount of Janice's losses—while at the same time trying to negotiate a highly favorable settlement. All the way, Merrill continuously discouraged Janice from filing suit lulling Janice into believing that no suit would be needed. At the same time, however, it was also consistently trying to short-change her, striving mightily to convince Janice to accept the same partial return-of-commission settlements that it foisted on Buck's less determined victims. A partial return of commissions, however, does not come close to fully reimbursing Janice for her losses, which include the relatively poor returns she earned due to Buck's gross mis-management of her accounts—a management style that focused on generating commissions for Buck, not profits for Janice.

40. In support of its "Just move on nothing to see here" approach, Merrill, among other things, has variously argued that Janice should be satisfied:

    i.   because her accounts made a profit;

    ii.   because a well-managed account would have generated the same returns as Buck's; and

    iii.   because Buck achieved an internal rate of return of 10% even when the profits from Exact Target are excluded.

While the first of these is true—Janice's account did make a profit—it conveniently ignores that this profit was far smaller than it should have been due to Buck's reckless mismanagement. The remaining contentions above, however, are not even half true. While Merrill, during its years-long discussions with Janice presented well-managed account returns to justify Buck's handling of her accounts, these calculations were based on grossly inappropriate hypothetical allocations of only 20% - 30% of her accounts to equities, with the balance (i.e. 70% - 80%)

in low-yielding fixed income securities. Such an allocation is not appropriate for a *moderate* to conservative investor, particularly one that could afford to take some risk due to having approximately $17 million in cash anchoring her account. Similarly, Merrill argued that Janice should be satisfied with Buck's returns because he achieved a 10% internal rate of return. The true rate of return achieved by Buck was less than 5%, not the 10% claimed by Merrill. By presenting skewed and/or false information as to her actual losses, Merrill sought to convince Janice that her claim had no value beyond, at most, a partial return of the commissions that Buck had fraudulently charged.

41. Merrill's undertook these efforts to hide the true extent of Buck's fraud even though as a current advisory customer, Merrill had a fiduciary obligation to be completely transparent with her—even though such honesty was adverse to Merrill's immediate interests. Ironically, Janice had remained a customer of Merrill—rather than move her accounts to another firm—because she thought Merrill would value its relationship with her and thus treat her fairly.

42. Through these and other acts, Merrill has attempted to overreach Janice during its extended discussions with her. This conduct not only tolls any statute of limitations (to the extent that a statute of limitations has any applicability in this arbitration), but also is relevant to Janice's claim for punitive damages since it shows Merrill failed to offer a fair settlement for Janice's damages after Buck's fraud became public. (*See* Tenn. Code Ann. § 29-39-104(4).)

43. **Janice's subsequent education in as to investments**. After concluding her divorce and launching her girls, Janice decided she would learn more about investments. She did not like feeling stupid and after years of total helplessness, she thus began to take some limited steps to educate herself about stocks. In the fall of 2014, she even opened a self-directed account with Merrill in which she bought one stock a month.  Once Buck was fired in 2015, this effort

to learn about investments morphed into a herculean effort of trying to figure out how she had

been cheated by Buck. As she had done at other turning points in her life, Janice threw herself

into learning as much as she could. Janice described her steep learning curve in the Victim's

Statement that she provided to the Court in conjunction with Buck's sentencing, as follows:

> During those 2034 days in which Tom "managed" my accounts,
> approximately 1100 trades took place and over 450 of those trades
> were unauthorized. Once I became aware of what had gone on in my
> accounts in March 2015, I began to educate myself on the
> investment process and researched in detail on the types of things he
> bought and sold.
>
> I cannot adequately describe the feeling of betrayal by what Tom
> did to me. I couldn't believe it at first and was terribly embarrassed
> that this happened.
>
> I felt so stupid for not knowing the rules of investing, for not
> understanding the investments and for believing Tom in the first
> place. I couldn't understand (and still don't understand) how Tom
> could have done that to me as well as to my daughters.

(*See* Janice's Victim Impact Statement at pp. 3-4, attached as **Exhibit E**.)

44. **Buck's conviction for securities fraud and industry bars.** On September 6, 2017, the

Department of Justice charged Buck with securities fraud under 18 U.S.C. Section 1348—

alleging the very misconduct Janice has described herein—via an Information.[17] (*See*

Information, *United States of America v. Thomas J. Buck,* attached as **Exhibit F**.) Specifically,

the government alleged,

> As part of the scheme to defraud, in violation of NYSE Rule 408
> and Merrill Lynch policy, BUCK exercised discretion when placing
> certain trades on certain client accounts without obtaining
> authorization from the client. As a result, certain clients on a

---

[17] An "Information" is a formal charging document the government uses to institute criminal proceedings against a defendant that outlines the elements of and the probable cause against the defendant for an alleged crime.

> commission based cost platform, which comprised 80% of BUCK'S clients, paid commissions on these trades.
>
> As further part of the scheme to defraud, BUCK made false and materially misleading representations to his clients about the total amount the clients were paying Merrill Lynch in annual commissions.
>
> As further part of the scheme to defraud, BUCK intentionally failed to inform certain clients that a fee-based option was available, and that the fee-based option could be cheaper than the commissions the client was paying.

(*Id*. at p. 5.) On January 18, 2018, Buck pled guilty to this charge and, in doing so, admitted each allegation of *criminal* securities fraud contained in the Information. (*See* Plea Minute Entry attached as **Exhibit G**.) The Court thereafter sentenced Buck to prison for 40 months despite Buck's request to serve no time. (*See* Sentencing Minute Entry and Final Judgment attached as **Exhibit H**). In seeking the most prison time possible, the prosecutors relayed to the Court the harm Buck caused to Janice and her family. (*See* Janice's Victim Statement referenced in the Government's Sentencing Memorandum which is attached as **Exhibit I**.)[18]

45. In addition to his criminal conviction, Buck has been permanently barred from the securities industry. FINRA's bar came in July 2015 just a few months after Buck's termination. (See FINRA AWC attached as **Exhibit J**.) The SEC instituted an enforcement action against Buck in federal court on October 31, 2017, followed by an in-house SEC administrative action, resulting in a bar from Buck acting as an investment advisor. (*See* Complaint in SEC Civil Case, Consent Judgment in SEC Civil Case, and SEC Administrative Action, collectively attached as **Exhibit K**.)  The SEC also imposed $5.1 million in fines and restitution, which Buck has since personally paid. The proceeds of the SEC enforcement action went to a

---

[18] Janice is referred to as "Client D" in the Government's Sentencing Memorandum and specifically mentioned on pages 6, 7, 22 and 23 as well as Footnote 14 in **Exhibit I**.

Victim's Fund, from which Janice recently obtained a partial recovery of the commissions she

paid ($782,220), plus pre-judgment interest ($131,209) and post-judgment interest ($33,439)

on this amount, albeit at the (low) rates that apply to SEC disgorgement actions.[19]

## IV.  CAUSES OF ACTION

The following claims are pled independently of one another and, where appropriate, in the

alternative. Each Count incorporates the proceeding paragraphs by reference.

## COUNT ONE

### INDIANA'S CORRUPT BUSINESS INFLUENCE ACT - OPERATING AN ENTERPRISE THROUGH A PATTERN OF RACKETEERING

### RESPONDENTS: BUCK, BUCK'S SUPERVISORS & MERRILL (DERIVATIVELY)

46. The preceding paragraphs are hereby incorporated by reference.

47. It is a violation of the Indiana Corrupt Business Influence Act ("ICBIA") for:

     i.    A person who is employed by or associated with any enterprise;

    ii.    To knowingly or intentionally conduct or otherwise participate in the activities of that enterprise;

   iii.    Through a pattern of racketeering activity.

*See* Indiana Code Ann. § 35-45-6-2. Buck, Merrill and the John Doe Respondents have violated

Indiana Code Ann. § 35-45-6-2, in multiple ways, including as follows.

---

[19] While plaintiffs in Tennessee can get statutory pre-judgement interest at a rate of 10%, the rate applied by the SEC was only 5% to 6%. Janice's demand here seeks interest on the full amount of commissions at 10% with a credit for the amount she has already recovered from the SEC Victim's Fund.

48. Under the ICBIA, racketeering means to "commit, … conspire to commit a violation of, or aiding and abetting in a violation" of a number of crimes including fraud. (Ind. Code Ann. § 35-45-6-1(1)(e).)

49. Merrill is an enterprise engaged in the financial services industry and Buck and the John Doe Respondents were at all relevant times employed by Merrill.

50. As alleged above and/or as will be proven at trial, Buck knowingly and/or intentionally conducted—or otherwise participated in—the activities of Merrill through a pattern of racketeering activity that included the commission of multiple acts of fraud against Janice as well as other customers. Buck's scheme also included other predicate acts under the ICBIA, including theft. (*See* also Ind. Code Ann. §§ 35-45-6-1(1)(e), 35-43-4-2.)

51. As alleged above and/or as will be proven at trial, some or all of the John Doe Respondents—Buck's Supervisors—likewise, at a minimum, participated in the activities of Merrill through a pattern of racketeering activity by, among  other things, aiding and abetting Buck and/or conspiring with Buck in his commission of multiple acts of fraud against Janice and/or other customers. The participation of these Respondents also included other predicate acts under the ICBIA, including theft. (*See* also Ind. Code Ann. §§ 35-45-6-1(1)(e), 35-43-4-2.)

52. As a direct and proximate result of these violations of the ICBIA, Janice has been injured in her property in the ways and in the amount to be shown at trial. The private right of action created by the ICBIA *requires* that Janice be awarded three times her compensatory damages, the cost of bringing this action, and attorneys' fees, and allows for punitive damages.[20]

---

[20] Ind. Code Ann. § 34-24-2-6 reads as follows:

53. Buck and his Supervisors are liable for these damages directly, while Merrill is liable for these damages under principles of respondeat superior because the individual respondents acted within the scope of their employment and/or within their actual or apparent authority. Merrill is also liable for its employees' criminal conduct and resulting damages under Indiana Code Ann. § 35-41-2-3, which holds a corporation strictly liable for the criminal acts of its employees committed within the scope of the authority given to them.

<u>**COUNT TWO**</u>

**INDIANA CORRUPT BUSINESS INFLUENCE ACT - USE OF RACKETEERING PROCEEDS TO OPERATE AN ENTERPRISE**

***RESPONDENTS: MERRILL & BUCK'S SUPERVISORS***

54. The preceding paragraphs are hereby incorporated by reference.

55. It is a violation of the Indiana Corrupt Business Influence Act ("ICBIA") for:

    i.    A person who knowingly or intentionally receives any proceeds directly or indirectly from a pattern of racketeering activity;

    ii.    To use or invest those proceeds or the proceeds derived therefrom to operate an enterprise.

*See* Indiana Code Ann. § 35-45-6-2(1). Merrill and the John Doe Respondents have violated Indiana Code Ann. § 35-45-6-2(1), in multiple ways, including as follows.

---

Upon a showing by a preponderance of the evidence that the aggrieved person has been damaged by corrupt business influence, the court **shall** order the person causing the damage through a violation of IC 35-45-6-2 to pay to the aggrieved person:
    (1) an amount equal to three (3) times the person's actual damages;
    (2) the costs of the action;
    (3) a reasonable attorney's fee; and
    (4) any punitive damages awarded by the court and allowable under law.

Ind. Code Ann. § 34-24-2-6(b) (emphasis added).

56. In addition to being an enterprise" for purposes of the ICBIA, Merrill, as a corporation, is also a "person" under the law.

57. As described in Count 1, Buck and the John Doe Respondents conducted and/or otherwise participated in the activities of Merrill through a pattern of racketeering activity.

58. Buck's Supervisors and Merrill, itself through said employees, knowingly and/or intentionally used income that was derived from that pattern of racketeering activity in the operations of Merrill, which included, among other things, the large sums generated by Buck through his fraudulent trading practices. Merrill, through both Buck and one or more of the John Doe Respondents, knowingly and/or intentionally received proceeds from Buck's fraudulent acts and used those proceeds in the operation of Merrill.

59. As a direct and proximate result of Buck's Supervisors' and Merrill's violations of the ICBIA, Janice has been injured in her property in the ways and in the amount to be shown at trial. In addition, the ICBIA's private right of action requires this Panel to award three times Janice's compensatory damages, the cost of bringing this action, and attorneys' fees, and allows for punitive damages.[21]

60. Merrill and Buck's Supervisors are liable for these damages directly, while Merrill is also liable for these damages under principles of respondeat superior because the individual respondents acted within the scope of their employment and/or within their actual or apparent authority. Merrill is also liable for its employees' criminal conduct and resulting damages under Indiana Code Ann. § 35-41-2-3, which holds a corporation strictly liable for the criminal acts of its employees committed within the scope of the authority given to them.

---

[21] *See* Footnote 20, *supra*.

32

## COUNT THREE

**FEDERAL RICO - OPERATING AN ENTERPRISE THROUGH A PATTERN OF RACKETEERING**

*RESPONDENTS: BUCK & MERRILL LYNCH (DERIVATIVELY)*

61. The preceding paragraphs are hereby incorporated by reference.

62. It is a violation 18 U.S.C. 1964(c)—the Racketeer Influenced and Corruption Act ("RICO")

    for:

> i.    a person who is employed by or associated with an enterprise engaged in or the activities of which affects interstate or foreign commerce,
>
> ii.   to conduct or participate in the conduct of the enterprise's affairs, and
>
> iii.  to do so through a pattern of racketeering activity.

 Buck has violated 18 U.S.C. 1964(c) in multiple ways, including as follows.

63. At all relevant times Buck was employed by Merrill—the enterprise—a financial services business that was engaged in or the activities of which affected interstate commerce.

64. As alleged above, Buck conducted—or otherwise participated in the conduct—of Merrill's affairs through a pattern of racketeering activity that included the commission of multiple acts of securities fraud against Janice and other of Buck's customers. (*See* 18 U.S.C. § 1961(1)(D) and §1348.) Buck pled guilty to this crime and his conviction became final on February 15, 2019. (*See* Buck Information, Buck's Guilty Plea, and the Government's Sentencing Memorandum, **Exhibits G**, **H**, and **I,** respectively.)

65. As a direct and proximate result of these RICO violations, Janice has been injured in her property in the ways and in the amount to be shown at trial. The private right of action created

by RICO *requires* that Janice be awarded three times her compensatory damages, the cost of bringing this action, and attorneys' fees. [22]

66. Buck is liable for these damages directly, while Merrill is liable for these damages under principles of respondeat superior because Buck acted within the scope of his employment and/or within his actual or apparent authority. Merrill is also liable for its employees' criminal conduct and resulting damages under Indiana Code Ann. § 35-41-2-3, which holds a corporation strictly liable for the criminal acts of its employees committed within the scope of the authority given to them.

## COUNT FOUR

### CIVIL RECOVERY UNDER INDIANA'S CRIME VICTIM STATUTE
### *RESPONDENTS: BUCK AND MERRILL (DERIVATIVELY)*

67. The preceding paragraphs are hereby incorporated by reference.

68. Per Indiana Code Ann. § 34-24-3-1, Indiana's Crime Victim Statute, a person who suffers a pecuniary loss as a result of criminal conduct, including fraud and theft, may recover from the person who caused the loss: treble damages, the costs of bringing the action, and attorney's fees.

---

[22] The civil RICO recovery statute reads as follows,

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor …and **shall** recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee….

18 U.S.C. 1964(c) (emphasis added).

34

69. As described above, Buck handled Janice's accounts in a manner that constituted criminal fraud and/or theft from which Janice suffered pecuniary losses.

70. As a direct and proximate result of Buck's fraud/theft, Janice has been injured in her property in the ways and in the amount to be shown at trial.

71. Buck is directly liable to Janice under the Indiana Crime Victim Statute, while Merrill is liable for Buck's conduct and the resulting damages under principles of respondeat superior because Buck acted within the scope of his employment and/or within his actual or apparent authority. Merrill is also liable for Buck's criminal conduct and treble damages under Indiana Code Ann. § 35-41-2-3, which holds a corporation strictly liable for the criminal acts of its employees committed within the scope of the authority given to them.

## COUNT FIVE

### BREACH OF FIDUCIARY DUTY

#### RESPONDENTS: ALL

72. The preceding paragraphs are hereby incorporated by reference.

73. A breach of fiduciary duty is actionable where it is shown that: 1) the parties are in a fiduciary relationship; 2) a fiduciary duty is breached; and 3) either the claimant is thereby injured and/or the respondent is benefited.

74. Respondents owed Janice broad fiduciary duties, both those that are inherent to any broker-client relationship, as well as the additional and broader fiduciary duties that arose when Buck assumed discretion and control over Janice's accounts. By assuming discretion, Respondents were obliged to, *inter alia*, always act in Janice's best interests, adhere to rigorous duties of loyalty, avoid conflicts of interest, act with the utmost good faith and a high standard of care, and adhere to the duty of candor. *See* 2 Norman S. Poser & James A. Fanto, Broker-Dealer

35

Law and Regulation §16.01, at 16-3,4 (4ᵗʰ ed. 2017); *see also Johnson v. John Hancock Funds*, 217 S.W.3d 414, 428 (Tenn. App. 2006) (when a client requests the broker to provide investment advice–and the broker proceeds to do so–the broker "assumes broad fiduciary obligations that extend beyond the individual transactions").

75. Respondents' fiduciary duties also required them to, *inter alia*:

    i.   prudently manage Janice's accounts in light of her actual investment objectives and risk tolerances and avoid unsuitable investments;

    ii.   avoid all self-dealing and selfish interests;

    iii.   avoid speculative investments;

    iv.   refrain from misrepresenting any material facts;

    v.   disclose all material facts that could affect a transaction or the principle/agent relationship;

    vi.   forthrightly explain the practical impact and risks of a trading strategy;

    vii.   stay informed regarding any changes that affect the market and responsibly act to protect Janice's accounts from those changes; and

    viii.   faithfully adhere to all of the other fiduciary duties described herein or imposed by law.

76. Respondents also had an on-going obligation to disclose and correct any previous breaches of fiduciary duty to Janice.

77. Respondents breached these duties by at least the following acts:

    i.   Engaging in (and, in the case of Merrill, permitting and/or ratifying) all of the frauds for which Buck is now in prison;

    ii.   Managing Janice's accounts in order to generate commissions for Buck and Merrill rather than for the benefit of Janice;

    iii.   Managing Janice's accounts without any legitimate strategy;

    iv.   Purchasing, and selling unsuitable products;

     v.   Following unsuitable investment strategies;

    vi.   Placing trades in disregard of Janice's investment objectives;

   vii.   Purchasing securities in which Buck/Merrill had a conflict of interest;

  viii.   Lying to Janice regarding the benefits of converting at least some of her accounts to fee-based accounts;

    ix.   Failing to adequately supervise Buck; ignoring numerous red flags relating to Buck's management; and ratifying and incentivizing his breaches of fiduciary duty to Janice; and

    x.   Failing to disclose and correct Respondents' previous breaches of fiduciary duty, even as Merrill continued to manage and the enjoy the revenue from Janice's accounts.

78. Merrill is both directly and derivatively liable for breach of fiduciary duty to Janice. Among other things, it is directly liable in that it failed to effectively supervise Buck and his supervisors and is derivatively liable under principles of agency/respondeat superior for the acts of its employees, including Buck.

79. Respondents' breaches of their fiduciary duties were ongoing and continuing in nature, and Merrill's have persisted to this day through, inter alia, affirmatively concealing the full extent of Janice's damages and the involvement of other of its employees in Buck's scheme, in blatant disregard of its duty of candor to Janice and duty to correct prior fiduciary breaches.

80. Respondents' breaches of fiduciary duty greatly damaged Janice, including causing her to lose the returns she reasonably should have received if her account had been prudently managed.

## COUNT SIX

### FRAUD

### RESPONDENTS: ALL

81. The preceding paragraphs are hereby incorporated by reference.

82. The elements of a claim for common law and promissory fraud in Tennessee include:

     i.    an intentional misrepresentation of a material fact or omission of a material fact when there is a duty to disclose;

     ii.    knowledge of the representation's falsity or a reckless disregard for the representations' truth or falsity;

     iii.    an injury caused by the reasonable reliance on the misrepresentation (or omission); and

     iv.    the misrepresentation (or omission) involves a past or existing fact or in the case of promissory fraud the misrepresentation embodies a promise of future action or projection without the present intention to carry out the promise or no reasonable belief in the projection.

83. Respondents' conduct as described and alleged in the paragraphs above constituted common law and promissory fraud.

84. Janice reasonably relied on Respondents' various representations, omissions, and concealments due to, among other things, her close and long-standing relationship with Buck.

85. Merrill Lynch is derivatively liable for Buck's fraud through principles of respondeat superior and agency. Buck's scheme—while fraudulent—was executed within the scope of his employment with Merrill and/or with Merrill's apparent authority. It is also directly liable for the damages caused by Buck's scheme because, upon information and belief, Buck's managers/supervisors aided and abetted or otherwise assisted in his scheme.

86. As a direct and proximate result of Buck's fraud, Janice has been injured in her property in the ways and in the amount to be shown at trial.

## COUNT SEVEN

### NEGLIGENT SUPERVISION AND RATIFICATION

### *RESPONDENT: MERRILL*

87. The preceding paragraphs are hereby incorporated by reference.

88. Merrill had statutory, regulatory, common law, and internal obligations to supervise Buck's activities, as well as the activities of its management and its compliance personnel. Merrill was at least negligent in carrying out these obligations in that, among other things, it failed to detect and/or prevent Buck from: assuming control over Janice's accounts, mismanaging Janice's accounts, trading Janice's accounts for his own benefit, and failing to ensure effective branch and compliance oversight. Instead, Merrill incentivized Buck's misconduct and fraud and later ratified it by among other things concealing its full scope. Among other things, Merrill:

    i.    Failed to enforce SEC, FINRA and other SRO rules;

    ii.    Failed to establish procedures—and a system for applying those procedures—that would reasonably prevent and detect violations of the securities rules/laws by Buck;

    iii.    Failed to supervise Buck with a view to prevent violations;

    iv.    Failed to vigorously investigate red flags or other suggestions of irregularity/ wrongdoing regarding Buck and/or his team through diligent inquiry by those with the knowledge and authority to conduct a thorough investigation, including going beyond the unverified and self-serving representations of Buck or others under his control;

    v.    Failed to contact Janice directly when red flags were raised in her accounts;

    vi.    Failed to provide the compliance department with the resources/power to effectively and independently police Buck;

    vii.    Failed to place adequate limitations on Buck to prevent further misconduct once issues had been identified; and

    viii.    Failed to follow industry practices for supervision.

89. Upon information and belief, the manner in which Buck's Supervisor's conducted their oversight of Buck did not comport with Merrill Lynch's internal policies, rules, and guidelines. Rather than stop Buck's scheme, Buck's Supervisors and Merrill allowed him to continue it—ratifying his misconduct.

90. As a direct and proximate result of Merrill's negligent supervision, Janice has been injured in her property in the ways and in the amount to be shown at trial.

91. Merrill is both directly liable for its failure to supervise Buck and derivatively liable for Buck's Supervisors' failures under principles of respondeat superior and agency principles.

## VI. EXEMPLARY DAMAGES

92. In Tennessee, punitive damages should be awarded when a respondent has acted maliciously, intentionally, fraudulently or recklessly. *See* Tenn. Code Ann. § 29-39-104(a)(1).

93. In evaluating the amount of punitive damages, the Panel should look at the factors listed in Tenn. Code Ann. § 29-39-104(4), which as applied to this case include, *inter alia*,

    i.    the Respondents' net worth and financial condition;

    ii.    the nature and reprehensibility of the Respondents' wrongdoing;

    iii.    the impact of Respondents' conduct on Janice and others;

    iv.    the relationship of Respondents to Janice;

    v.    Respondents' motivation for causing harm to Janice and others;

    vi.    whether the Respondents attempted to conceal the misconduct;

    vii.    whether the Respondents profited from the misconduct; and

    viii.    whether once the misconduct was admittedly known to Merrill, whether it attempted to make amends by offering a prompt and fair settlement for actual harm caused to Janice.

94. The proof will demonstrate the applicability of most—if not all—of these factors. Justice therefore warrants an award of punitive damages against each Respondent in an amount to be determined by the Panel consistent with the public policy of punishing past misconduct and deterring further misconduct in the future.

## VII.   STATUTE OF LIMITATIONS & ELGIBILITY

95. Janice and Merrill entered a tolling agreement that suspends any time-based defense as of September 5, 2019.[23] To the extent that statutes of limitation are even apply in this arbitration, all of Janice's claims are timely when calculated from this date. The above claims have varying statutes of limitations that have either not run or have been tolled. The statute of limitations for Janice's federal RICO claim (Count Three) has only recently accrued. It has a four-year statute of limitations that did not begin to run until at least February 15, 2019—the date Buck was sentenced and his conviction became final. The Indiana Corrupt Business Influence Act claims (Counts One and Two) have a ten-year statute of limitations. These claims are thus timely on their face.

96. As for the rest of Janice's claims, each claim is timely based on the existence of several tolling doctrines, including lack of discovery (Janice did not and could not reasonably have discovered her claims until sometime after Buck's termination); equitable estoppel (Merrill's active concealment of Janice's claims and damages was intended to—and in fact did—induce and lull Janice into putting off filing suit, which estops Merrill from asserting statute of limitations defenses); promissory estoppel (since Buck's termination, Merrill has consistently suggested

---

[23] The tolling agreement went into effect on September 5, 2019 and expired on the date of the filing of this Statement of Claim.

that Janice engage in settlement discussions and mediation—and made severely undervalued settlement offers to Janice as recently as July 2019—such that Merrill has represented to Janice that her claims remain valid and pending), and revival (even if some of Janice's claims are somehow untimely, Merrill has revived its obligations and Janice's damages by acknowledging her claims and expressing a willingness to partially pay them). The application of these doctrines is only of academic interest, however, because as opposed to states whose legislatures have explicitly applied statutes of limitations to arbitration claims, Tennessee's legislature has declined to do so.

97. Further, Janice's claims are fully eligible for submission under FINRA Rule 12206, which states that "No claim shall be eligible for submission to arbitration under the Code where six years have elapsed from the occurrence or event giving rise to the claim." Here, the earliest event/occurrence giving rise to all but one of Janice's claims was her discovery of Buck's fraud following his termination in March of 2015.  As such, any claim brought prior to March 2021 falls within the 6-year eligibility rule. Moreover, Merrill repeatedly told Janice in its discussions with her that her claims were actionable for the 6-year period that precedes Buck's termination in March 2015, and it would therefore be estopped if it now attempted to claim otherwise. Moreover, with respect to Janice's federal RICO claim, the event giving rise to that claim—the point Buck's criminal conviction became final—did not occur until February 15, 2019, putting that claim plainly within the six-year period.

## VIII.  DAMAGES & PRAYER FOR RELEIF

As a result of the Respondents' misconduct as set forth above, Janice seeks an award of damages jointly and severally against the Respondents as follows:

1. An amount equal to the returns Janice lost due to the Respondents' failure to prudently manage her accounts e.g. well managed damages;

2. Disgorgement of the balance of the commissions Janice has not recovered to date from the SEC's Victim's Fund;

3. Pre-judgement interest at the highest rate allowed by law;

4. Treble damages;

5. Attorney's fees, costs and expenses;

6. Punitive/exemplary damages; and

7. Such other, different or additional relief and damages which the Panel deems to be just and equitable.

## IX.  RIGHT TO AMEND

Given that Respondents hold documents and information necessary for Janice to fully evaluate her claims, Janice reserves the right to amend this Statement of Claim and/or at the final hearing to prove up the claims made with additional or different facts and/or to prove up additional claims.

Respectfully submitted this 31st day of July, 2020.

 /s/ Niel Prosser

Nathaniel Prosser (TN #11647)
Rob Clapper (TN #34180)
Kyle Johnson (TN #36066)
Jake Dickerson (TN #26269)

The Prosser Law Firm, PLC
5865 Ridgeway Center Parkway, Suite 300
Memphis, Tennessee 38120
Telephone: (901) 820-4433

# EXHIBIT A

Case 2:22-mc-00017    Document 1-5   Filed 06/06/22   Page 46 of 139    PageID 81

**SUBMIT A TIP (https://advisorhub.com/submittip/)**    **RECEIVE DAILY NEWS**

**(https://advisorhub.com/newsletter-sign-up/)**

March 8, 2015

# Merrill Fires Barron's 100 Advisor: Tom Buck/#1 Indiana

by Yoda   |   <u>News (https://advisorhub.com/category/news/)</u>   |

<u>MERRILL LYNCH (HTTPS://ADVISORHUB.COM/FIRMS/MERRILL-LYNCH/)</u>   |   No Comments

SHARE THIS 

**SUBMIT A TIP (https://advisorhub.com/submittip/?post-top)**

In a stunning development (or maybe not that stunning) Merrill Lynch has fired another high profile advisor and members of his team. We've received credible information today detailing the firing of Tom Buck this past Friday. Buck has been named the #1 Advisor by Barron's in Indiana for the last three years. He's worked only for Merrill Lynch since the outset of his career and has been the 'BSD' (yeah, we said it) in that state and on recognition trips for the legacy firm for a couple decades. The information below clearly comes from a Merrill source who probably is hoping to inherit a heap of assets from Buck's firing.

Any way you interpret the following email, this is a big deal – and seems to be a pattern that Merrill has been following over the past 18 months or so. Anyone catching even a sniff from the compliance department is in serious jeopardy. This one is going to be the talk of the industry for this week. Here you go, unedited:

"Merrill Lynch "Big Gun" and long time #1 ranked advisor in Indiana, Tom Buck, got his walking papers last Wednesday.  The move by management to fire Buck, and the the subsequent resignation of his daughter Ann, may have come as a shock to some, in particular to many of Buck's wealthy clients, but to those in financial services industry in Indiana, this was a move that was long overdue."

"It has been well known among local industry insiders that Buck and his team of "heavy hitters" have taken liberties in making trades and executing transactions in clients' accounts without authorization.  Buck's large book, comprised heavily of physicians, attorneys, and other professionals, has continued to remain primarily transaction based, even though the industry and, in particular Merrill Lynch, have made strong efforts and advancements in converting both existing and new assets into fee based relationships.  How management at Merrill Lynch has continued to look the other way while Buck and his minions have continued to exploit their clients to pad their own pockets, raises several questions which will most certainly need to be answered before the final fallout of this major announcement comes to pass."

"What will happen to the remainder of The Buck Group which, at the time of this, are still employed by mother Merrill?  It seems improbable there will not be additional attrition, either voluntary or involuntary, in the remaining ranks of this team.  What are the potential ramifications to management, both past and present?  As stated previously, it has been well known by many that management has ignored Buck's continual violations, but sacrificed the advisor client relationship for the almighty dollar.  Finally, what will happen to Buck?  This firing simple could not have been a spur of the moment decision.  The removal of the state's top advisor from your roster would not have happened without both significant evidence and a trigger event which finally forced management to make this move.  So Buck will now have to face the ramifications of his years of illegal activity, and, based upon the outcome, will have to make a decision to try and rebuild his reputation at a firm that would be willing to roll the dice on him or, and more likely, move into the world of the RIA's and attempt to resurrect his practice from the ground up."

Once you get past the cynicism in that email you realize that there is a real story that will involve lawyers, Tom Buck and Merrill over whatever language lands on his record. And the next 30 days will be a wild ride as speculation will be rampant as to where Buck and his team will land. Can't imagine what the weekend has been like for Tom and his team. A quick search of the Merrill site and 'The Buck Group' shows nada. He got broomed and the fight for how and why now begins between Buck's attorneys and Merrill's.

# EXHIBIT B

# Notice

**CRD® or IARD(TM) Information:**  This report contains information from the CRD (Central Registration Depository) system, or the IARD system (Investment Advisers Registration Depository), which are operated by FINRA, a national securities association registered under the Securities Exchange Act of 1934. The CRD system primarily contains information submitted on uniform broker-dealer and agent registration forms and certain other information related to registration and licensing. The IARD system primarily contains information submitted on uniform investment adviser and agent registration forms and certain other information related to registration and licensing. The information on Uniform Forms filed with the CRD or IARD is deemed to have been filed with each regulator with which the applicant seeks to be registered or licensed and shall be the joint property of the applicant and such regulators. The compilation constituting the CRD database as a whole is the property of FINRA. Neither FINRA nor a participating regulator warrants or guarantees the accuracy or the completeness of the CRD or IARD information. CRD information consists of reportable and non-reportable information.

FINRA operates the CRD system in its capacity as a registered national securities association and pursuant to an agreement with the North American Securities Administrators Association, Inc. (NASAA).

FINRA operates the IARD system as a vendor pursuant to a contract with the Securities and Exchange Commission and undertakings with NASAA and participating state regulators.

**Reportable Information:**  Information that is required to be reported on the current version of the uniform registration forms.

**Non-Reportable Information:**  Information that is not currently reportable on a uniform registration form. Information typically is not reportable because it is out-of-date; it was reported in error; or some change occurred either in the disposition of the underlying event after it was reported or in the question on the form that elicited the information. Although not currently reportable, this information was once reported on a uniform form and, consequently, may have become a state record.  Users of this information should recognize that filers have no obligation to update non-reportable data; accordingly, it may not reflect changes that have occurred since it was reported.

CRD® or IARD(TM) System        Current As Of:   06/17/2020
Snapshot - Individual
CRD® or IARD(TM) System Report provided to:   Tennessee
Request Submitted:   6/18/2020 5:20:12 PM                                    **Page 5 of  129**

---

**Individual    1024868 - BUCK, THOMAS JOSEPH**

**Administrative Information**
**Registrations with Previous Employer(s)**

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|-----------|----------------------|-------------|---------------------|---------------|
| SD | AG | 04/10/2015 | TEMP_WD | 04/09/2015 |
| TN | AG | 07/29/2015 | T_NOREG | |
| TN | AG | 05/04/2015 | TEMP_WD | 04/09/2015 |
| TX | AG | 07/29/2015 | TERMED | 04/09/2015 |
| TX | RA | 07/29/2015 | TERMED | 04/09/2015 |
| VA | AG | 07/29/2015 | T_NOREG | |
| VA | AG | 04/10/2015 | TEMP_WD | 04/09/2015 |
| WA | AG | 07/29/2015 | TERMED | 04/09/2015 |
| WI | AG | 07/29/2015 | TERMED | 06/04/2015 |
| WI | AG | 04/28/2015 | TEMP_WD | 04/09/2015 |

From   10/19/1981  To   03/04/2015   MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED(7691)

**Reason for Termination**        Discharged

**Termination Comment**        CONDUCT INCLUDING FAILING TO DISCUSS SERVICE LEVEL AND PRICING ALTERNATIVES WITH A CUSTOMER, PROVIDING INACCURATE INFORMATION TO FIRM MANAGEMENT DURING ACCOUNT REVIEWS REGARDING THIS ISSUE, MISMARKING BOND CROSS TRADE ORDER TICKETS AS UNSOLICITED, AND PROVIDING INFORMATION TO A CLIENT DURING AN ACTIVE ACCOUNT REVIEW THAT DID NOT CORRESPOND TO THE FIRM'S RECORDS, RESULTING IN MANAGEMENT'S LOSS OF CONFIDENCE.

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|-----------|----------------------|-------------|---------------------|---------------|
| AK | AG | 04/02/2015 | TERMED | 11/09/2005 |
| AL | AG | 04/02/2015 | TERMED | 10/18/1986 |
| AR | AG | 04/02/2015 | TERMED | 10/13/1993 |
| AZ | AG | 04/02/2015 | TERMED | 10/15/1990 |
| BOX | GS | 04/02/2015 | TERMED | 05/14/2012 |
| BOX | SU | 04/02/2015 | TERMED | 05/14/2012 |
| BX | GS | 04/02/2015 | TERMED | 08/16/2011 |
| BX | SU | 04/02/2015 | TERMED | 08/16/2011 |
| CA | AG | 04/02/2015 | TERMED | 07/26/1985 |
| CBOE | GS | 04/02/2015 | TERMED | 03/03/1991 |
| CBOE | SU | 04/02/2015 | TERMED | 04/04/1985 |
| CBOE BYX | GS | 04/02/2015 | TERMED | 05/13/2014 |
| CBOE BZX | GS | 04/02/2015 | TERMED | 05/13/2014 |
| CBOE C2 | GS | 04/02/2015 | TERMED | 05/13/2014 |
| CBOE C2 | SU | 04/02/2015 | TERMED | 05/29/2014 |
| CBOE EDGA | GS | 04/02/2015 | TERMED | 05/13/2014 |
| CBOE EDGA | SU | 04/02/2015 | TERMED | 05/29/2014 |
| CBOE EDGX | GS | 04/02/2015 | TERMED | 05/13/2014 |
| CBOE EDGX | SU | 04/02/2015 | TERMED | 05/29/2014 |
| CO | AG | 04/02/2015 | TERMED | 04/08/1992 |

---

**CRD® or IARD(TM) System Report -- See notice regarding CRD Data on cover page.**

CRD® or IARD(TM) System      Current As Of:   06/17/2020
Snapshot - Individual
CRD® or IARD(TM) System Report provided to:   Tennessee
Request Submitted:   6/18/2020 5:20:12 PM                          Page 17 of 129

---

**Individual      1024868 - BUCK, THOMAS JOSEPH**

**Reportable Events**

**Termination DRP**                              **DRP Version**   05/2009

  6. Comment:

**Filing ID**            38789257                 **Form (Form Version)**   U5 (05/2009)
**Filing Date**          04/02/2015
**Source**               7691 - MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
**Disclosure Questions Answered**      7F(1)

**Termination DRP**                              **DRP Version**   05/2009

  1. Firm name:                  MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

  2. Termination type:           Discharged

  3. Date filed/Explanation:     03/04/2015

  4. Allegation(s):             ALLEGATIONS INCLUDING FAILING TO DISCUSS SERVICE LEVEL AND
                                  PRICING ALTERNATIVES WITH A CUSTOMER, PROVIDING INACCURATE
                                  INFORMATION TO FIRM MANAGEMENT DURING ACCOUNT REVIEWS
                                  REGARDING THIS ISSUE, MISMARKING BOND CROSS TRADE ORDER
                                  TICKETS AS UNSOLICITED, AND PROVIDING INFORMATION TO A CLIENT
                                  DURING AN ACTIVE ACCOUNT REVIEW THAT DID NOT CORRESPOND TO
                                  THE FIRM'S RECORDS.

  5. Product type(s):           No Product

  6. Comment:

**Occurrence#**                    1758169          **Disclosure Type**        Internal Review
**FINRA Public Disclosable**       No               **Reportable**             Yes
**Material Difference in Disclosure**  No

**Filing ID**            52769421                 **Form (Form Version)**   U5 (05/2009)
**Filing Date**          10/23/2019
**Source**               7691 - MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
**Disclosure Questions Answered**      7B

**Internal Review DRP**                          **DRP Version**   05/2009

  **Part I**

  1. Notice received from:       MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

  2. Date initiated/Explanation:   03/03/2015

  3. Details:                    INTERNAL REVIEW INTO CONDUCT INVOLVING: POTENTIAL HIGH-
                                  ACTIVITY BROKERAGE ACCOUNTS ADMINISTERED BY THE REP;
                                  WHETHER THE REPRESENTATIVE DISCUSSED SERVICE LEVEL AND
                                  PRICING ALTERNATIVES FOR BROKERAGE CLIENTS IN A
                                  MANNER CONSISTENT WITH FIRM POLICIES AND SUPERVISORY
                                  DIRECTION REGARDING ACCOUNT SUITABILITY
                                  CONSIDERATIONS; WHETHER REP PROVIDED ACCURATE
                                  INFORMATION IN RESPONSE TO SUPERVISORY REVIEWS OF

---

CRD® or IARD(TM) System        Current As Of:    06/17/2020
Snapshot - Individual
CRD® or IARD(TM) System Report provided to:   Tennessee
Request Submitted:   6/18/2020 5:20:12 PM                                   Page 18 of 129

---

Individual      1024868 - BUCK, THOMAS JOSEPH
**Reportable Events**

**Internal Review DRP**                        DRP Version    05/2009

ACTIVE BROKERAGE ACCOUNTS; WHETHER THE REP PROVIDED CLIENTS WITH TRANSACTIONAL COST INFORMATION IN A MANNER CONSISTENT WITH FIRM RECORDS AND POLICIES; WHETHER THE REP PROCESSED UNAUTHORIZED TRADES; AND WHETHER THE REP ACCURATELY  DESIGNATED CERTAIN ORDER TICKETS AS UNSOLICITED TRADES.

4. Internal review pending:               No

5. Resolution details:

A. Date concluded/ Explanation:        10/10/2019

B. Internal review resolution:         The Firm concluded that client complaints against former financial advisor Thomas Buck (terminated March 4, 2015) had substantial merit. Information adduced during the Firm's internal review was provided to the FINRA enforcement staff in matter 201504474501 (In Re: Thomas Buck).  The matter was closed through a Letter of Acceptance Waiver & Consent dated July 24, 2015 imposing a bar from association with any FINRA member on Mr. Buck.

6. Comment:

**Part II**

Summary:

| | | | |
|---|---|---|---|
| **Occurrence#** | 1766419 | **Disclosure Type** | Customer Complaint |
| **FINRA Public Disclosable** | Yes | **Reportable** | Yes |
| **Material Difference in Disclosure** | No | | |

| | | | |
|---|---|---|---|
| **Filing ID** | 39357045 | **Form (Form Version)** | U4 (05/2009) |
| **Filing Date** | 07/07/2015 | | |
| **Source** | 31194 - RBC CAPITAL MARKETS, LLC | | |
| **Disclosure Questions Answered** | 14I(3)(a) | | |

**Customer Complaint DRP**                      DRP Version    05/2009

1. Customer name(s):                   THOMAS G. SLAMA, TRUSTEE U/A DATED 6/28/2000, MADE BY THOMAS G. SLAMA

2. Residence information:

A. Customer(s) state of residence:     Indiana

B. Other state(s) of  residence/ detail:

3. Employing firm:                     MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

4. Allegation(s):                      THE CUSTOMER ALLEGES UNAUTHORIZED TRADING FROM JANUARY 2012 TO MARCH 2015.

5. Product type(s):                    Equity Listed (Common & Preferred Stock)

6.  Alleged compensatory damage amount:  $0.00

---

**CRD® or IARD(TM) System Report -- See notice regarding CRD Data on cover page.**

# EXHIBIT C

## Summary of Buck's Termination Related Customer Complaints

Source: CRD Snapshot for Thomas J. Buck dated 6/18/2020

| No. | Customer Name | Amount of Claim | Settlement / Award Amount | Date Complaint Received | Date Complaint Resolved | Days to Resolve | Oral or Written Complaint | Arbitration Filed | Allegation |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Sharon Linder | Not specified | $300,000 | 3/11/2015 | 07/01/2015 | 112 | Oral | No | Excessive Trading from August 2010 to March 2015 |
| 2 | Thomas G. Slama, Trustee | Not specified | $100,000 | 3/23/2015 | 05/12/2015 | 50 | Written | No | Unauthorized Trading from January 2012 to March 2015 |
| 3 | Jack J. Hoffman and Patricia Jones, Co-Trustees of the Family Share | Not specified | $210,000 | 4/10/2015 | 07/22/2015 | 103 | Oral | No | Unauthorized Trading from January 2012 to March 2015 |
| 4 | Jim Pearson | Not specified | Denied | 4/10/2015 | 05/06/2015 | 26 | Written | No | Unauthorized trading and misrepresentation from January 2010 to February 2013 |
| 5 | Todd S. Schafer | Not specified | $49,500 | 4/23/2015 | 11/23/2015 | 214 | Written | No | Misrepresentation from May 2011 to March 2015 |
| 6 | Wayne Daege | Not specified | $24,154 | 4/24/2015 | 06/10/2015 | 47 | Oral | No | Unauthorized Trading from July 2014 to March 2015 |
| 7 | Katherine Brentlinger | $125,000 | $140,000 | 4/27/2015 | 07/13/2015 | 77 | Written | No | Through her attorney in fact, alleges excessive trading and unsuitable investment recommendations from January 2006 to March 2015 |
| 8 | Wiley E. & Rita K. Etscheid | Not specified | $275,000 | 5/4/2015 | 07/31/2015 | 88 | Written | No | Misrepresentation, Excessive Trading and Unsuitable Investment Recommendations from February 2009 to March 2015 |
| 9 | John Fehrenbacher | Not specified | $300,000 | 5/13/2015 | 06/05/2015 | 23 | Oral | No | Unauthorized Trading from January 2012 to March 2015 |
| 10 | Patricia Jones | Not specified | $60,000 | 5/19/2015 | 06/22/2015 | 34 | Oral | No | Unauthorized Trading on February 3, 2015 |
| 11 | Mary Ann Wagner | Not specified | $30,291 | 5/29/2015 | 06/15/2015 | 17 | Written | No | Misrepresentation regarding commissions from January 2012 to December 2014 |
| 12 | Richard Wagner | Not specified | $5,191 | 5/29/2015 | 06/16/2015 | 18 | Written | No | Misrepresentation regarding commissions from January 2012 to December 2014 |
| 13 | James R. & Sharon E. Baumgardt | Not specified | $600,000 | 6/1/2015 | 09/18/2015 | 109 | Written | No | Unauthorized Trading and Misrepresentation from January 2010 to March 2015 |
| 14 | Janice J. Compton | Not specified | Pending | 6/5/2015 | - | - | Written | Yes* | Unauthorized Trading, Misrepresentation and Omission of Material Facts, Excessive Trading and Unsuitable Investment Recommendations from August 2009 to March 2015. |
| 15 | Debra L. Kelleher, Trustee | Not specified | $35,000 | 6/26/2015 | 08/28/2015 | 63 | Written | No | Misrepresentation regarding commissions from January 2013 to March 2015 |
| 16 | Jill Y. Fogelsong | Not specified | $8,600 | 7/7/2015 | 07/24/2015 | 17 | Written | No | Misrepresentation regarding fees and commissions from January 2011 to March 2015 |
| 17 | Joseph L. Mark, Trustee | Not specified | $719,014 | 7/7/2015 | 09/15/2015 | 70 | Oral | No | Misrepresentation regarding commissions charged from January 2009 to March 2015 |
| 18 | William Fehribach | $400,000 | $400,000 | 7/22/2015 | 09/22/2015 | 62 | Oral | No | Excessive Trading from December 2009 to March 2015 |
| 19 | Susan Miller Hall | Not specified | $60,000 | 7/29/2015 | 08/24/2015 | 26 | Oral | No | Unauthorized Trading in October 2014 |
| 20 | Elliot Hillary & Pamela Cousins, Trustees of Family Revocable Trust | $114,787 | $75,000 | 8/4/2015 | 08/14/2015 | 10 | Written | No | Unauthorized Trading from August 2012 to December 2012 |
| 21 | Performance Services, Inc. | Not specified | $105,000 | 8/11/2015 | 10/02/2015 | 52 | Oral | No | Failure to allow instructions from September 2014 to March 2015 |
| 22 | Christopher & Sara Wirthwein | Not specified | $34,195 | 8/12/2015 | 08/21/2015 | 9 | Oral | No | Unauthorized Trading from July 2014 to March 2015 |

## Summary of Buck's Termination Related Customer Complaints
### Source: CRD Snapshot for Thomas J. Buck dated 6/18/2020

| No. | Customer Name | Amount of Claim | Settlement / Award Amount | Date Complaint Received | Date Complaint Resolved | Days to Resolve | Oral or Written Complaint | Arbitration Filed | Allegation |
|---|---|---|---|---|---|---|---|---|---|
| 23 | Deborah Bojrab | Not specified | $15,444 | 8/24/2015 | 09/14/2015 | 21 | Written | No | Misrepresentation regarding commissions from January 2012 to March 2015 |
| 24 | James Beeson | Not specified | $31,103 | 8/24/2015 | 09/11/2015 | 18 | Oral | No | Misrepresentation and Omission of Material Facts from April 2013 to March 2015 |
| 25 | Timothy S. & Debra K. Schafer | $565,000 | $565,000 | 10/15/2015 | 11/23/2015 | 39 | Written | No | Misrepresentation from May 2011 to March 2015 |
| 26 | Timothy S. Schafer | $39,000 | $39,000 | 10/15/2015 | 11/23/2015 | 39 | Written | No | Misrepresentation from May 2011 to March 2015 |
| 27 | Robert Compton | $425,000 | $135,000 | 11/17/2015 | 05/09/2016 | 174 | Written | No | Misrepresentation and Omission of Material Facts and unsuitable investment recommendations from February 2000 to March 2015 |
| 28 | Debra Adair | Not specified | $16,305 | 12/11/2015 | 01/15/2016 | 35 | Written | No | Excessive trading from January 2012 to March 2015 |
| 29 | Peggy Bell | $125,000 | $56,953 | 1/27/2016 | 03/23/2016 | 56 | Written | No | Misrepresentation and omission of material facts regarding fees and commissions and unsuitable investment recommendations from December 2011 to March 2015. |
| 30 | Robert W. Elzer & Michael A. Rasor, Trustees, made by Bemas Downing | $950,000 | $430,000 | 1/28/2016 | 01/04/2017 | 342 | Written | No | Misrepresentation and omission of material facts from January 2010 to March 2015 |
| 31 | Amanda M. Wagner | Not specified | $69,661 | 2/2/2016 | 11/23/2016 | 295 | Written | No | Unauthorized trading, excessive trading and misrepresentation and omission of material facts from January 2009 to March 2015. |
| 32 | Matthew Caito | Not specified | Settled | 2/2/2016 | 11/23/2016 | 295 | Written | No | Unauthorized trading, excessive trading and misrepresentation and omission of material facts from January 2009 to March 2015. |
| 33 | Melissa A. Caito | Not specified | Settled | 2/2/2016 | 11/23/2016 | 295 | Written | No | Unauthorized trading, excessive trading and misrepresentation and omission of material facts from January 2009 to March 2015. |
| 34 | Philip J. Caito IV and Roberts Ruth Caito | Not specified | $395,339 | 2/2/2016 | 11/23/2016 | 295 | Written | No | Unauthorized trading, excessive trading and misrepresentation and omission of material facts from January 2009 to March 2015. |
| 35 | Roberta A. Caito | Not specified | Settled | 2/2/2016 | 11/23/2016 | 295 | Written | No | Unauthorized trading, excessive trading and misrepresentation and omission of material facts from January 2009 to March 2015. |
| 36 | Nancy J. Sunderwirth | Not specified | $88,202 | 10/16/2017 | 12/29/2017 | 74 | Written | No | Excessive trading from December 2011 to February 2015 |

* Updated to reflect filing of the Statement of Claim on 7/31/2020

# EXHIBIT D

**To:** rcompto1@comcast.net[rcompto1@comcast.net]
**From:** Bob Compton[bcompton56@gmail.com]
**Sent:** Mon 3/23/2009 1:11:17 PM (UTC-05:00)
**Subject:** Re: Regions Bank account

I'm very sad to hear about Ms. Harless. When will the service be held? Count me in for whatever you want to give as a remembrance of her.

Splitting our assets should make you more comfortable than not. This way you will have 50% of all our income to spend anyway you want after joint expenses. And if I waste money on stupid projects - which I often do - you can be comfortable that I'm not wasting your money.

On that topic: I am making 2 investments this month out of our joint funds - $61,000 into Baggott's Compendium Software and $100,000 in Active Implants - the polymer device company here in Memphis where Rick Treharne works. If you do not want to make these investments, I will cover both out of my half of our money.

Tom Buck is a very good, conservative money manager. He can advise you if you want to change asset allocations post-split. I'm looking into "tax loss harvesting" with Tom and Sandra and anything I do of course you can do as well. We will have capital gains of almost 100% on ExactTarget stock so we can shelter those taxes without much change to either of our portfolios.

I will also create a monthly joint expense budget that we can even up at the end of each month.

Bob

On Mon, Mar 23, 2009 at 1:00 PM, <rcompto1@comcast.net> wrote:

I just got the word Mrs.Harless died. This is very sad to me and will be to the girls. Nancy and I had lunch with her about a month ago and I gave her Elizabeth's songs. We will be going to the services this week. I wanted to get back to you on your emails about splitting accounts.

I am working toward getting comfortable with your solution and am trying to wrap my head around it. I got the form from Tom's office.

I will just need a few more days to think about it.

Thank you.

Janice
----- Original Message -----
From: "Bob Compton" <bcompton56@gmail.com>
To: rcompto1@comcast.net
Sent: Sunday, March 22, 2009 7:09:49 PM GMT -06:00 US/Canada Central
Subject: Regions Bank account

I will meet with Regions tomorrow to take my name off your accout.
I'll wire money in from Merrill to make the amount equal to Paragon.
You will have about $200K to start.

I will stop using Regions checking, savings and ATM - that will be
your money. You will have the checks and the ATM and you can still pay
your GM credit card as u always have.

I'll switch my credit cards to Paragon.

I'm meeting with Tom Buck on Tues when I am in Indy to start the
process if splitting the income producing assets.

Once you have your own ML account u and Tom can discuss what u want to do with your assets.

Is that satisfactory to you at this point?

Bob

Sent from my iPhone


--
Bob Compton, Founder & Chairman
VONTOO VOICE MESSAGING
www.vontoo.com

VONTOO - America's Most Sought After Company For:
1- Increasing Sales
2- Accelerating Cash Collections
3- Radically Reducing Direct Mail Costs
4- Retaining Customer Loyalty

# EXHIBIT E

November 30, 2017

The Honorable Tanya Walton Pratt
U.S. District Judge, Southern District of Indiana
U.S. District Court
46 East Ohio Street
Indianapolis, IN 46204


Your Honor,

Thank you in advance for taking the time to read my impact statement.
I hope my words can adequately convey the deep feelings of anger, hurt
and violation that my daughters and I have toward Tom Buck.

2034 Days.  That was the amount of time Tom Buck managed my
accounts.
For each one of those 2034 days, he made a moral choice as what
actions he took as my investment advisor.  With a degree in economics,
a MBA in finance, years of investment training, industry certifications,
and years of experience, Tom was fully equipped to advise his clients in
a positive and productive way.

Tom also was fully aware of the legal obligations he had.

Unfortunately for me, Tom chose to take advantage of my personal
situations and my lack of investment knowledge.  He purposefully
elected to buy, sell and then repurchase various investment products
with high commissions with the express purpose of generating fees for
himself.

When I received the call from Merrill Lynch in March 2015 informing
me that Tom Buck was fired from his job, I was sick to my stomach.  I
felt so bad for him and his family.  I knew there must be some mistake.
Our families were friends as well as neighbors.  My daughters were
close friends with his daughters.  Surely, the rumors about Tom were
not true.  This is someone I trusted.

It never occurred to me that his firing had anything to do with me. Surely he would not have done anything that would hurt me intentionally.

Every call from Tom Buck would start the same way. I would ask, "How are you?" And he would answer, "Well, I'm just sitting here looking at how great your accounts are doing." Then we would talk about what his daughters and wife were doing and I'd update him on what my daughters were up to. Only after that discussion would he discuss the next purchases and sales he wanted to make with my accounts. We never discussed anything regarding the risk of the trades or the commission involved. Why would I question the actions of someone who had been doing this for so long and with such success?

But within days of his firing, several internet articles speculating on his removal began to appear. These articles all indicated that Tom was fired for not offering customers the option of a fee account instead of a commissions based account for the trades he executed for clients. There was also concern that he made unauthorized trades in accounts without customers' permission.

Then I started getting sick to my stomach because I feared that what was speculated about actually happened to me.

My history with Tom goes back to 1990, when we moved in a house across the street from the Bucks. We had our daughters in 1992 and 1994 and heard that our neighbors, the Bucks, had girls that were born around the same time. The girls spent a lot of time playing together and quickly became close friends. Our families also became close –eating dinner together, taking our girls to events and even going a trip together. The Bucks were always so supportive when my youngest daughter had medical procedures for her clubfeet and again later when my eldest was diagnosed with Type 1 diabetes in 2004.

In 1998, we moved to Memphis, TN., but kept in touch with the Bucks and visited them whenever we came back to Indianapolis to see family. The girls would even spend the night at the Buck's home while we were home.

In 2000, my husband set up a family account with Tom.  The account was set up in my husband's name and I was not involved with any account planning, discussions nor was involved with any account reviews.

In 2006, we took a family trip with the Bucks.  Tom got to see firsthand what my eldest daughter went through to check her blood sugar several times a day and then give herself a shot after she ate.  He saw what she went through when her blood sugar would go high or when it went low. He knew that Type 1 diabetics have significant health care costs and she will most certainly face future health issues.

Prior to 2009, my husband asked me for a divorce.  In March of 2009, on the direction on my husband, Tom's assistant sent me a one-page document to sign in order to set-up a Merrill Lynch account in my name. I signed it and sent it back.  I was not sent any other new account information or given any account options.

By August 2009, my husband had transferred part of the family account to my new account.   Then Tom began trading my account. Tom and I had no discussion of fee options, various account options, advisor roles and responsibilities and investor responsibilities.  Nothing.  There were no account meetings or reviews until my divorce was final in June 2011.

At the end of July 2011, I met with Tom for the first time.  I asked Tom specifically (because my accountant asked me to ask him) why I wasn't on a fee account and he replied,  "Merrill Lynch has people looking at this all the time and no, a commission based account is better for you".  I asked again in September 2012 and got the same response from Tom.

During those 2034 days in which Tom "managed" my accounts, approximately 1100 trades took place and over 450 of those trades were unauthorized.  Once I became aware of what had gone on in my

accounts in March 2015, I began to educate myself on the investment process and researched in detail on the types of things he bought and sold.

I cannot adequately describe the feeling of betrayal by what Tom did to me.
I couldn't believe it at first and was terribly embarrassed that this happened.
I felt so stupid for not knowing the rules of investing, for not understanding the investments and for believing Tom in the first place.
I couldn't understand (and still don't understand) how Tom could have done that to me as well as to my daughters.

If Tom had needed the money to pay for some medical bills for his wife or his daughters, I would have gladly given him the money.

But the money wasn't for that.  I guess it was for his lavish lifestyle—the two oceanfront condos, his custom built home, the worldwide family vacations, the luxury cars, the home for a daughter while she was in college or premium Indianapolis 500 tickets purchased every year.

Tom's actions did not occur just one time.  They occurred from August 2009 thru March 2015.  This was deliberate.  This was intentional.  I think he   selected clients like me who fit a certain demographic –clients uneducated in investments, or who were trusting of their advisor or who were worried about other personal situations.

I truly believe Tom's trading behavior would have continued if he hadn't been caught.  A Reuters article October 31, 2017, quoted Tom's attorney commenting on the treatment of clients by saying ,  "This was not a case where all of his clients were on the Titanic.  They were on the Queen Mary.  They had an excellent voyage, and were overbilled for their rooms.".  I couldn't believe what I was reading.  This wasn't a billing error.  This was a five-year plan to purposefully steal from clients.

Make no mistake about it, there were financial losses.  I am still in settlement discussions with Merrill Lynch. We still are assessing the effect of Tom's trades on my accounts.  The financial losses were not just from commission "overcharges".  Trades were made that were

unsuitable and risky and were clearly traded for the fees Tom would receive.  What I do know is that my investments would look very different today had they been invested appropriately and not been churned to generate fees.

But equally as important as the money that was taken, where is Tom Buck's remorse?  I have yet to hear or see any kind of apology from Tom Buck.  Even after getting fired from Merrill Lynch and banned by the industry FINRA, his lifestyle has not changed.

I realize that I have not suffered any physical loss or damage that has impacted my life.  But he violated the trust between an investment advisor
and a client. He also violated our family's friendship.  When I think back to all the times we were with the Bucks and he was actively taking money from my accounts-- when we attended his daughter's wedding, or when we went to another daughter's dance competition, or when we visited them in Indianapolis, it makes me sick.

It should not matter whether someone has lost $1000 or $10 million dollars, what Tom did was illegal as well as immoral.   His attorney also indicated in the same article that "he would seek probation for Tom" for what he did.  I do not understand how living in an oceanfront condo would help Tom Buck fully understand what financial damage he caused and what pain he alone caused to so many people.

Thank you again for your time.

Janice J. Compton

# EXHIBIT F

**Sealed**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

*FILED*

SEP 0 6 2017

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| V. | ) | CAUSE NO. |
| | ) | |
| THOMAS J. BUCK, | ) | |
| | ) | **1:17** -cr- **0172** TWP -TAB |
| *Defendant.* | ) | |

## INFORMATION

The United States Attorney charges that:

### COUNT ONE
**(Securities Fraud)**
**[Title 18, United States Code, Section 1348]**

### Background

At times material to this Information:

#### *Relevant Persons and Entities*

1.    The defendant THOMAS J. BUCK, a resident of Carmel, Indiana, was a registered financial advisor employed by Merrill Lynch, Pierce, Fenner & Smith, Incorporated, now a division of Bank of America ("Merrill Lynch"), a global investment firm, from approximately October 1981 until March 2015 when he was terminated for cause.   In this capacity, BUCK counseled thousands of clients of Merrill Lynch, including Clients A, B, and C, on how to manage and invest their money, including advising clients on the buying and selling of particular securities registered on national exchanges, specifically, among others, AbbVie Inc.,

1

Ford Motor Company, General Electric Company, Intel Corporation, Medtronic, Inc., all of which are issuers with a class of securities registered under Section 12 of the Securities Exchange Act of 1934.

2.     Merrill Lynch was a broker-dealer registered with the United States Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority, Inc. (FINRA), with an office in Carmel, Indiana, among other places across the country.

3.     BUCK was the leader a team with two other financial advisers, four or five registered investment advisors, seven or eight registered client advisors, and one non-registered client advisor under the designations "The Buck Group" and "The Buck Team" (The Buck Group).  During approximately January 2012 through March 2015, the Buck Group's customer base comprised approximately 800 households with more than 3,000 customer accounts and approximately $1.3 billion assets under management at or near the time of BUCK's termination from employment.

### *Merrill Lynch's Cost Structures*

4.     BUCK offered The Buck Group's services to clients through Merrill Lynch's cost structures.  In general, Merrill Lynch clients are offered commission and fee-based cost options, among others.

     a.     The ***commission-based option*** charged clients an amount of money for each transaction made on the client's account, such as buying and selling securities. Thus with limited exceptions, the number and size of transactions completed directly affected the commissions yielded.

b.      The *fee-based option* charged clients a set percentage of the client's total assets under management at Merrill Lynch regardless of the number and dollar value of transactions made on their account.   The fee could range as high as 2.75%.   The specific percentage within that range for a given client depended on the client's total assets under management, the type of securities in the account, and negotiations between the client and the financial adviser.

5.      Commissions have been the traditional cost structure in the financial advising industry.   In recent years, however, the industry has offered clients a fee-based alternative in part because such an alternative may be cheaper for the client.   To that end, Merrill Lynch had encouraged its financial advisers, including BUCK, to evaluate whether a fee-based alternative might be appropriate for their clients, particularly by informing clients about the amounts they paid annually in commissions, comparing those amounts to what clients would have paid under a fee-based alternative, and encouraging clients to choose the lowest cost option consistent with their investment objectives.

6.      Accordingly, in recent years, approximately 70% of all revenue from Merrill Lynch's Indiana-based financial advisers came from clients on a fee-based cost platform. However, during the same period, approximately 80% of the revenue from BUCK's clients still came from commissions.

### *BUCK's Compensation*

7.      Merrill Lynch paid its financial advisers, including BUCK, a portion of the revenue generated from clients' accounts, which was largely made up of the commissions and

3

fees that clients paid.   In general, the more revenue that a financial adviser generated, whether from commissions or fees, the greater that adviser's compensation.

### Rules and Compliance Systems

8.   Risk Management System ("RMS").   Merrill Lynch employed internal security measures to monitor the activity of its representatives and brokers, including measures to ensure clients were not being overcharged.   Merrill Lynch's Risk Management System ("RMS") was one such measure.   The RMS was an internal, largely automated electronic communications system that analyzes, among other things, the production credits that Merrill Lynch advisors were being awarded over a period of time (usually one year).   Commissions paid by individual clients were one subset of these production credits.   If the RMS determined that the annual production credits exceeded certain thresholds, then a Merrill Lynch compliance professional responsible for internal supervisory monitoring functions would notify the client's financial adviser and require the financial adviser to explain the apparently high production credits paid by the client and confirm that the client has been informed of any available lower-cost options, such as using a fee-based cost structure as opposed to commissions, and has rejected those options.

9.   Prohibition on "Discretion."   It was against New York Stock Exchange (NYSE) Rule 408 and a violation of Merrill Lynch policy for a registered financial advisor to exercise discretion in a non-discretionary customer account.   Accordingly, Merrill Lynch required that its financial advisers obtain client consent for each trade.

4

### The Scheme to Defraud

#### *Overview of the Scheme*

10.     Beginning in or before 2012, the exact being unknown, through March 2015, BUCK devised, intended to devise, and executed a scheme to defraud by overcharging certain clients for his financial advising services and misleading those clients, Merrill Lynch, and its compliance systems regarding those overcharges by concealing the overcharges.   The object of the scheme was to generate increased revenues from clients, which in turn increased his personal compensation and professional reputation.

#### *Manner and Means*

11.     As part of the scheme to defraud, in violation of NYSE Rule 408 and Merrill Lynch policy, BUCK exercised discretion when placing certain trades on certain client accounts without obtaining authorization from the client.   As a result, certain clients on a commission-based cost platform, which comprised 80% of BUCK's clients, paid commissions on these trades.

12.     As further part of the scheme to defraud, BUCK made false and materially misleading representations to his clients about the total amount the clients were paying Merrill Lynch in annual commissions.

13.     As further part of the scheme to defraud, BUCK intentionally failed to inform certain clients that a fee-based option was available, and that the fee-based option could be cheaper than the commissions the client was paying.

14.     As further part of the scheme to defraud, and to mislead Merrill Lynch regarding the overcharging of his clients, BUCK made or caused to be made false and materially

5

misleading statements to Merrill Lynch in response to inquiries by the RMS. On numerous occasions and related to numerous investor client accounts, after receiving a notice from the RMS that a client's account had excessively high production credit velocity during the prior year, BUCK informed or caused a member of his staff to inform Merrill Lynch's compliance managers in writing that he made his clients aware of the cheaper fee-based option, and that the clients intentionally opted to keep their accounts in the commission-based cost structure, when in fact, as BUCK well knew, he did none of this.

## CLIENT A

A. For example, on or about September 16, 2014 and again on or about December 31, 2014, Merrill Lynch's RMS identified a commission-based account of Client A that had excessive production credit velocity during the prior year. Specifically, the RMS noted that a commission based account of Client A had a production credit velocity that equaled approximately 4.39% of Client A's assets in that account during the prior year. Merrill Lynch compliance personnel notified BUCK of this fact and inquired why the account had not been moved to the cheaper fee-based cost structure. On or about January 26, 2015, BUCK instructed a client associate to reply to Merrill Lynch compliance personnel that the client's portfolio was reviewed with the client on or about January 20, 2015 and that BUCK had discussed a fee-based option during previous reviews. This statement, for example, was materially misleading however because as BUCK well knew, BUCK failed to discuss the fee-based option with Client A as he had represented to Merrill Lynch compliance personnel.

6

B.     During the applicable time, BUCK caused trades of publicly traded stocks over the national exchange within Client A's accounts, including:

| DATE OF TRADE | TRADE DESCRIPTION | PUBLICLY-TRADED STOCK | QUANTITY |
|---|---|---|---|
| 01/16/15 | Sell | ABBVIE INC. | 2,000 |
| 02/13/15 | Buy | FORD MOTOR COMPANY | 5,000 |

**CLIENT B**

C.     As another example, on or about August 29, 2014 and again on or about September 16, 2014, Merrill Lynch's RMS identified a commission-based account of Client B that had excessive production credit velocity during the prior year.   Specifically, the RMS noted that the production credit velocity for a given account of Client B equaled approximately 3.82% of the assets in that account during the prior year.   Merrill Lynch compliance personnel notified BUCK of this fact and inquired why the account had not been moved to the cheaper fee-based cost structure.   On or about September 19, 2014, BUCK instructed a client associate to reply to Merrill Lynch compliance personnel that the account was reviewed with the client on or about September 4, 2014, that BUCK had discussed the fee-based option in the past, and that the client was not interested in at the time.   This statement was materially misleading, however, because as BUCK well knew, he had not discussed the fee-based option with Client B as he had represented to Merrill Lynch compliance personnel.

7

D. During the applicable time, BUCK caused trades of publicly traded stocks over the national exchange within Client B's accounts, including:

| DATE OF TRADE | TRADE DESCRIPTION | PUBLICLY-TRADED STOCK | QUANTITY |
|---|---|---|---|
| 01/12/15 | Sell | ABBVIE INC. | 500 |
| 02/03/15 | Buy | GENERAL ELECTRIC COMPANY | 1,000 |

**CLIENT C**

E    As a final example, on or about June 30, 2014 and again on or about July 9, 2014, Merrill Lynch's RMS identified a commission-based account of Client C, as described above, that had excessive production credit velocity during the prior year.   Specifically, the RMS noted that Client C's account had production credit velocity that equaled approximately 3.09% of the assets in that account during the prior year.   Merrill Lynch compliance personnel notified BUCK of this fact and inquired why the account had not been moved to the cheaper fee-based cost structure.   On or about July 11, 2014, BUCK instructed a client associate to reply to Merrill Lynch compliance personnel that the account was reviewed with the client on or about May 12, 2014, that BUCK had discussed the fee-based option with the client in the past, and that the client was not interested in at the time.   This statement was materially misleading, however, because as BUCK well knew, he had not discussed the fee-based option with Client C as he had represented to Merrill Lynch compliance personnel.

8

F.    During the applicable time, BUCK caused trades of publicly traded stocks over the national exchange within Client C's accounts, including:

| DATE OF TRADE | TRADE DESCRIPTION | PUBLICLY-TRADED STOCK | QUANTITY |
|---|---|---|---|
| 11/11/14 | Buy | INTEL CORPORATION | 1,200 |
| 01/20/15 | Buy | MEDTRONIC, INC. | 400 |

### The Charge

15.    Paragraphs 1 through 14, above, are incorporated fully herein by reference.

16.    Beginning in or before 2012, and continuing until in or around March 2015, in Carmel, Indiana, which is in the Southern District of Indiana, and elsewhere, the Defendant,

**THOMAS J. BUCK,**

did knowingly and intentionally execute, and attempted to execute, a scheme and artifice to defraud, and to obtain, by means of materially false or fraudulent pretenses, representatives, promises, and omissions, money or property in connection with the purchase and sale of securities on or about the dates described above of AbbVie Inc., Ford Motor Company, General Electric Company, Intel Corporation, and Medtronic, Inc., among others, all of which were issuers with a class of securities registered under Section 12 of the Securities Exchange Act of 1934.

All of which is in violation of Title 18, United States Code, Section 1348.

JOSH J. MINKLER
United States Attorney
Southern District of Indiana

9

STATE OF INDIANA )
)    SS:
COUNTY OF MARION )

Cynthia J. Ridgeway, being first duly sworn, upon her oath deposes and says that she is an Assistant United States Attorney in and for the Southern District of Indiana, that she makes this affidavit for and on behalf of the United States of America and that the allegations in the foregoing Information are true as she is informed and verily believes.

Cynthia J. Ridgeway
Assistant United States Attorney

Subscribed and sworn to before me, a notary public, on this 6th day of September, 2017.

Guey Jen Yang
Notary Public

My Commission Expires:

June 27, 2022

My County of Residence:

Hendricks

10

# EXHIBIT G

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cr-00172-TWP-TAB |
| | ) | |
| THOMAS J. BUCK, | ) | -01 |
| | ) | |
| Defendant. | ) | |

## ENTRY FOR JANUARY 18, 2018
## THE HONORABLE TANYA WALTON PRATT

The Government appeared by Nicholas J. Linder, Assistant United States Attorney. The Defendant appeared in person, and by retained counsel Anthony Seaton Ridolfo, Jr. and Robert W. Hammerle. Travis Bartelson attended as agent for the Government. David Moxley was the Court Reporter. Parties appeared for hearing on Defendant's Petition to Enter a Plea of Guilty at the Indianapolis Courthouse.

The Defendant was sworn. The Court advised Defendant of his rights. The Court inquired of the Defendant whether the Defendant understood the rights that the Defendant would relinquish if the Court accepted the plea of guilty and the Defendant responded affirmatively. A factual basis was accepted. The Court found the Defendant was fully competent and able to enter an informed plea, the Defendant's plea was made knowingly and voluntarily, the plea was supported by an independent basis in fact containing each of the essential elements of the offense charged. Defendant's Plea Agreement was accepted by the Court pursuant to the Federal Rules of Criminal Procedure 11(c)(1)(B) and 11(c)(1)(C) and Defendant was adjudged guilty of Count 1 Securities Fraud as charged in the Information.

Sentencing remains scheduled to commence on April 12, 2018 at 9:00 a.m. in Courtroom

344, Birch Bayh Federal Building and U.S. Courthouse, Indianapolis, Indiana.

Date: 1/19/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Robert W. Hammerle
HACKMAN HULETT LLP
rhammerle@hhlaw-in.com

Steven T. Henke
HACKMAN HULETT LLP
shenke@hhlaw-in.com

Nicholas J. Linder
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
nick.linder@usdoj.gov

Cynthia J. Ridgeway
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
cynthia.ridgeway@usdoj.gov

Anthony Seaton Ridolfo, Jr.
HACKMAN HULETT LLP
aridolfo@hhlaw-in.com

David E. Robbins
KAUFMANN GILDIN ROBBINS LLP
767 Third Avenue, 30th Floor
New York, NY 10017

Timothy Knoll Ryan
HACKMAN HULETT LLP
tryan@hhlaw-in.com

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cr-00172-JRS-TAB |
| | ) | |
| THOMAS J. BUCK, | ) | -01 |
| | ) | |
| Defendant. | ) | |

### ENTRY FOR FEBRUARY 13, 2019

On this date, Defendant Thomas Buck appeared in person and by counsel, Robert Hammerle, Anthony Ridolfo, Steven Henke, Timothy Ryan, and David Robbins, for an evidentiary and sentencing hearing. The Government appeared by counsel, Cynthia Ridgeway and Nicholas Linder, with its investigative agent Travis Bartelson. La Tia Dowdell appeared on behalf of the United States Probation Office. The hearing was recorded by Court Reporter, David Moxley.

An evidentiary hearing was held. Government exhibits 1 through 20 were admitted into the record without objection. Defendant's exhibits A through C were admitted into the record without objection. The following witnesses were sworn, examined, cross-examined and in some cases reexamined: Peter Malafronte, Adam Berry, and Ross Tulman. The Court sustained Defendant's objection to the PSR's finding that the offense involved sophisticated means, *see* USSG § 2B1.1(b)(10)(C), and overruled Defendant's objection to the PSR's finding that the loss was more than $1,500,000, *see* USSG § 2B1.1(b)(1).

The parties were heard with respect to the sentence and application of the Sentencing Guidelines.

==Pursuant to the Sentencing Reform Act of 1984, Sentence was imposed as stated on the record,== including:

- <u>Special Assessment:</u>  $100.00
- <u>==Incarceration:  40 months.==</u>  The Court recommends placement at a facility closest to Indianapolis, IN with the lowest applicable security level possible.
- <u>Supervised Release:</u>  2 years.
- <u>Community Service:</u>  200 hours, to be completed during supervised release.

The Court followed the Government's request to not impose any restitution, since any restitution would merely offset the disgorgement portion including interest; namely, $2,858,043.01, of the Seizure Amount of $5,091,637.14 already in the hands of the Government as ordered in the Final Judgment of this Court in the Securities and Exchange Commission's civil case against the Defendant.

By reference to the PSR, and after the Defendant waived formal reading, the Court advised the Defendant that while he is on supervised release, he is to comply with the following conditions:

- You shall report to the probation office in the judicial district to which you are released within 72 hours of release from the custody of the Bureau of Prisons.
- You shall report to the probation officer in a manner and frequency directed by the court or probation officer.
- You shall permit a probation officer to visit you at a reasonable time at home, or another place where the officer may legitimately enter by right or consent, and shall permit confiscation of any contraband observed in plain view of the probation officer.
- You shall not knowingly leave the judicial district without the permission of the court or probation officer.
- You shall answer truthfully the inquiries by the probation officer, subject to your 5th amendment privilege.

- You shall not meet, communicate, or otherwise interact with a person you know to be engaged, or planning to be engaged, in criminal activity. You shall report any contact with persons you know to be convicted felons to your probation officer within 72 hours of contact.
- You shall reside at a location approved by the probation officer and shall notify the probation officer at least 72 hours prior to any planned change in place or circumstances of residence or employment (including, but not limited to, changes in who lives there, job positions, job responsibilities). When prior notification is not possible, you shall notify the probation officer within 72 hours of the change.
- You shall not own, possess, or have access to a firearm, ammunition, destructive device or dangerous weapon.
- You shall notify the probation officer within 72 hours of being arrested, charged, or questioned by a law enforcement officer.
- You shall maintain lawful full time employment, unless excused by the probation officer for schooling, vocational training, or other reasons that prevent lawful employment
- You shall make a good faith effort to following instructions of the probation officer necessary to ensure compliance with the conditions of supervision.
- You shall provide the probation officer access to any requested financial information and shall authorize the release of that information to the U.S. Attorney's Office for use in connection with the collection of any outstanding fines and/or restitution.
- You shall not incur new credit charges or open additional lines of credit without the approval of the probation officer.
- You shall not engage in an occupation, business, profession or volunteer activity which would require or enable you to engage in fiduciary responsibilities during the term of supervision without prior approval of the probation officer.
- You shall complete 200 hours of community service within 24 months. The probation officer shall supervise the participation in the program by approving the program (agency, location, frequency of participating, etc.) You shall provide written verification of completed hours to the probation officer.
- You shall have no contact (direct or indirect) with Merrill Lynch / Bank of America employees, current or former, except for family members and those pre-approved in writing by the probation officer.

The Defendant shall pay to the United States a special assessment of $100.

Payment of the special assessment shall be due immediately and is to be made directly to the Clerk, U.S. District Court.

The proceedings were adjourned.

Date: 2/15/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Robert W. Hammerle
HACKMAN HULETT LLP
rhammerle@hhlaw-in.com

Steven T. Henke
HACKMAN HULETT LLP
shenke@hhlaw-in.com

Nicholas J. Linder
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
nick.linder@usdoj.gov

Cynthia J. Ridgeway
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
cynthia.ridgeway@usdoj.gov

Anthony Seaton Ridolfo, Jr.
HACKMAN HULETT LLP
aridolfo@hhlaw-in.com

David E. Robbins
KAUFMANN GILDIN ROBBINS LLP
drobbins@kaufmanngildin.com

Timothy Knoll Ryan
HACKMAN HULETT LLP
tryan@hhlaw-in.com

AO 245B(Rev. 02/16) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Southern District of Indiana

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | Case Number: 1:17CR00172-001<br>USM Number: 15989-028 |
| THOMAS J. BUCK | Robert W. Hammerle |
| | Defendant's Attorney |

**THE DEFENDANT:**

☒ pleaded guilty to count 1

☐ pleaded nolo contendere to count(s) which was accepted by the court.

☐ was found guilty on count(s) after a plea of not guilty

The defendant is adjudicated guilty of these offense(s):

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1348 | Securities Fraud | March 31, 2015 | 1 |

     The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) dismissed on the motion of the United States.

     **IT IS ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

February 13, 2019

Date of Imposition of Sentence:

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Date: 2/15/2019

A CERTIFIED TRUE COPY
Laura A. Briggs, Clerk
U.S. District Court
Southern District of Indiana

By
Deputy Clerk

DEFENDANT: Thomas J. Buck
CASE NUMBER: 1:17CR00172-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **40 months.**

☒The Court makes the following recommendations to the Bureau of Prisons: Designation to a facility as close as possible to Indianapolis, Indiana, with the lowest security level possible.

☐The defendant is remanded to the custody of the United States Marshal.

☐The defendant shall surrender to the United States Marshal for this district:

    ☐ at

    ☐ as notified by the United States Marshal.

☒The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on

    ☐ as notified by the United States Marshal.

    ☒ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant was delivered on _____ to _____
at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

BY: _____
DEPUTY UNITED STATES MARSHAL

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CAUSE NO. 1:17-cr-00172-JRS-TAB |
| THOMAS J. BUCK, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through the undersigned attorneys, hereby submits its Sentencing Memorandum in support of a Guidelines sentence of **78 months of imprisonment**.

## I. INTRODUCTION

The Defendant was a revered, veteran wealth management and financial advisor. During his over three decades with Merrill Lynch, one of the world's most recognizable financial services firms, he cultivated personal relationships with hundreds of clients. His clients believed that he always put their interests first. They gave him their hard-earned money – sometimes millions of dollars each – and trusted that he would advise them how to invest it wisely. The fact that they trusted him made sense. For many clients, he had advised them – and oftentimes their parents and relatives too – for years. And, he was good at his job. Year after year, he was Indiana's highest-grossing financial advisor. In short, over his 30-plus-year career, the Defendant had earned his clients' trust.

Or so it seemed. What his clients did not know was that, near the end of his career, he had started lying and stealing from them. He lied about how much they were paying in commissions, he increased those commissions by making trades that clients did not authorize, and he

intentionally failed to offer them cheaper options for paying for his services, all while Merrill Lynch notified him again and again that clients seemed to be paying too much in commissions. But, like the clients, Merrill Lynch did not know the Defendant was stealing, not until clients had already lost millions. That is because the Defendant lied to Merrill Lynch too. The firm's compliance personnel contacted the Defendant repeatedly about clients paying too much, and each time, the Defendant lied and concealed the fact that he had hatched a scheme to keep his clients paying more than they should have. In short, the Defendant exploited that trust he had earned for his own personal gain. And, in light of the fact that he was a multi-millionaire himself, he did so for no reason other than pure greed.

A sentence of 78 months of imprisonment is sufficient but not greater than necessary to account for the facts of this case and the characteristics of this Defendant. Such a sentence reflects the seriousness of the offense, provides just punishment, promotes respect for the law, and critically, would deter others from exploiting positions of special trust.

Before addressing the factors under 18 U.S.C. § 3553(a), this Sentencing Memorandum provides some background as to facts of the Defendant's crime and the terms of his Plea Agreement. Then, this Memo addresses the two contested Sentencing Guidelines issues in this case, which the Probation Office correctly evaluated in its Presentence Report ("PSR"). First, the evidence shows that the Defendant's fraud caused (conservatively) $2 million in loss to his clients, resulting in a 16-level enhancement in the Defendant's offense level. Similarly, the evidence shows that the Defendant used "sophisticated means" to deceive his clients and Merrill Lynch for several years, resulting in a 2-level enhancement. Thus, the Guidelines calculations in the PSR were correct, yielding an advisory Guidelines range of 78 to 97 months. A sentence at the low end of that range of 78 months is reasonable and appropriate in this case.

## II.    BACKGROUND

**A.      Summary of the Offense**

      **1.        The Defendant and Merrill Lynch**

The Defendant was a financial advisor.    His job was to help his clients invest their money in stocks, bonds, and other investments.    He was good at his job.    Very good.    At the end of his 34-year career with Merrill Lynch, he and his team were responsible for over $1 billion on behalf of roughly 800 households.    The Defendant was considered one of the most – if not the most – successful financial advisors in the State of Indiana.

Near the end of his career, though, the world of financial advising was evolving.    The investing public had started paying close attention to how much they were being charged by their financial advisors.    In response, traditional investment houses like Merrill Lynch encouraged their financial advisors to offer clients alternatives to the traditional "commission-based" pricing structure – i.e., each time the advisor placed a trade for the client, the client paid a commission.

The typical alternative was a flat fee, which was usually based on an annual percentage of the value of the assets in a client's account (referred to as "assets under management" or "AUM"). Under a flat-fee alternative, the number of trades did not impact what the client paid for services. The logic was that flat fee pricing better aligned the financial advisor's interests with the client's interests:    Commissions were an incentive to place more trades, whereas flat fees were an incentive to grow the client's assets.    Also, for many clients, the fee-based option was simply cheaper than traditional commissions.

But, cheaper for the client usually meant less revenue for the financial advisor. Recognizing that financial advisors might have a financial incentive to keep clients in commission-based accounts, Merrill Lynch did more than just passively press its advisors to recommend

cheaper fee-based options. The firm's automated Risk Management System ("RMS") flagged for Merrill Lynch compliance personnel when it appeared that a client could have saved money by paying a flat fee instead of paying commissions. Compliance personnel contacted the client's financial advisor and asked, among other things, whether a cheaper fee-based option had been presented to the client. The financial advisor would respond accordingly. All of these communications were electronic and were maintained by Merrill Lynch.

### 2. The Defendant's Fraud Scheme

The Defendant resisted these changes. By the time Merrill Lynch fired him in March 2015 for committing fraud, approximately 80% of his revenue still came from commissions. By contrast, only approximately 30% of other financial advisors' revenue came from commissions, while 70% came from flat fees.

This was no accident. Those statistics reflect the impact of the Defendant's fraud scheme. For years, he lied to clients about how much they were paying in commissions, traded in their accounts without client authorization (causing more commissions), intentionally failed to disclose to clients that a fee-based option might have been cheaper, and lied to Merrill Lynch's compliance personnel when asked whether he had discussed fee-based options with clients. *See* Information, Dkt. No. 1, ¶¶ 10–14; PSR ¶ 13. Keeping clients in the dark about their commissions and the cheaper fee-based options meant more money for the Defendant.

And the Defendant knew it. In early 2015, the Defendant's boss, Carma Wentzlaff, the director of Merrill Lynch's Carmel, Indiana office, confronted him about keeping so many clients in commission-based accounts. When interviewed, Ms. Wentzlaff recalled for the FBI word-for-word how the Defendant responded: "You know, this is how we keep the lights on around here."

Merrill Lynch ultimately fired the Defendant – their top broker in Indiana – after learning of the deceptive conduct to which the Defendant has now pleaded guilty.  (And the Financial Industry Regulatory Authority ("FINRA") ultimately barred the Defendant from serving as a financial advisor.[1])  Leading up to his firing, Merrill Lynch compliance personnel contacted dozens of the Defendant's clients to ask why they had not switched to the cheaper fee-based options.  Clients said either that they were not aware of those options, or that they had asked and the Defendant told them they were already paying less in commissions.

That came as a surprise to the compliance personnel.  On numerous occasions over the previous several years, they had contacted the Defendant after the firm's RMS system flagged clients' accounts for potentially excessive commissions.  Again and again, the Defendant, through an assistant, responded that the fee-based option had been discussed with the client and the client chose to stick with commissions.  That was false.  The Defendant often had not discussed the fee-based option with the client after learning the client was potentially overpaying in commissions.

Clients B and C (as identified in the Information) are examples.  Both reported that the Defendant never discussed with them that they could save money by switching to a fee-based option.  But the Defendant reported to Merrill Lynch that he had.  For instance, Merrill Lynch notified the Defendant on September 2014 that Client B had likely paid more in commissions during the prior year than she would have in a fee-based account.  The Defendant's assistant

---

[1]	FINRA's Consent Decree also contains a summary of the Defendant's misconduct, which the Defendant neither admitted nor denied.  *See* Exhibit 1, FINRA Letter of Acceptance, Waiver and Consent, No. 2015044745701 (July 24, 2015) ("[Buck] held customer assets in commission-based accounts instead of fee-based accounts in order to generate higher revenues, although he knew that some customers would have paid substantially lower fees by using fee-based accounts.  Buck misled customers about the relative costs of fee-based or commission-based trading for their accounts.   In addition, Buck exercised discretion in customer accounts without written or oral authorization, and made unauthorized trades in certain customer accounts.").

responded: "per fa [financial advisor] tom buck -- last review was 9/4/14. . . . have talked about [fee-based option] in the past -- not interested at this time."   Similarly, for Client C, in response to a July 2014 compliance alert, the Defendant's assistant responded: "per fa tom buck -- last review was 5/12/14. . . . we have discussed [fee-based] platforms in the past and the client prefers to keep things as they are."

Furthermore, when the Defendant did discuss fee-based options with some clients, the Defendant lied about how much they were paying in commissions, making the fee-based option seem less attractive.   Client A (as identified in the Information) is an example.   He was one of the Defendant's largest clients, with over $18 million in assets.   On multiple occasions stretching back to 2012 and before, Merrill Lynch compliance personnel contacted the Defendant as to why Client A was not in a cheaper fee-based account.   The Defendant, via his assistant, responded that Client A was not interested.   What the Defendant failed to state was that he had falsely assured Client A that his commissions totaled only 0.70% of AUM.   (Under a fee-based option, Client A would have paid roughly the same or more than 0.70%.)   In reality, and unbeknownst to Client A, the commissions often totaled much more.   In 2014, for instance, they totaled roughly 1.6% of AUM – much more than they would have been under a fee-based option.   Nevertheless, when Merrill Lynch compliance personnel again asked the Defendant why Client A had chosen to remain in commissions when it was more expensive, the Defendant falsely reassured the firm that he and Client A had adequately vetted the options.

Clients A, B, and C identified in the Information were by no means the Defendant's only victims.   An analysis of Merrill Lynch's trading data make that clear, as discussed more fully below with regard to loss calculations.   Beyond the data, though, clients' experiences illustrate the Defendant's fraud.   Take Client D, for example, who filed a Victim Impact Statement.   *See*

Dkt. No. 64-1.   Early on in her relationship with the Defendant, "Tom and I had NO discussion of fee options, various account options, advisor roles and responsibilities or investor responsibilities."   *Id.* at 3.   Then, several years into their relationship, Client D asked on her own initiative about fee-based options, to which the Defendant replied, "Merrill Lynch has people looking at this all the time and no, a commission based account is better for you."   *Id.*   The FBI heard similar stories during multiple interviews with the Defendant's clients.

Beyond lying to clients and Merrill Lynch compliance personnel, the Defendant also made trades that clients did not authorize.   *See id.* ("[O]ver 1100 trades took place, 450 of which were unauthorized.").   Such conduct was not only against Merrill Lynch policy and industry standards, but also it furthered his fraudulent scheme.   In commission-based accounts, clients were charged per trade.   So the Defendant not only deceived clients and compliance personnel to keep clients in commission-based accounts, but he also racked up those commissions by placing trades clients did not authorize.

In the end, by lying to his clients and Merrill Lynch's compliance personnel, the Defendant deprived clients of a meaningful opportunity (or, in many cases, any opportunity at all) to consider cheaper fee-based options.   Ultimately, the Defendant's fraud caused dozens of clients to pay more in commissions than they would have paid under a cheaper fee-based option.   As a result, to date, Merrill Lynch has paid nearly 50 of the Defendant's former clients a total of over $6 million in compensation for the Defendant's actions.

**B.    Procedural History**

On September 6, 2017, the parties filed a Plea Agreement.   Dkt. No. 7.   The Defendant agreed to plead guilty to one count of Securities Fraud, in violation of 18 U.S.C. § 1348, as alleged in an Information filed the same day.   *Id.* ¶ 1.   On January 18, 2018, the Court accepted the

Defendant's plea of guilty to the Information.   Dkt. No. 39.   Per the Plea Agreement, the Defendant admitted each and every fact alleged in the Information as the factual basis for his guilty plea.   *See Id.*; Dkt. No. 7 ¶¶ 23–25.

***Rules 11(c)(1)(B) and (C).***   The Plea Agreement contained two provisions governed by Federal Rule of Criminal Procedure 11(c)(1)(C), namely: (a) the amount of loss and restitution should not exceed $2 million, and (b) the Court should not impose a fine.   Dkt. No. 7 ¶ 13.   All other aspects of the Plea Agreement, including the ultimate sentence to be imposed, are left to the discretion of the Court under Rule 11(c)(1)(B).   *Id.* ¶ 13–22.

***Restitution and the Parallel SEC Settlement.***   The Plea Agreement noted a parallel civil settlement with the Securities and Exchange Commission ("SEC").   *Id.* ¶ 11.   In total, the Defendant has agreed to pay the SEC approximately $5.1 million, a portion of which will be returned to victims as disgorgement.   *See id.* ¶ 11(b).   To the extent the Court orders restitution in this criminal case, the amount the Defendant owes to the SEC will be reduced by the amount of restitution.   *Id.*   Thus, pursuant to the Plea Agreement and SEC settlement, the Defendant will pay approximately $5.1 million in monetary penalties/restitution, but not more than that.

***Sentencing Guidelines.***   Two enhancements under the Sentencing Guidelines are disputed.   The first is the amount of loss that the Defendant's criminal conduct caused.   *Id.* ¶ 31. The government will argue that a reasonable estimate of loss is $2 million, which would add 16 levels.   The Defendant will argue that the offense caused no loss.   *Id.*   The second issue is whether the offense involved "sophisticated means," which would add 2 levels.   *Id.* ¶ 33.

The parties agreed that the base offense level is 7, *id.* ¶ 30; that Defendant's criminal conduct involved 10 or more victims, which results in a 2-level enhancement, *id.* ¶ 32; and that the

Defendant's conduct involved a violation of a securities law and the Defendant was an investment advisor, which results in a 4-level enhancement, *id.* ¶ 34.

Finally, the government agreed to recommend a 3-level reduction for acceptance of responsibility, assuming the Defendant continues to accept responsibility at sentencing and does not falsely deny or frivolously contest relevant conduct that the Court determines to be true. *Id.* ¶ 35; *see* U.S.S.G. § 3E1.1 app. n. 1(A), (C) ("A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.").

***Appeal Waiver.*** The Defendant agreed to waive his rights to appeal his conviction and sentence if the Court sentences him within or below the advisory Guidelines range calculated by the Court.

\* \* \*

***Continuances of the Sentencing Date.*** Sentencing was originally set for a date in April 2018. The Court granted unopposed motions to continue the sentencing date to allow the government additional time to address issues as to its loss calculation.[2] Dkt. Nos. 48 (unopposed motion), 50 (order), 58 (joint motion), 59 (order). The government has since refined its loss calculation, and on October 19, 2018, the government provided the Defendant a copy of the calculation.[3] Additionally, on January 3, 2019, at defense counsel's request, the government made its retained consultant available for questioning by the Defendant's retained expert.

---

[2] The Court also ordered one final continuance *sua sponte* due to congestion of the Court's calendar, resulting in the present sentencing date of January 18, 2019. Dkt. No. 61.

[3] Months before, on January 23, 2018 and Jul 16, 2018, the government provided the Defendant with the underlying data from Merrill Lynch on which the government's loss calculations are based.

# III.  DISCUSSION

## A.    $2 Million is a Reasonable Estimate of the Loss Caused by the Defendant

In a fraud case like this one, the Sentencing Guidelines provide for an increase in a Defendant's offense level based on the amount of the loss caused to victims by the Defendant's conduct.  U.S.S.G. § 2B1.1(b)(1).  The loss equals "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* app. n. 3(A).  "The court need only make a reasonable estimate of the loss. . . . based on available information[.]" *Id.* app. n. 3(C).  The commentary to the Guidelines provide examples for how the Court might estimate loss in a given case, including by looking to average amounts, *id.* app. n. 3(C)(iv), and "more general factors, such as the scope and duration of the offense and revenues generated by similar operations," *id.* app. n. 3(C)(v).  In other words, the Guidelines recognize that frauds do not always lend themselves to precise loss calculations.  Hence, the requirement of a "reasonable estimate," which must be shown by a preponderance of the evidence.  *See, e.g.*, *United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007) ("A court need only make a reasonable estimate of the loss, not one rendered with scientific precision.").

Here, a conservative albeit reasonable estimate of the loss the Defendant caused his clients is $2 million.  The following section describes the government's methodology in estimating the loss and why the government's estimate is reasonable.[4]

---

[4]    At sentencing, the government will call two witnesses to further elaborate on the loss calculations.  Peter Malafronte is a representative from Merrill Lynch, who will discuss Merrill Lynch's fee-based options, the fee rates for each option, and the average discounts applied to those rates.  Adam Berry with FTI Consulting, Inc. is a consultant who assisted the government in calculating the loss by crunching the hundreds of thousands of data points provided by Merrill Lynch concerning client commission payments and AUM.

## 1.    The Government's Methodology for Calculating Loss

The Defendant's fraud scheme aimed to keep clients in commission-based accounts.   He lied to clients about how much they were paying in commissions, failed to disclose fee-based options that might have been cheaper, and lied to Merrill Lynch's compliance personnel when asked whether he had discussed fee-based options with clients.   As a result, the Defendant's fraud caused some clients to pay more in commissions than they would have paid under a cheaper fee-based option.   Therefore, the loss in this case is the difference between (A) the amount those clients paid in commissions, and (B) an estimate of what those clients would have paid had the Defendant told the truth.   The government's loss calculation follows this approach.

### a.    Commissions Paid

Regarding (A), Merrill Lynch provided data on the commissions generated from every trade that took place in nearly every one of the Defendant's clients' commission-based accounts between January 1, 2012 and March 2015, when the Defendant was terminated.[5]   These data pertained of over 100,000 individual trades.   The government's loss analysis focused on those clients who most likely suffered significant losses as a result of the Defendant's fraud, namely the clients who invested the most money with the Defendant (i.e., had the highest "AUM") and the clients who had filed a complaint with Merrill Lynch when they learned of the Defendant's termination.   For those approximately 140 clients (who held approximately 450 accounts), the

---

[5]        The data Merrill Lynch provided included more than just client's out-of-pocket commissions.   Rather, the data was based on "production credits," a Merrill Lynch-coined term tied to account performance and used to calculate financial advisor compensation.   In its analysis of these data, FTI removed all non-commission production credits to isolate the true out-of-pocket cost to the Defendant's clients.

government was able to determine precisely the total dollars that these approximately 140 clients paid out-of-pocket in commissions during the relevant time period.[6]

### b.    Estimating What Clients Would Have Paid Under a Fee-Based Option

Regarding (B) – the money clients would have paid had the Defendant told them the truth – that figure must be estimated, since the Defendant's fraud deprived his clients of the opportunity to switch to the fee-based option.   In general, estimating the amount clients would have paid in fees involves two factors: (1) the amount of money a given client likely would have paid had the client switched to a fee-based option, and (2) whether (or when) a given client would have switched to the fee-based option had the client known the truth.   The government's estimate of loss in this case accounted for both factors.

### i.    What a Client Would have Paid Under a Fee-Based Option

The amount a client likely would have paid under a fee-based option is a function of (i) the AUM in a client's account, and (ii) the applicable annual fee rate.   Merrill Lynch provided the relevant AUM data for each account, which consisted of over 1 million data points showing the value of each security in each of the 140 clients' portfolios.   The applicable fee rate, however, must be estimated.   This is for two reasons.

***Fee-Based Programs.***   First, as a Merrill Lynch representative will testify at sentencing, Merrill Lynch offered multiple fee-based products that a client could have chosen, each with its own rates.   For instance, the Merrill Lynch Personal Advisor, or "MLPA," program allowed clients to retain control, or "discretion," over the trades being placed in their account.   If a

---

[6]    The government focused only on those clients households that Merrill Lynch identified as having been primarily serviced by the Defendant.   The Defendant led a small group of financial advisors called "The Buck Group." For some clients, the primary point of contact was someone other than the Defendant.   Those clients were removed from the government's analysis and did not increase the loss calculation.

financial advisor wanted to buy a stock, and the client was enrolled in MLPA, then the advisor must seek the client's authorization for that trade. By contrast, Merrill Lynch's "Personal Investment Advisory, or "PIA," program gave discretion to the financial advisor to place trades without prior authorization from the client for each individual trade. In terms of list pricing (the maximum a client could be charged), the fees for MLPA were generally lower than for PIA. Exhibit 2 shows the MLPA and PIA list pricing.

There was a third option too. During the relevant time period, Merrill Lynch consolidated all fee-based options, whether MLPA or PIA, into a new option called the "Investment Advisor Program," or "IAP." The list pricing for IAP was generally higher than MLPA but lower than PIA.[7] (Exhibit 2 also shows the IAP list pricing.) However, Merrill Lynch did not automatically convert all MLPA and PIA accounts to IAP accounts, and abruptly change clients' fee rates, on the day IAP became available in late 2013. Rather, Merrill Lynch rolled out the IAP product slowly. For instance, it was not until August 2014 that Merrill Lynch required that all new fee-based accounts be enrolled in IAP, instead of MLPA or PIA. And, it was not until December 2015 – after the relevant time period in this case – that Merrill Lynch required any existing MLPA and PIA accounts to be converted to IAP.

To account for this variety of options, the government calculated the estimated loss under each of them. Thus, the government ran multiple loss computations, one with MLPA rates only, another with PIA rates only, and still others that started with MLPA or PIA rates initially and then

---

[7]     Additionally, the IAP rate might be further increased slightly if a client enrolled in a specific type of fee-based account that relied on third-party financial research, or a so-called "Style Manager." The increase was, on average, approximately 0.25%. Merrill Lynch data show, however, that such accounts were used infrequently by clients. In Indiana, for example, only approximately 16% of accounts used a "Style Manager."

switched to IAP rates in the fourth quarter of 2013. As described below, each analysis shows that the government's loss estimate of $2 million is reasonable, and indeed, quite conservative.

    ***Discounts to "List" Fee Rates.*** Second, clients were typically charged less than the "list" rate for any of the fee-based options. In other words, as the Merrill Lynch representative will testify at sentencing, clients typically paid discounted fee rates. The discounted rates were negotiated between an individual client and the individual financial advisor, based on myriad factors such as the client's needs and objectives, the client's history with the advisor, and the client's overall portfolio at Merrill Lynch.

    Just as it is impossible to know which fee-based option a client would choose, it is impossible to know the discount that would have been negotiated between the Defendant and his clients. Therefore, the government requested, and Merrill Lynch provided, the average discounts (shown as a percentage) for each MLPA, PIA, and IAP[8] during the fourth quarter of 2014.[9] Exhibit 3 (submitted as a sealed filing) shows these average discounts, which the Merrill Lynch representative will testify are in his experience in line with historical averages. The government applied these average discounts under each of the fee-based scenarios it analyzed.

### ii. Whether (or When) a Client Would have Switched to a Fee-based Option

    In addition to estimating how much clients would have paid under a fee-based option, the loss analysis must also account for the prospect that some clients would not have switched to a

---

[8]     As alluded to, within IAP, there are different service options, such as one like MLPA where clients retain discretion, another like PIA where clients give discretion to their advisors, and still another that used "Style Managers." Average discounts vary between such types of service. The government's loss calculation used a blended average discount for all types of IAP services.

[9]     Merrill Lynch provided average discounts for three populations: nationally, Indiana clients only, and "The Buck Group" clients only. The government's analysis employed the Indiana average discount percentages.

fee-based option.    For instance, for some clients, a fee-based option may have been more expensive than paying commissions.    If a client's strategy was to buy and hold a set of stocks, for example, then they may not have paid much in commissions at all.    Therefore, they would have been unlikely to switch to a fee-based option even if the Defendant had made them aware of it.  (Presumably, the Defendant would have also accurately told them that they would pay more in a fee-based account.)[10]

Moreover, some clients may have chosen to remain in a commission-based account even if the fee-based option were cheaper.    For instance, certain highly specialized investment products are generally available only in commission-based accounts, such as participating in initial public offerings (IPOs) and "bond crosses."[11]    If a client desired to participate in those transactions, then the client must have done so through a commission-based account.

The government's methodology sought to account for each of these possibilities.    First, trades in highly specialized investments available only in commission-based accounts were excluded from the analysis.    In essence, the government's model assumed that, even if a client switched an account to a fee-based option but still wanted to participate in an IPO, the client could open a separate commission-based account to do so, which had no bearing on the loss calculation.

Second, as a proxy for clients who would not have switched to a fee-based option, the government's methodology excluded any client account that would not have been better off under

---

[10]        It is possible that some clients may have been reluctant to switch to a fee-based option simply because they were uncertain whether it would have been cheaper for them in the future.    That said, the Defendant's fraud deprived these clients of the opportunity to meaningfully consider the fee-based option at all.    In other words, what the Defendant stole was the client's *opportunity*, not just their money.    Therefore, the client's hypothetical reluctance to switch to a fee-based option should have little impact on the Court's loss determination.

[11]        A "bond cross" is where a broker orchestrates a transaction between two clients, one seeking to sell a bond and the other seeking to buy it, without involving the market.

the fee-based option over the entire January 2012–March 2015 time period.  Thus, if the total amount the client paid in commissions over the time period was less than the total amount the client would have paid under a fee-based option, then the account was removed from the analysis and the amount paid in commissions was not counted against the Defendant.  In other words, the government's methodology focuses only on true victims – i.e., those client accounts who likely would have saved money by switching to the fee-based option.

### 2.  $2 Million is a Reasonable (and Conservative) Estimate of Loss

Exhibit 4 contains the government's loss calculations based the above-described methodology.  The Court will undoubtedly notice that the estimated losses shown under this model range between approximately $6 million and $7.6 million.  Nevertheless, the government, in accordance with the Plea Agreement, submits that a reasonable estimate for loss in this case is $2 million.  This reduction, from the loss figures in Exhibit 4 to the government's recommendation of $2 million, is intended to further account for the uncertainties identified above, in particular the possibility (however remote) that the Defendant's clients would have received less-than-average discounts to the "list" fee rates, and the fact that some clients would have chosen to continue paying commissions even if the Defendant had been 100% transparent about fee-based options.[12]

---

[12]  Additionally, the government is standing by its obligation in the Plea Agreement to cap its recommendation as to loss at $2 million.  Dkt. No. 7 ¶ 13.  The government entered the Plea Agreement over a year ago, months before it refined its loss calculations in response to issues the Defendant raised.  *See* Dkt. No. 48.  As the government undertook to refine its calculations, before knowing the results of those calculations, the government noted that, if it found principled reasons to recommend a loss amount lower than $2 million, it would do so.  Dkt. No. 48 ¶ 14.  At the same time, giving the Defendant the benefit of the bargain struck in the Plea Agreement, the government did not seek to be able to advocate for more than $2 million, despite the results of its refined calculations.  The government stands by that position today.

The government expects the Defendant to emphasize these points at sentencing. Indeed, the government expects the Defendant will argue that the Defendant's fraud caused zero loss. In other words, the Defendant will argue that because the government's model cannot predict with certainty which clients would have switched to a fee-based option and how much they would have paid, then the government's calculations are unreliable. But that is not the law. *See United States v. Walsh*, 723 F.3d 802, 809 (7th Cir. 2013) ("[A defendant's] unsupported, general objections are insufficient to show that the evidence of loss was unreliable or that the court shifted the burden of proving (or disproving) the loss amount to [the defendant]"). Rather, the Court must determine based on a preponderance of the evidence what is a *reasonable estimate* of the loss. *See id.*; U.S.S.G. § 2B1.1(b)(1) app. n. 3(C). If the Guidelines required certainty in calculating loss, then fraudsters like the Defendant whose lies deprive people of opportunities to make choices would not be held appropriately accountable.

Here, it is reasonable to assume that, had the Defendant told his clients the truth, at least some of them would have switched at least one of their accounts to a cheaper fee-based option. Exhibit 5 illustrates this point. That exhibit shows examples of just 12 individual client accounts and the difference, by quarter during 2012–2015, between commissions the client actually paid and the amount the client would have paid under a fee-based option.[13] (Notably, these figures reflect the fee-rate scenario most favorable to the Defendant, i.e., PIA transition to IAP.) As the exhibit illustrates, had the Defendant been truthful with these clients about the accounts in Exhibit 5 back in 2012, the client would have realized that they could have saved a substantial amount of money under a fee-based option. And, for the most part, that remained true for the entire time

---

[13]     In this Exhibit 5, Clients A, B, and C are the same ones listed in the Information, and Clients C and D are the same as those who submitted Victim Impact Statements. Clients E through L are just a handful of the other clients who paid far more in commissions than they would have paid under a fee-based option.

period.   Thus, it is reasonable to assume that these clients would indeed have switched at least those 12 accounts depicted in Exhibit 5 to a fee-based option.   The clients did not make the switch because the Defendant's fraud deprived them of a meaningful opportunity to evaluate and choose a fee-based option.   Those clients are victims, and, as Exhibit 5 shows, their losses can indeed be reasonably quantified.

In other words, the math undercuts the Defendant's argument that the government's loss calculations are too speculative as to which clients would have switched to a fee-based option. Exhibit 5 illustrates that, had the Defendant been honest and shown his clients the money they could have saved, at least for some of their accounts, it is reasonable to assume that they would have switched.   *See Walsh*, 723 F.3d at 809 ("[T]he district court need not identify specific victims who were refused margin redemption requests for purposes of calculating the loss.").   Thus, the math reinforces what the factual basis for the Defendant's guilty plea already established:

> [The Defendant] executed a scheme to defraud by *overcharging* certain clients for his financial advising services and misleading those client, Merrill Lynch, and its compliance systems regarding those *overcharges* by concealing the *overcharges*. The object of the scheme was to *generate increased revenues* from clients, which in turn *increased his personal compensation* and professional reputation.

Information, Dkt. No. 1 ¶ 10 (emphasis added).   If the Defendant contradicts his factual basis or falsely denies relevant conduct, he risks losing the 3-level reduction for acceptance of responsibility.   *See Gordon*, 495 F.3d 427.

In total, for just the 12 individual client accounts in Exhibit 5, the estimated loss (using the conservative fee rates) totals roughly $1.8 million.   Overall, there were roughly 100 of the Defendant's clients who had at least one account that would have been better off, to some extent, under a fee-based option.   (And, some clients had more than one account fitting that bill.)

Such circumstances would seem to justify a total loss higher than $2 million. Indeed, that is what the government's loss calculations in Exhibit 4 appears to show. Nevertheless, the government's recommendation of $2 million accounts for the possibility that some subset of clients might have chosen to stay in commissions, even if presented with the fact that they could have saved thousands by switching to fee-based.

The government's $2 million recommendation also takes account of the possibility that the Defendant's clients would have received less-than-average discounts on the list fee rates. The government anticipates that the Defendant will argue that the Court should assume no discounts at all. That is unreasonable for three reasons. First, as the Merrill Lynch representative will testify, discounts were common both nationally and in Indiana, as shown in Exhibit 3. Second, as noted above, Merrill Lynch provided data showing that The Buck Group itself offered fee-based clients discounts in line with national and state averages. *See supra* note 9. Finally, the Defendant discounted the commissions he charged his clients too. *See, e.g.*, Exhibit 6 (submitted as sealed filing).

Nevertheless, to underscore the reasonableness of the government's $2 million recommendation, the government calculated the estimated loss under the list (undiscounted) fee rates. Exhibit 7 shows this analysis. Under each fee rate scenario, there is a loss, ranging from approximately $725,000 to $4 million. These figures confirm that $2 million is a reasonable, indeed conservative, estimate of the loss in this case.[14]  *See United States v. White*, 737 F.3d 1121, 1142 (7th Cir. 2013) (affirming government's "conservative" loss computation).

---

[14]  The government's loss calculation was conservative in one other respect: the 2012–2015 time period. The Defendant almost certainly began his fraud before 2012. *See* Client D's Victim Impact Statement, Dkt. No. 64-1.

* * *

In sum, by lying to his clients and to Merrill Lynch, what the Defendant stole from these clients was the *opportunity* to evaluate whether they should have switched to a fee-based option at all. For some clients – those who would have been worse off by switching to fee-based accounts – the value of that opportunity was nominal. But for others – those who lost thousands by continuing to pay commissions under the false pretense that it was in their best interest to do so – the value of that opportunity was real and can be estimated in dollars. A reasonable estimate of that lost value is $2 million. Accordingly, the 16-level increase under U.S.S.G. § 2B1.1(b)(1)(I) applies in this case.

## B.    The Enhancement for "Sophisticated Means" Applies

The Guidelines assign a two-level enhancement where the defendant "intentionally engaged in or caused" the use of "sophisticated means" to carry out a fraud. U.S.S.G. § 2B1.1(b)(10)(C). Sophisticated means is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* at app. n. 9(B). The Guidelines give some examples of conduct triggering the enhancement, such as using shell corporations or offshore accounts, but those are "not exhaustive and merely suggest[ ] the wide variety of criminal behavior covered by the guideline." *United States v. Wayland*, 549 F.3d 526, 528 (7th Cir. 2008). At bottom, "[o]ffense conduct is sophisticated if it displays a greater level of planning or concealment than a typical fraud of that kind." *Id.*

This Defendant's multi-faceted fraud met that standard. First, to his clients, he lied about the commissions he was charging them, and he failed to disclose the existence of the cheaper fee-based alternative. And he did this, despite receiving reports from Merrill Lynch's compliance

personnel flagging that clients may have been paying much more in commissions than they would have paid under the fee-based option.

Second, his placing of trades that clients did not authorize were part of the reason that clients' commissions were so high.  In this sense, his fraud not only sought to keep clients in commission-based accounts, but it also exploited the fact that those accounts remained commission-based.  Had the clients switched to a fee-based option, they would not have paid more for unauthorized trades.

Finally, for years, the Defendant actively concealed his fraud from Merrill Lynch, one of the world's largest and most sophisticated financial advisory firms.  He did this by repeatedly lying to Merrill Lynch's compliance personnel regarding his communications with clients. Compliance personnel flagged for him that, in the prior 12 months, a client's commissions far exceeded what the client would have paid under a fee-based option.  In light of this fact, the compliance personnel asked whether the Defendant had discussed the fee-based option with the client.  Each time, the Defendant directed one of his employees to respond affirmatively and notify compliance that the client had chosen to stick with the commission-based option.  Those were lies.  And as a result, Merrill Lynch did not detect the Defendant's fraud for several years, leading to still further losses for his clients.  Indeed, the fraud was only uncovered when compliance personnel began contacting clients directly, informing them of what they had been paying in commissions, and learning they were not aware of either their commissions or the availability of cheaper fee-based options.  Even then, the Defendant took additional steps to conceal the fraud by duping clients into believing the company's compliance team, who might call, were not savvy enough to recognize their best interests.

Such conduct – lying to numerous clients, placing unauthorized trades, and successfully concealing the scheme for years from Merrill Lynch – constituted sophisticated means. *See, e.g.*, *United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010) (successfully fooling multiple sophisticated victims indicated sophistication); *United States v. Rettenberger*, 344 F.3d 702, 709 (7th Cir. 2003) (carefully executing and concealing fraud scheme "over an extended period" indicated sophistication).   Accordingly, the two-level increase under U.S.S.G. § 2B1.1(b)(10)(C) applies in this case.

**C.**   **A Guidelines Sentence of 78 Months is Reasonable under 18 U.S.C. § 3553(a)**

The Sentencing Guidelines adequately and appropriately capture the "nature and circumstances" of the Defendant's crime.   The facts of this case reflect a brazen and insidious fraud predicated on the Defendant abusing not only his position as a financial advisor, but also his unique tenure and stature as a long-time, successful Merrill Lynch broker in Indiana.   The Defendant worked for Merrill Lynch for over 30 years, during which time he was frequently the state's top-grossing advisor.   His success was, in part, the product of many long-term, personal relationships he developed with his clients.   His clients relied on his advice, and many trusted him implicitly.   *See, e.g.*, Client C's Victim Impact Statement, Dkt. No. 60-1 ("Our relationship with Tom Buck began many years ago.   [Victim's] dad was one of Tom's first clients when he was beginning his career.   [We] became clients later on . . . .   Still later, both of our sons trusted Tom with their life savings.   [We] recommended Tom to our friends[.]"); Client D's Victim Impact Statement, Dkt. No. 64-1 ("[The Defendant] was someone I trusted completely.").

He exploited those relationships, and the trust that was built over time, to perpetrate his fraud.   He hid behind his long career and large book of business to repeatedly lie to Merrill Lynch's compliance personnel.

And it worked. For years. This was not a one-time lapse in judgment when the Defendant had fallen on hard times. The Defendant's fraud was a sustained effort to bilk dozens of clients, through dozens of electronic and in-person communications, out of two million of their dollars.

The Guidelines computation in this case – which folds in the loss, number of victims, use of sophisticated means, and abuse of a position as a financial advisor – correctly accounts for the way in which the Defendant carried out his fraud and its impact on the victims. *See* Client C's Victim Impact Statement, Dkt. No. 60-1 ("We had trust in Tom and we admired him. . . . His actions have forever ruined our trust in others."); Client D's Victim Impact Statement, Dkt. No. 64-1 ("I cannot put into works how betrayed I felt by Tom's actions. . . . "I couldn't understand (and still don't understand) how Tom could have done that to me as well as to my daughters."). The advisory Guidelines range appropriately reflects the seriousness of the offense and provides just punishment for a fraud of this kind.

The Defendant's "history and characteristics" augur in favor of a sentence at the low end of the advisory Guidelines range, but do not justify a variance below that range. It is no stretch to say that this Defendant has lived the American dream. He had a stable childhood, earned a bachelor's degree and an M.B.A, and eventually became the highest-grossing financial advisor in the State for one of the world's preeminent financial services firms. PSR ¶¶ 62, 75, 78. As a result, the Defendant amassed a personal fortune that included millions of dollars, vacation homes, expensive jewelry, multiple vehicles, and artwork. PSR ¶ 84. Indeed, at the end of his time with Merrill Lynch, he was earning over $600,000 per year. PSR ¶ 78. Accordingly, the only explanation for defrauding his clients was the Defendant's insatiable greed.

It is notable that the Defendant has contributed to charity and served in community leadership roles. PSR. ¶¶ 80–82. Although it is generally far easier for a wealthy person to engage in such activities, it does reflect positively on the Defendant's character. Nevertheless, the Defendant's charitable giving is not so extraordinary, given his wealth, that it warrants a below-guidelines sentence. The Seventh Circuit has counseled that charitable donations by the wealthy should generally have little influence on the Court's sentence:

> Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card. . . . To allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines.

*Vrdolyak*, 593 F.3d at 683 (internal quotation omitted). This is particularly true in a case such as this, where the amount the Defendant stole ($2 million) dwarfs the Defendant's lifetime charitable giving, let alone during the 2012–2015 time period during which he stole the $2 million.

Finally, a sentence of 78 months provides sufficient general deterrence and promotes respect for the law in an investment fraud case such as this. While it is unlikely this Defendant will commit this sort of offense again, particularly in light of FINRA's bar on him being a financial advisor, the Court's sentence should send a message to other financial advisors and those occupying positions of trust. The public must have confidence in our financial system, and by extension, confidence in those who serve as intermediaries between the public and that system. Investors should feel secure knowing that those they entrust with their money will not seek to steal it. And that those who exploit their trust will be held appropriately accountable. A sentence of 78 months does just that.

Accordingly, a sentence of 78 months of imprisonment is sufficient but not greater than necessary to accomplish the goals of sentencing under 18 U.S.C. § 3553(a) in this case, for this defendant.

## IV. **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose a term of imprisonment of 78 months.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

Date:   January 11, 2019   By:   /s/ Nicholas J. Linder
                                  Nicholas J. Linder
                                  Cynthia J. Ridgeway
                                  Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 11, 2019, a copy of the foregoing Government's

Sentencing Memorandum, and Exhibits 1, 2, 4, 5, and 7, were filed electronically.   Service of

this filing will be made on all ECF-registered counsel by operation of the court's electronic filing

system.   Parties may access this filing through the court's system.

I further certify that on January 11, 2019, a copy of Exhibits 3 and 6, which were filed

under seal, were sent via email to counsel for the Defendant, as follows:


Robert W. Hammerle
Steven T. Henke
Anthony Seaton Ridolfo , Jr.
Timothy Knoll Ryan
HACKMAN HULETT LLP
135 N. Pennsylvania Street, Suite 1610
Indianapolis, IN 46204-2454
rhammerle@hhlaw-in.com
shenke@hhlaw-in.com
aridolfo@hhlaw-in.com
tryan@hhlaw-in.com

David E. Robbins
KAUFMANN GILDIN ROBBINS LLP
767 Third Avenue, 30th Floor
New York, NY 10017
drobbins@kaufmanngildin.com


Date:   January 11, 2019         By:   /s/ Nicholas J. Linder
                                       Nicholas J. Linder
                                       Assistant United States Attorney
                                       United States Attorney's Office
                                       10 West Market Street, Suite 2100
                                       Indianapolis, IN 46204-3048
                                       Telephone: 317-226-6333
                                       Email: nick.linder@usdoj.gov

# EXHIBIT J

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**LETTER OF ACCEPTANCE, WAIVER AND CONSENT**
**NO. 2015044745701**

TO:    Department of Enforcement
       Financial Industry Regulatory Authority ("FINRA")

RE:    Thomas J. Buck, Respondent
       General Securities Representative
       CRD No. 1024868

Pursuant to FINRA Rule 9216 of FINRA's Code of Procedure, I submit this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against me alleging violations based on the same factual findings described herein.

**I.**

**ACCEPTANCE AND CONSENT**

A.    I hereby accept and consent, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

**BACKGROUND**

Respondent Thomas J. Buck entered the securities industry in October 1981 when he became associated with Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"). He has held General Securities Representative (Series 7), General Securities Sales (Series 8), State Law (Series 63), and Investment Adviser (Series 65) licenses. He was registered with Merrill Lynch from October 1981 until his registration was terminated on April 2, 2015.

Buck became registered with RBC Capital Markets, LLC on April 9, 2015. He resigned from that firm on July 21, 2015, but the firm has not yet terminated his registration. FINRA possesses jurisdiction over Buck because he is currently registered with a FINRA member firm.

**OVERVIEW**

Buck engaged in misrepresentations and other misconduct in the handling of customer accounts. Beginning by at least 2009, Buck has pursued unethical and improper business practices which generated increased commissions and

revenues and enhanced his status as a top-producing broker. He held customer assets in commission-based accounts instead of fee-based accounts in order to generate higher revenues, although he knew that some customers would have paid substantially lower fees by using fee-based accounts. Buck misled customers about the relative costs of fee-based or commission-based trading for their accounts. In addition, Buck exercised discretion in customer accounts without written or oral authorization, and made unauthorized trades in certain customer accounts.

## FACTS AND VIOLATIVE CONDUCT

### Background

Buck was a registered representative in Merrill Lynch's Carmel, Indiana office, which was part of the firm's Indiana complex, from October 1981 until April 2015. He conducted business with fifteen to twenty other registered and unregistered persons under the designation "The Buck Group." The Buck Group's customer base was comprised of approximately 800 households with more than 3,000 customer accounts and $1.3 billion under management by the time Buck left Merrill Lynch. Some of his customers had accounts worth tens of millions of dollars.

Since at least 2009, The Buck Group generated annual revenues ranging from $6 million to more than $10 million, at least 85% of which was directly attributable to Buck's individual production. Approximately 80% of the revenues generated by Buck came from commission-based activity, whereas approximately 70% of the Indiana complex's revenue was generated through fee-based accounts.

### Misconduct Relating to the Use of Commission-Based Accounts

Registered representatives are required to assess the comparative costs to customers of fee-based or commission-based accounts and discuss those alternatives with their customers. FINRA's predecessor, NASD, noted in 2003:

It is generally inconsistent with just and equitable principles of trade – and therefore a violation of Rule 2110 – to place a customer in an account with a fee structure that reasonably can be expected to result in a greater cost than an alternative account offered by the member that provides the same services and benefits to the customer.[1]

Beginning in or before 2009, Buck not only failed to fully assess the suitability of the fee structure for certain clients, but decided to use commission- based accounts when he knew that it would have been less expensive for those clients to maintain fee-based accounts. In some instances, clients paid substantially more in commissions than they would have paid in fee-based accounts.[2] During this same time period, Buck also misled clients about the potential advantages of using fee-

---

[1] Notice to Members 03-68 (November 2003). NASD Rule 2110 was superseded by FINRA Rule 2010 in December 2008. The Notice to Members also noted that the failure to assess the suitability of the type of transaction or account (fee-based or commission-based) could violate NASD Rule 2310 (now FINRA Rule 2111).
[2] The fee-based accounts generally incurred fees of 1-1.25% or less of the value of the accounts.

based accounts in order to keep the clients in higher-cost commission-based accounts. As noted above, approximately 80% of Buck's accounts were commission-based, whereas approximately 70% of the accounts in the Indiana complex were fee-based.

By virtue of the foregoing conduct, Buck engaged in unethical business practices in violation of FINRA Rule 2010 and violated the suitability requirements under NASD Rule 2310 (for conduct prior to July 9, 2012) and FINRA Rule 2111 (for conduct on or after July 9, 2012) by conducting business in commission-based accounts which should have been conducted in fee-based transactions. By virtue of the foregoing conduct, Buck also willfully committed fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and violated FINRA Rules 2010 and 2020.

**Unauthorized trading and exercise of discretion without oral or written authorization**

Beginning in or before 2011, Buck at times made unauthorized trades and exercised discretion in certain customer accounts without prior authorization from the customers or his firm. He at times unilaterally placed trades in customer accounts without getting the customers' acquiescence in advance, or even after placing the trade. In some instances, he exercised discretionary authority without obtaining written authorization. He placed trades which he assumed the customers would want without obtaining their authorization to do so. In other instances, customers explicitly or implicitly allowed him to place trades in their accounts without prior discussion. Buck did not obtain written authorization to do so from either the customers or from Merrill Lynch.

Unauthorized trading violates a broker's obligation to observe high standards of commercial honor and just and equitable principles of trade. By engaging in this conduct, Buck violated FINRA Rule 2010. In addition, he violated NASD Rule 2510(b) by exercising discretionary power in customers' accounts without obtaining written authorization to do so from the customers and from his firm.

\*       \*       \*

By engaging in the foregoing conduct, Respondent Buck willfully violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder; violated FINRA Rules 2010, 2020, and 2111; and violated NASD Rules 2310 and 2510(b).

B.    I also consent to the imposition of the sanction of a bar from association with any FINRA member.

The sanctions imposed herein shall be effective on a date set by FINRA staff. A bar shall become effective upon approval or acceptance of this AWC.

I understand that if I am barred from associating with any FINRA member, I become subject to a statutory disqualification as that term is defined in Article III, Section 4 of FINRA's By-Laws, incorporating Section 3(a)(39) of the Securities Exchange Act of 1934. Accordingly, I may not be associated with any FINRA member in any capacity, including clerical or ministerial functions, during the period of the bar (see FINRA Rules 8310 and 8311).

I also understand that this settlement includes a finding that I willfully violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder and that under Article III, Section 4 of FINRA's By-Laws, this makes me subject to a statutory disqualification with respect to association with a member.

## II.

## WAIVER OF PROCEDURAL RIGHTS

I specifically and voluntarily waive the following rights granted under FINRA's Code of Procedure:

A.      To have a Complaint issued specifying the allegations against me;

B.      To be notified of the Complaint and have the opportunity to answer the allegations in writing;

C.      To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D.      To appeal any such decision to the National Adjudicatory Council ("NAC") and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, I specifically and voluntarily waive any right to claim bias or prejudgment of the Chief Legal Officer, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

I further specifically and voluntarily waive any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

4

## III.

## OTHER MATTERS

I understand that:

A.  Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs ("ODA"), pursuant to FINRA Rule 9216;

B.  If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against me; and

C.  If accepted:

1.  this AWC will become part of my permanent disciplinary record and may be considered in any future actions brought by FINRA or any other regulator against me;

2.  this AWC will be made available through FINRA's public disclosure program in accordance with FINRA Rule 8313;

3.  FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

4.  I may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis.  I may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC.  Nothing in this provision affects my:  (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

I certify that I have read and understand all of the provisions of this AWC and have been given a full opportunity to ask questions about it; that I have agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce me to submit it.

7/23/15
Date

Thomas J. Buck
Respondent

5

Reviewed by:

_____
David E. Robbins, Esq.
Kaufmann Gildin & Robbins LLP
767 Third Avenue
New York, NY 10017
(212) 755-3100


Accepted by FINRA:

7/24/15
_____
Date

Signed on behalf of the
Director of ODA, by delegated authority

_____
Susan Schroeder
Senior Vice President & Counsel
FINRA Department of Enforcement
One World Financial Center
200 Liberty Street
New York, NY 10281-1003
Tel: 646-315-7466

6

# EXHIBIT K

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

|  |  |  |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-3984 |
| | ) | |
| THOMAS J. BUCK, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission ("Commission" or "SEC"), as and for its Complaint against Defendant Thomas J. Buck, alleges:

## SUMMARY

1.     From at least 2012 through March 2015, Defendant Thomas J. Buck, a registered representative and investment adviser employed by Merrill Lynch, Pierce, Fenner & Smith, Incorporated, executed a fraudulent scheme to obtain excessive commissions and fees by making material misrepresentations and omissions to certain customers and investment advisory clients regarding the fees or commissions charged in their accounts and by impermissibly exercising discretion by placing certain trades in certain customer accounts without obtaining authorization from the customer.

2.     The SEC brings this civil enforcement action seeking a permanent injunction, disgorgement plus prejudgment interest, and civil penalties for Defendant's violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 206 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6].

## JURISDICTION AND VENUE

3.      The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)]. The Commission seeks the imposition of a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

4.      The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d), 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa], and Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].

5.      Venue is proper in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because, among other things, Defendant resided in this district at the time of the conduct alleged herein and certain acts or transactions constituting the violations of the federal securities laws detailed herein occurred in this district.

6.      In connection with the conduct described in this Complaint, Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange.

## DEFENDANT

7.      Defendant Thomas J. Buck, age 63, is a resident of Orchid, Florida. Buck formerly resided in Carmel, Indiana. Buck was at all times relevant to the events described herein a registered representative and investment adviser representative employed as a financial advisor by Merrill Lynch, Pierce, Fenner & Smith, Incorporated, now a division of Bank of America ("Merrill Lynch").

## FACTUAL ALLEGATIONS

**A.    BACKGROUND**

8.    Buck was employed by Merrill Lynch as a financial advisor from approximately February 1982 until March 2015, when he was terminated for cause. During the relevant time period, Merrill Lynch was a broker-dealer and investment adviser registered with the Commission pursuant to Section 15(b) of the Exchange Act and Section 203 of the Advisers Act, with an office in Carmel, Indiana, among other places across the country.

9.    During the relevant period, Buck was a financial advisor to thousands of customers and investment advisory clients of Merrill Lynch. Buck was the leader of a team of at least thirteen other associated individuals under the designation of "The Buck Group" and "The Buck Team" (collectively "The Buck Group"). From 2012 through March 2015, the Buck Group's customer and client base comprised approximately 800 households with more than 3,000 accounts and approximately $1.3 billion assets under management.

10.    During the relevant period, in general, Merrill Lynch customers and clients were offered commission and fee-based cost options, among others.

11.    Under the commission-based option, customers were charged a commission for each transaction made in the customer's account. With limited exceptions, the number and dollar size of transactions completed directly affected the amount of commissions yielded.

12.    Under the fee-based option, clients were charged an annual fee that was a fixed percentage of the client's total assets under management at Merrill Lynch regardless of the number and dollar value of transactions made on their account. The specific percentage within that range for a given client depended on the client's total assets under management, the type of securities in the account, and negotiations between the client and the financial advisor.

13.    During the relevant period, Merrill Lynch encouraged its financial advisors, including Buck, to evaluate whether a fee-based alternative might be appropriate for their customers, particularly by informing customers about the amounts they paid annually in commissions, comparing those

3

amounts to what customers would have paid under a fee-based alternative, and encouraging customers to choose the lowest cost option consistent with their investment objectives.

14.     During the relevant period, approximately 70% of all revenue from Merrill Lynch's Indiana-based financial advisors came from clients on a fee-based cost platform. However, during the same period, approximately 80% of the revenue from Buck's customers came from commissions.

15.     Merrill Lynch paid its financial advisors, including Buck, a portion of the revenue generated from customers' and clients' accounts, which was largely made up of the commissions and fees that customers and clients paid. In general, the more revenue that a financial advisor generated, whether from commissions or fees, the greater that advisor's compensation.

**B.     DEFENDANT MADE NUMEROUS MATERIAL MISREPRESENTATIONS AND OMISSIONS TO CUSTOMERS AND CLIENTS AND ENGAGED IN A SCHEME TO DEFRAUD CUSTOMERS AND CLIENTS**

16.     From at least 2012 through March 2015, Defendant executed a fraudulent scheme to obtain excessive commissions and fees and increase his personal compensation by making misrepresentations and omissions to customers and clients regarding the commissions or fees that would be and had been charged to their accounts.

17.     Defendant represented to numerous customers that the total annual commissions would not exceed certain limits in their commission-based accounts. Defendant then traded in those accounts, generating commissions that exceeded the amounts that he had promised.

18.     Buck failed to inform customers that their total annual commissions were exceeding the promised limits and falsely represented to several customers that their total annual commissions were within the promised limits.

19.     Defendant also intentionally failed to inform those customers that a fee-based option could be cheaper compared to the total annual commissions the customer was paying based on trades executed in the account.

20.     Defendant also made similar false and materially misleading representations to certain investment advisory clients about the fees and commissions in their accounts.

4

21.     As part of the scheme, Defendant also impermissibly exercised discretion by intentionally placing certain trades in certain customer accounts without obtaining authorization from the customer.

22.     As part of the scheme, Defendant also directly or indirectly made false and materially misleading statements to Merrill Lynch in response to inquiries regarding the commissions charged in customer accounts.

23.     Defendant received in excess of $2.5 million in excessive commissions and fees from at least 50 customers and investment advisory clients in connection with the fraudulent scheme.

24.     In one example, on numerous occasions, Defendant made materially misleading statements to Customer A by representing that the total annual commissions in his accounts remained at or below a certain percentage of the value of the account, when in fact they exceeded this amount. During the applicable time, Buck bought and sold securities in Customer A's accounts.

25.     When Merrill Lynch identified a commission-based account of Customer A that had commissions that exceeded certain internal thresholds, Buck caused a false statement to be entered into Merrill Lynch's compliance system that stated that Buck had discussed a fee-based option during previous reviews, when in fact Buck failed to discuss the fee-based option with Customer A.

26.      As another example, Buck made materially misleading statements to Customer B by representing that the total annual commissions in her account would remain at a certain percentage of the value of the account, when in fact they exceeded this amount. During the applicable time, Buck bought and sold securities in Customer B's accounts.

27.     When Merrill Lynch identified a commission-based account of Customer B that had commissions that exceeded certain internal thresholds, Buck caused a false statement to be entered into Merrill Lynch's compliance system that stated that Buck had discussed a fee-based option in the past, when in fact Buck failed to discuss the fee-based option with Customer B.

28.     As a final example, Buck made materially misleading statements to Customer C, who had both fee-based and commission-based accounts, by representing that the total annual commissions

in his commission-based accounts would not exceed a certain percentage of the value of the account, when in fact they exceeded that amount. During the applicable time, Buck bought and sold securities in Customer C's accounts.

## CLAIMS FOR RELIEF

### First Claim
### Section 10(b) of the Exchange Act and Rule l0b-5
[15 U.S.C. § 78j(b);17 C.F:R. § 240.10b-5]

29.      Plaintiff repeats and incorporates by reference paragraphs 1 through 28 of this Complaint as if set forth herein.

30.      Defendant, by engaging in the conduct described above, directly and indirectly, with *scienter,* in connection with the purchase or sale of securities, and by use of the means and instrumentalities of interstate commerce the mails, or any facility of a national securities exchange, has: (a) employed devices, schemes and artifices to defraud; or (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business that have operated or will operate as a fraud and deceit upon other persons.

31.      Defendant acted knowing and/or recklessly when he engaged in the conduct detailed above.

32.      By reason of the foregoing acts and practices, Defendant violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### Second Claim
### Section 17(a)(1), (2) and (3) of the Securities Act
[15 U.S.C. § 77q(a)(1), (2) and (3)]

33.      Plaintiff repeats and incorporates by reference paragraphs 1 through 28 of this Complaint as if set forth herein.

34.      Defendant directly or indirectly, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails,

6

has: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

35.     In engaging in the conduct described herein, Defendant acted knowingly and/or with a reckless disregard for the truth and/or negligently.

36.     For these reasons, the Defendant has violated, and unless enjoined will likely again violate, Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1), § 77q(a)(2) and § 77q(a)(3)].

Third Claim
Sections 206(1) and 206(2) of the Advisers Act
[15 U.S.C. §§ 80b-6(1) and 80b-6(2)]

37.     Plaintiff repeats and incorporates by reference paragraphs 1 through 28 of this Complaint as if set forth herein.

38.     Defendant, directly or indirectly, knowingly, recklessly or negligently, by use of the mails or any means or instrumentality of interstate commerce, while acting as an investment adviser within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], has: (a) employed devices, schemes, and artifices to defraud a client or prospective client; and/or (b) engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

39.     In engaging in the conduct described herein, Defendant acted knowingly and/or with a reckless disregard for the truth and/or negligently.

40.     For these reasons, Defendant has violated, and unless restrained and enjoined, will continue violating, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

7

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)     Enter an Order finding that Defendant committed, and unless restrained will

continue to commit, the violations alleged in this Complaint;

(2)     Permanently enjoin Defendant from future violations of Section 10(b) of the

Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240. 10b-5] and Section

17(a) of the Securities Act [15 U.S.C. § 77q(a)];

(3)     Permanently enjoin Defendant from future violations of Sections 206(1) and 206(2)

of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

(4)     Order Defendant to disgorge all ill-gotten gains from the conduct alleged herein,

with prejudgment interest;

(5)     Order civil penalties against Defendant pursuant to Section 20(d) of the Securities

Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section

209(e) of the Advisers Act [15 U.S.C. $ 80b-9(e)] for violations of the federal securities laws as

alleged herein; and

(6)     Order such other and further relief as the Court may deem just and proper.


Dated: October 31, 2017                     Respectfully submitted,

                              By:     /s/Aleah Borghard
                                      Aleah Borghard (NY Bar No. 4595054)
                                      Brian D. Fagel (IL Bar No. 6224886)
                                      U.S. Securities and Exchange Commission
                                      Chicago Regional Office
                                      175 W. Jackson Blvd., Suite 1450
                                      Chicago, Illinois 60604
                                      (312) 353-7390

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 17-cv-3984-WTL-TAB |
| THOMAS J. BUCK, | |
| Defendant. | |

**FINAL JUDGMENT AS TO DEFENDANT THOMAS J. BUCK**

The Securities and Exchange Commission having filed a Complaint and Defendant Thomas J. Buck having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final Judgment; waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

     (b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

     (c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

     (a)     to employ any device, scheme, or artifice to defraud;

     (b)     to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

     (c)     to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U .S.C. §§ 80b-6(1) and (2)] by, as an investment adviser, using the mails, or any means or instrumentality of interstate commerce, directly or indirectly:

(1)     to employ any device, scheme, or artifice to defraud any client or prospective client; or

(2)     to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $2,561,236.71, representing profits gained as a result of the conduct

3

alleged in the Complaint, together with prejudgment interest thereon in the amount of $296,806.31, for a total of $2,858,043.02. Said disgorgement and prejudgment interest shall be offset by an amount equal to the amount of restitution ordered to be paid in the criminal Order of Restitution entered or to be entered in *United States v. Thomas J. Buck*, Crim. No. 1:17-cr-00172-TWP-TAB (S.D. Ind.).

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Thomas J. Buck as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission shall hold the funds (collectively, the "Fund") and may propose a plan to distribute the Fund subject to the Court's approval. The Court shall retain jurisdiction over the

administration of any distribution of the Fund.  If the Commission staff determines that the Fund

will not be distributed, the Commission shall send the funds paid pursuant to this Final Judgment

to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment

interest by moving for civil contempt (and/or through other collection procedures authorized by

law) at any time after 14 days following entry of this Final Judgment.  Defendant shall pay post

judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay a

civil penalty in the amount of $2,233,594.12 to the Securities and Exchange Commission

pursuant to Section 20(d)(2)(C) of the Securities Act, Section 21(d)(3)(B)(iii) of the Exchange

Act, and Section 209(e)(2)(C) of the Investment Advisers Act.  Defendant shall make this

payment within 14 days or pursuant to the terms set forth in section VI below after entry of this

Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank

cashier's check, or United States postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Thomas J. Buck as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action.  By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.  The Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury. Defendant shall pay post-judgment interest on any delinquent amounts pursuant to 28 USC § 1961.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all money, securities or other assets held in the account(s) restrained pursuant to a Seizure Warrant issued in the Southern District of Indiana under *In re Seizure Warrant*, No. 1:16-mj-0320-DML (the "Restrained Funds"), not to exceed $5,091,637.14 (the "Seizure Amount"), that are not used to satisfy any Order of Restitution and/or fine in *United States v. Thomas J. Buck*, Crim. No. 1:17-cr-00172-TWP-TAB (S.D. Ind.), shall be transferred to the Commission in satisfaction of this Final Judgment in accordance with Sections IV and V above.  It is acknowledged and agreed that Defendant's agreement hereunder is limited to the Seizure Amount and any Restrained Funds in excess of the Seizure Amount shall be released to Defendant free and clear of any restriction whatsoever.  The Defendant is hereby ordered to take any steps necessary to affect the transfer of the Restrained Funds to the Commission as required herein. The Commission shall credit those assets upon receipt as payments towards the disgorgement, prejudgment interest, and penalty as set forth in Section IV and V above.  Except as expressly provided in this paragraph, Defendant

6

shall not receive, accept or use for his benefit, whether directly or indirectly, any of the Restrained Funds.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

Dated:  12/21/17

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

7

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 82681 / February 9, 2018**

**INVESTMENT ADVISERS ACT OF 1940**
**Release No. 4856 / February 9, 2018**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-18366**

|  |  |
|---|---|
| In the Matter of<br><br>       THOMAS J. BUCK,<br><br>Respondent. | **ORDER INSTITUTING ADMINISTRATIVE PROCEEDINGS PURSUANT TO SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SECTION 203(f) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted pursuant to Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Section 203(f) of the Investment Advisers Act of 1940 ("Advisers Act") against Thomas J. Buck ("Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, Respondent admits the Commission's jurisdiction over him and the subject matter of these proceedings, and the findings contained in paragraph III.2 below, and consents to the entry of this Order Instituting Administrative Proceedings Pursuant to Section 15(b)(6) of the Securities Exchange Act of 1934 and Section 203(f) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds that:

1.　　From February 1982 to March 2015, Buck was a registered representative and investment adviser representative associated with Merrill Lynch, Pierce, Fenner & Smith Inc., a broker-dealer and investment adviser registered with the Commission during the relevant period. Buck, 63 years old, is a resident of Carmel, Indiana.

2.　　On December 21, 2017, a final judgment was entered by consent against Buck, permanently enjoining him from future violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act, in the civil action entitled Securities and Exchange Commission v. Thomas J. Buck, Civil Action Number 17-CV-3984, in the United States District Court for the Southern District of Indiana.

3.　　The Commission's complaint alleged that Buck, among other things, impermissibly exercised discretion when placing certain trades in certain customer accounts without obtaining authorization from the customer and made material misrepresentations and omissions to customers and investment advisory clients regarding the fees or commissions charged in their accounts.

**IV.**

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent Buck's Offer.

Accordingly, it is hereby ORDERED pursuant to Section 15(b)(6) of the Exchange Act, and Section 203(f) of the Advisers Act, that Respondent Buck be, and hereby is barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and

Pursuant to Section 15(b)(6) of the Exchange Act  Respondent Buck be, and hereby is barred from participating in any offering of a penny stock, including: acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock.

Any reapplication for association by the Respondent will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, the satisfaction of any or all of the following:  (a) any disgorgement ordered against the Respondent, whether or not the Commission has fully or partially waived payment of such disgorgement; (b) any arbitration award related to the conduct that served as the basis for the Commission order; (c) any self-regulatory organization arbitration award to a

customer, whether or not related to the conduct that served as the basis for the Commission order; and (d) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

By the Commission.

Brent J. Fields
Secretary

3