# EXHIBIT 3



767 THIRD AVENUE
NEW YORK NEW YORK 10017

TEL(212) 755-3100
FAX(212) 755-3174
WWW.KAUFMANNGILDIN.COM

Writer's Direct Dial: 212.705.0815
drobbins@kaufmanngildin.com

October 15, 2020

**Via The Portal**

Steeve D. Encaoua
Senior Case Administrator
FINRA Dispute Resolution Services
Southeast Regional Office
Boca Center Tower 1
5200 Town Center Circle – Suite 200
Boca Raton, FL 33486-1017

**Subject:** FINRA Dispute Resolution Services Arbitration Number 20-02468
*Janice J. Compton vs. Merrill Lynch, Pierce, Fenner & Smith Inc. and*
*Thomas Joseph Buck*

### THOMAS J. BUCK'S ANSWER TO STATEMENT OF CLAIM

Dear Mr. Encaoua:

This is the Answer of Respondent Thomas Buck, who requests that the arbitration Panel dismiss all claims against him for the reasons set forth in this Answer and as will be presented at the arbitration hearing. While Respondents in a FINRA arbitration have no burden of proof, we will nevertheless show that the claims and allegations against Mr. Buck are not only time-barred but are false.

### Overview of Answer

Before FINRA, the Securities and Exchange Commission ("SEC") and the United States Federal District Court for the Southern District of Indiana, Tom Buck took responsibility for his misconduct, tendering $5,091,637 to the SEC (representing what that federal agency deemed to be the disgorgement of excessive compensation/commissions, interest and penalty). Mr. Buck pled guilty to a charge of securities fraud fully understanding that he would thereafter be incarcerated

KAUFMANN GILDIN & ROBBINS LLP

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 2

and, while the Department of Justice asked the federal judge that he be sentenced to a term of 78 months, the Court recognized that the amount of loss to customers alleged by DOJ was wholly inconsistent with the facts; the Court sentenced him to 40 months and he has returned home.

Of the $5.1 million Tom Buck paid the government, the SEC established a fund for his former clients who claimed they were excessively charged commissions in lieu of management fees. A fund of $2,858,043 was established in addition to payments made by Respondent Merrill Lynch to customers.  All of those customers accepted payments from Merrill Lynch *except* Claimant, who obtained $946,868 from the SEC despite the fact that:

(1)   Merrill Lynch determined the so-called "excessive fee" amount to be  less;

(2)   Claimant approved all the trading in her accounts and was always aware of their status;[1] and,

(3)   As a result of Tom Buck's securities recommendations to Claimant over the years, she made millions of dollars in trading profits.

Despite these facts, Claimant – who sat silent in the courtroom when Tom was sentenced – has waited years to complain about  trading that took place from 2009 through 2013, rendering her otherwise meritless claims time-barred.  Further, the trading activity at issue in Tom Buck's FINRA, SEC and DOJ matters is different from the trading in Claimant's accounts, as will be explained in this Answer and at the hearing.

We are presently at a disadvantage in fulfilling Respondent Tom Buck's  Rule 12303(a)(2) obligation to serve each party with an Answer "specifying the relevant facts and available defenses to the statement of claim" because he has not had access to Claimant's account records since the spring of 2015. For example, by not having access to Claimant's monthly account statements, we cannot see the trading in 2012 and 2013 that she claims to have been untoward (but which has been referred to in Respondent Merrill Lynch's Answer).[2] This disadvantage should be resolved after Claimant and Merrill Lynch produce Discovery Guide documents and respond to Rule 12507

---

[1] Although Mr. Buck recalls one instance of a miscommunication, to be explained below.
[2] We also need to see account commission runs and what Merrill Lynch refers to as Annual Time Rated Return tables by households to be certain of the returns from the inception of the relationship in 2000 through its cessation in the spring of 2015 and thereafter (because, upon information and belief, Claimant maintained accounts with Merrill Lynch up to sometime this year).

**KAUFMANN GILDIN & ROBBINS LLP**

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 3

additional requests.  At that time, Mr. Buck may very well seek to amend this Answer.  Until then, what follows is based on his best recollection of events that occurred many years ago.

    This Answer will provide a preview of Tom Buck's testimony and will explain how the claims are time-barred by applicable statutes of limitation and are ineligible for FINRA arbitration in accordance with a FINRA arbitration rule. When Tom testifies, the arbitrators will readily see that he never intended to defraud Claimant and that he had her best interests as his motivation for his recommendations.  One need only read Merrill Lynch's Answer to see that there are often two sides to a story.

**THE ALLEGATIONS AND TOM BUCK'S ANTICIPATED TESTIMONY**

    The following are 11 of the many allegations in the 43-page Statement of Claim that Mr. Buck will respond to in this Answer and which he will expand upon at the hearing.[3]

*Quoted Assertions in  the Statement of Claim*[4]

1.  **2009 and Thereafter – "**As soon as Janice's first account was funded in August 2009, Buck assumed control. He proceeded to sell most of the securities that had been transferred into her account from Bob and then began a course of aggressive trading—selling long-term positions prematurely and trading other positions speculatively. He did so knowingly—in complete disregard for Janice's investment objectives and risk tolerances—and did so in order to generate commissions for himself and Merrill. While this trading contradicted Janice's listed objectives, it drew no effective scrutiny because of who Buck was. In little more than five years of trading, Buck generated more than $1.4 million in commissions on some 1,100 trades."

2.  **Tens of Millions of Dollars – "**Janice had been close friends with Buck and

---

[3] All of the allegations of the Statement of Claim are not responded to in this Answer but will be addressed at the hearing.
[4] While the Claim has 97 numbered paragraphs and while the following quotes have not been changed, we have numbered them for formatting purposes and added headings that we believe summarize the allegations quoted.

KAUFMANN GILDIN & ROBBINS LLP

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 4

his family for nearly sixteen years when she opened her accounts with him in 2009. The substantial amount of money she received then – and the additional tens of millions of dollars she received thereafter – came as a result of her painful divorce."

3. **Five Years of Mismanagement** – "For the next five years, Janice allowed Buck to manage her money as he thought best, with Buck only keeping Janice generally apprised of the activity and performance in her accounts. … Buck assumed discretion and control over Janice's accounts from the start, ultimately making over 1,100 trades, charging high commissions and frequently turning over positions that would normally be held long-term by a moderate to moderately conservative investor such as Janice."

4. **Trading Was Profitable** – "While Janice's accounts did generate an overall profit—making some $3.7 million dollars over five years—they made nowhere near what they should have made with simple, prudent management. … Janice had a right to expect that Buck would adhere to such a minimal fiduciary duty and is entitled to a recovery of all of her losses arising out of his failure to do so. The amount of such damages will be proved at trial but with interest, is expected to exceed $7 million."[5]

5. **Never Questioned Trades** – "Selecting only customers who he knew would not question his actions – such as Janice – Buck proceeded to buy and sell high-commission products simply to enrich himself. Account performance – if it was considered at all – was at most secondary."

6. **What was Traded** – "Buck concentrated his trading on securities that paid high commissions but which drew less scrutiny from compliance—including

---

[5] If we are reading this correctly, Claimant is asserting that instead of a $3.7 million profit she earned, the accounts should have generated a profit of $7 million. And this is on top of the $946,868 she received from the SEC fund paid for by Tom Buck. We will seek the statistical support for these alleged damages in accordance with the Discovery Guide and Rule 12507.

**KAUFMANN GILDIN & ROBBINS LLP**

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 5

municipal bonds, common stocks, master limited partnerships and certain new issue syndicate items."

7. **Change of Degree of Trading in 2014** – "Buck's awareness of this investigation can be inferred from changes in how he traded Janice's accounts during parts of 2014 and up until March 2015 when he was fired. In past years Buck had actively traded certain of Janice's accounts—placing multiple trades nearly every month. During 2014, however, his trading slowed and in 2015 it stopped altogether."

8. **"Short Term Trading in Bonds –** Short term trading in bonds was a hallmark of Buck's mismanagement. Buck essentially treated Janice's bond holding as his own private inventory – to be swapped/traded with the Firm or other of his customers at will. While bonds by their nature are intended to be held for the long term, Buck routinely sold them prematurely…The following timeline [in paragraph 26 of the Statement of Claim] reflects the five separate bonds that Buck bought with this $200,000 between February 26, 2010 and May 17, 2011."

9. **"Short-Term  Trading in MLP –** … Buck engaged in the same pattern of short term, speculative trading as he did with bond trades [in 2010, 2011 and 2012 listed paragraph 27 of the Statement of Claim.]"

10. **"Short-Term Holding of Equities.** Buck's pattern of short-term, speculative sales also extended to equities….The following is an abbreviated list of stocks that were purchased only to be sold months (sometimes only weeks) later [from  2009 to 2013, as set forth in paragraph 28 of the Statement of Claim].

11. **No Cogent Strategy** – "Buck employed no cogent investment strategy and executed trades merely to generate commissions."

**KAUFMANN GILDIN & ROBBINS LLP**

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 6

*Tom Buck's Responses to These Quoted Assertions in the Statement of Claim*

These are strong allegations of intentional wrongdoing that need to be addressed at in-person arbitration hearings and they will be. Until then, what follows is Tom Buck's anticipated testimony (which, again, is not based on access to any documents). In words or substance, the arbitrators will hear the following from Tom:

1. **Accounts Opened in 2000** – Bob and Janice Compton opened their accounts with him in 2000. They were in Bob Compton's name and served as the financial support for the family since Bob – who is primarily a venture capitalist – was the primary income earner. From the late 1990s to approximately 2005, he held a senior corporate position with Medtronic Sofamore Danek in Memphis. Tom recalls that a majority of the assets in the accounts (all fee-based) were in bonds. There was very little trading in the accounts after the initial purchases.

2. **2009 Separation** – In 2009, the Comptons separated and Janice opened an account worth approximately $7 million. She profiled as a moderately conservative investor, with a balance of about 45% bonds/45% stocks/10% cash.

3. **Commission-Based** – Tom suggested a commission arrangement based on the previous nine years' experience with the Comptons. His also recommended that she be on the commission platform because, as he recalls, most of his clients paid less in commissions than they would have in fees and therefore the commission platform was expected to be in her best interests. At Mr. Buck's sentencing hearing (that Claimant attended), it was shown by his expert witness that the clients referenced by the Department of Justice did not suffer the damages alleged by that agency.

4. **Strategy** – Because Claimant had not run a portfolio before (although, according to Tom, she is very smart, savvy and had been in the IBM 401K program for 20 years), he made certain to fully explain proposed strategy. That is, he recommended

**KAUFMANN GILDIN & ROBBINS LLP**

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 7

maintaining about a 50% bonds and split the stock portion into two tranches: defensive stocks (P&G, J7J, AT&T, etc.) and offensive stocks (Boeing, Intel, etc.).

5. **Miscommunication Recalled –** There is one time that Tom recalls miscommunicating with Claimant about a purchase. Over the phone, he recommended adding a certain dollar amount to each of the defensive stocks, almost 15 or 20 in her accounts. A day or two later, Claimant called Tom, wanting to know what those purchases were for. When he explained, she said she thought that Tom meant "defense" stocks, like Raytheon. She did not complain, but from that day forward, Tom made certain that he informed her fully before every trade.

6. **Exact Target Stock and Tax-Swapping** – Because the following will be a central subject in Mr. Buck's defense, it will be summarized here and expanded upon greatly at the hearing:

   **A.** *Alleged Overbilling* – The alleged "overbilling" was due to the aggressive tax-swapping necessitated by the Exact Target IPO and buyout. The tax swaps were effective in reducing Claimant's sizeable tax bill.

   **B.** *December 2011* – That month, Claimant received word that Exact Target – a major investor of the Comptons – would be going public in the foreseeable future. This was great news, but was going to create a large tax bill, about which Claimant expressed concern. Tom explained that the only means he had to reduce her tax burden was to take advantage of "down strokes" in the markets to execute tax-swaps to turn a paper loss into a deductible write off. Claimant said she was all for that.

   **C.** *2012* – Exact Target went public and Claimant received approximately $30 million in Exact Target stock. She decided to sell half and keep half based on Tom's advice because with the proceeds from the sales she would have enough

KAUFMANN GILDIN & ROBBINS LLP

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 8

to build her portfolio to provide life-long security for her and her family.

**D.** *Tax-Swaps Continued* – In November 2012, Claimant and her accountant told Tom that they realized that capital gains tax rates were increasing from 15% in 2012 to 23.8% in 2013. So, they decided – with no input from Tom – to sell the half of Claimant's stock and immediately buy it back, thereby realizing a $15 million capital gain and paying taxes at 15% (i.e., about $2.25 million in taxes). That would save her the 8.8% difference in tax rate on $15 million (i.e., a saving of approximately $1.3 million).

**E.** *2013* – That year, Exact Target was bought in an all-cash deal by Sales Force, which resulted in Claimant having a 43.8% short-term profit capital gain rate on about $10 million. With Claimant's approval, Tom did as much tax-swapping as he could throughout 2013.

**F.** *Resulting Commissions* – Because of the tax-swaps, commissions were higher than they otherwise would have been.

**G.** *Exact Target Profit Omitted* – The Statement of Claim omits the profit made on the Exact Target stock from its IPO in the spring of 2012 until its buyout by Sales Force in 2013. At the IPO, Tom recommended that Claimant sell half of her stock for diversification and income security and keep the other half because the prospects for the company were very good.

**H.** *Knowledge of Trading in Exact Target* – Tom was also an early stage investor and, as a result, was well informed about the company. Claimant seems to assert that the profit from that decision should not be considered for this arbitration. That is wrong. The decision to own half of the Exact Target stock was made with Tom, as were all other investment decisions in her portfolio. Tom made the recommendation; he explained the reasons and risks; and, Claimant gave the OK

**KAUFMANN GILDIN & ROBBINS LLP**

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 9

after a discussion.  When those items are included in the calculations, one will find that at Tom Buck's recommendation, Claimant made more than $20 million.

**I.** *Why Claimant Sold Exact* – Tom recalls that Claimant sold 750,000 shares of Exact Target because she knew the capital gains tax rate was going to rise. Again, Exact Target was acquired by Sales Force in 2013, which generated a tax gain of 43% from this sale of these shares. To the best of his recollection, no other client of Mr. Buck's sold investments in 2012 to avoid that increase in the capital gains tax.

**J.** *Slow Down in 2014* – Claimant claims that Tom slowed down his trades in 2014 because he knew Merrill Lynch was on to him. In reality, trading slowed down because the tax-swap strategy that Claimant requested to avoid the huge tax bill was no longer needed.

## TIME-BAR NATURE OF THE CLAIMS

A fair reading of the long Statement of Claim (that has no trading analysis attached but does reference particular bond and equity trading) focuses the reader on trading deemed to be problematic in 2009 through 2013. Mr. Buck and Claimant did not enter into any tolling agreement to extend any applicable statutes of limitation (as Merrill Lynch apparently did).

Let us *assume arguendo* that there is merit to the claims of fraud and other wrongdoing by Mr. Buck with regard to Claimant's Merrill Lynch accounts.  Those claims are still time-barred under Indiana law[6] and are ineligible for arbitration under FINRA Rule 12206(a), which states that "No claim shall be eligible for submission to arbitration under the Code where six years have elapsed from the occurrence or event giving rise to the claim."

---

[6] Tennessee law does not apply under the legal principle of *lex loci delicti commissi,* which means the law of the place where the tort was committed. The term is commonly shortened to *lex loci delicti.*  See: https://definitions.uslegal.com/l/lex-loci-delicti-commissi/

**KAUFMANN GILDIN & ROBBINS LLP**

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 10

*Arbitration Eligibility in Indiana*

The United States Court of Appeals for the Seventh Circuit, which has jurisdiction over the State of Indiana, has held that FINRA's eligibility rule is absolute and not subject to tolling. In that court's analysis of § 15 of the NASD Code (the predecessor to Rule 12206), it held:

- "[W]e note that [FINRA] reads [Rule 12206] to be an eligibility requirement rather than a statute of limitations."[7]

- "[Rule 12206] therefore serves as an absolute bar to claims submitted for arbitration more than six years after the event which gave rise to the dispute."[8]

The federal appeals court's analysis was cited in September 2017 by the arbitration panel in FINRA Case No. 17-00449 in support of that panel's decision to *grant* a respondent's motion to dismiss on the ground that the customer's claim was time-barred under Rule 12206.[9]

Unlike Claimant's dispute with Respondent Merrill Lynch, there is no tolling and standstill agreement between Claimant and Mr. Buck. Therefore, the Panel may not award damages against Mr. Buck for any transaction that occurred before **July 31, 2014**, as any such transaction is ineligible for arbitration under Rule 12206(a).

*Statement of Claim Counts:*

I.   **Indiana's Corrupt Business Influence Act – Operating An Enterprise Through Pattern of Racketeering ("ICBIA")**

*Mr. Buck's Response:*

In her Statement of Claim, Claimant incorrectly asserts that the statute of limitations for a claim under the ICBIA is 10 years.[10]   The statute referenced by Claimant (IC 35-45-6-2) states that violations of the ICBIA are a "Level 5" felony, which has a statute of limitation of 5 years *to bring a criminal prosecution.*[11]   However, *civil actions* like this arbitration seeking damages for violations of the ICBIA are governed by IC 34-24-2-6.

---

[7] *PaineWebber, Inc. v. Farnam*, 870 F.2d 1286, 1292 (7th Cir. 1989).
[8] *Id.* at 1292.
[9] *See Cordero v. Merrill Lynch, et al.*, FINRA Case No. 17-00449 (September 2017). **Exhibit #1** to this Answer.
[10] *See* Statement of Claim, pg. 41.
[11] *See* IC 35-41-4-2(a)(1).

KAUFMANN GILDIN & ROBBINS LLP

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 11

In *Branham Corp. v. New Res. LLC,* 17 N.E.3d 979 (Ind. Ct. App. 2014), the Indiana Court of Appeals confirmed that an action under IC 34-24-2-6 is one for injury to personal property and therefore falls within the purview of IC 34-11-2-4, which states that an action for injury to personal property must be commenced <u>within 2 years</u> after the cause of action accrues.[12]

The wrongdoing alleged in the Statement of Claim is related to trading that took place between 2009 and 2013.  Whether Indiana's 5-year or 2-year statute of limitations applies, Claimant's claims against Mr. Buck under the ICBIA are time-barred and must be denied.

**II.      Indiana Corrupt Business Influence Act – Use Of Racketeering Proceeds To Operate An Enterprise** [*not claimed against Mr. Buck*]

**III.     Federal Rico – Operating An Enterprise Through A Pattern Of Racketeerin**g

*Mr. Buck's Response*:

The Private Securities Litigation Reform Act of 1995 ("Reform Act") amended RICO to eliminate securities fraud as a predicate act except where the defendant has been criminally convicted of the securities fraud.  However, this exception does not apply to Claimant in this matter against Mr. Buck.

The "securities fraud" for which Mr. Buck pled guilty was not similar to the trading activity that is at issue in this case: the trading activity in 2009 – 2013, as set forth in this Answer and as will be explained at the arbitration.

In 1997, the United States District Court for the Eastern District of Michigan, Southern Division, ruled that the so-called "conviction exception" to RICO only applies to victims named in the criminal conviction.  That court held:

> [T]he record reveals that Congress was very weary of the susceptibility of civil RICO to litigation abuses in the securities fraud area.  In recognition of Congress' intention and mindful of it concerns, this court is inclined to interpret the "conviction exception" language as narrowly as possible so that *the exception is only available to those plaintiffs against whom a*

---

[12] *See* IC 34-11-2-4(a)(2)

**KAUFMANN GILDIN & ROBBINS LLP**

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 12

> *defendant has specifically been convicted of criminal fraud.*[13] (*Italics*
> added)

The *Krear* court's narrow interpretation of the "conviction exception" has been adopted throughout the country since it was issued in 1997.  In 2015, the United States District Court for the Southern District of New York applied this narrow interpretation in *Kaplan v. S.A.C. Capital Advisors L.P.*  That court, in addition to adopting the interpretation of the *Krear* court, further limited the exception to parties specifically named in the allocution[14] in cases where a plea is reached, stating:

> This Court agrees, for the reasons stated in *Krear* and the other decisions
> described above, that RICO's criminal conviction exception must be
> interpreted as narrowly as possible. Accordingly, in accord with *Krear,* the
> exception is "only available to those plaintiffs against whom a defendant
> has specifically been convicted of criminal fraud." . . . Further, particular
> plaintiffs cannot avail themselves of RICO's criminal conviction exception
> where they were not specifically named in the plea allocution if there is
> one.[15]

Having not been named in Mr. Buck's criminal conviction nor his plea allocution, Claimant cannot avail herself of the "conviction exception" and her claim must comport with the statute of limitations for civil RICO actions.  The United States Supreme Court has ruled that civil litigation related to RICO violations have a 4-year statute of limitations. [16]

The trading activity at issue in this case took place between 2009-2013, well beyond the four-year limit required under the RICO statute.  Therefore, Claimant's federal RICO claim is untimely and must be denied.

---

[13] *Krear v. Malek*, 961 F. Supp. 1065, 1076 (E.D. Mich. 1997).)
[14] After pleading guilty, a defendant is typically offered a formal opportunity to address the court to express remorse, and explain personal circumstances that might be considered in sentencing. This is known as an allocution statement. https://www.americanbar.org/groups/public_education/publications/teaching-legal-docs/what-is-an-allocution-statement-/
[15] *Kaplan v. S.A.C. Capital Advisors, L.P.*, 104 F. Supp. 3d 384, 389 (S.D.N.Y. 2015).
[16] *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156, 107 S. Ct. 2759, 2767, 97 L. Ed. 2d 121 (1987).

**KAUFMANN GILDIN & ROBBINS LLP**

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 13

**IV.     Civil Recovery Under Indiana's Crime Victim Statute**

*Mr. Buck's Response*:

In Count Four of the Statement of Claim, Claimant alleges that she is entitled to, among other things, treble damages under Indiana's Crime Victim Relief Act (CVRA), but she is mistaken.  The CVRA creates a civil remedy for victims of a criminal offense.  As stated above, in Mr. Buck's response to the federal RICO claim, Claimant was not a named victim of the crime to which Mr. Buck pled guilty.  As with her federal RICO claim, Claimant invokes the CVRA to bootstrap her claim to an unrelated criminal proceeding in an attempt to obtain treble damages to which she is not entitled.

The Indiana Supreme Court has interpreted the CVRA to only apply where a predicate, criminal act was committed against the claimant.  While Claimant here made a claim for "fraud," that claim – while incorrectly citing Tennessee law – was for *common law fraud* and not *criminal fraud* as required by the CVRA.[17]  In affirming an Indiana Court of Appeals denial of exemplary damages, the Indiana Supreme Court held:

- "[T]he court's original order expressly premised its judgment on common-law fraud, and it just as expressly *refused* to award any additional damages under the CVRA. . . [I]t was well within its discretion to impose common-law liability for fraud as an intentional tort, while declining to impose quasi-criminal CVRA liability."[18]

- "The [Plaintiff's] open-ended complaint encompassed multiple alternative theories of liability.  The relevant count of their complaint was simply captioned 'Fraud'; they pleaded all the elements of common-law fraudulent misrepresentation; and their prayer for relief was expressly 'not . . . limited to' the CVRA."[19]

Without the predicate claim of criminal wrongdoing, Claimant has no standing to request exemplary damages under the CVRA.  However, even if the Panel were to find a predicate criminal act, Claimant's claim under the CVRA is time barred.

---

[17] *See* Statement of Claim, pg.38.
[18] *Wysocki v. Johnson*, 18 N.E.3d 600, 604-605 (Ind. 2014).
[19] *Id*. at 605.

KAUFMANN GILDIN & ROBBINS LLP

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 14

Indiana courts have interpreted the CVRA to be punitive, not compensatory in nature, thus requiring a claim to be brought within 2 years.  The Court of Appeals of Indiana affirmed this interpretation in 2003, holding:

> We note that Indiana Code section 34–24–3–1 [the CVRA] allows a plaintiff to collect treble damages, attorney's fees, and court costs from a defendant who has committed certain violations of the criminal code . . . . We also note, however, that this court has determined that a claim under Indiana Code section 34–24–3–1 is penal in nature. . . . . As such, a two-year statute of limitation applies.[20]

The trading activity that Claimant seeks compensation for took place between 2009-2013 and falls well outside of the 2-year statute of limitation.  Claimant has failed to assert the condition precedent of criminal wrongdoing and has failed to bring this claim within 2 years, thus barring her from any exemplary damages under the CVRA.

Notwithstanding, Claimant has already recovered $946,868 indirectly from Mr. Buck (who funded the SEC fund).  This amount, upon information and belief, greatly exceeds the loss that Merrill Lynch and the Department of Justice determined that Claimant suffered.

V.      **Breach of Fiduciary Duty**

*Mr. Buck's Response*:

The Statement of Claim cites inapplicable Tennessee law, making no reference to the law of the state in which the alleged misconduct occurred.  In Indiana, where the wrongdoing is alleged to have taken place, claims for Breach of Fiduciary Duty are divided into two categories – claims involving negotiable instruments and claims for tortious breach of fiduciary duty.  Claims involving negotiable instruments are governed by IC 26-1-3.1-307, which has a statute of limitation of 3 years. *See* IC 26-1-3.1-118(g).

---

[20] *Clark v. Univ. of Evansville*, 784 N.E.2d 942, 945 (Ind. Ct. App. 2003) (citing *Browning v. Walters,* 616 N.E.2d 1040, 1046 (Ind.Ct.App.1993)).

K<small>AUFMANN</small> G<small>ILDIN</small> & R<small>OBBINS</small> LLP

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 15

While Claimant makes no reference as to which form of breach she seeks damages for, the facts and interpretation of the Statement of Claim make it appear that the Claimant is asserting a claim of tortious breach of fiduciary duty.  In 2009, the Indiana Supreme Court held:

> Our Court of Appeals has determined that a breach of fiduciary duty is a tort claim for injury to personal property and therefore *the applicable statute of limitation is two years*.[21] (*Italics* added)

As such, whether you apply the 3-year or 2-year statute of limitation, under Indiana law, Claimant's claim for Breach of Fiduciary Duty is time barred against Mr. Buck.

## VI.     Fraud

*Mr. Buck's Response*:

Here, too, Claimant cites "elements of a claim for common law and promissory fraud in Tennessee" (par. 82), despite her allegation that the fraud occurred in Indiana.  Indiana's statute of limitations governing fraud is IC 34-11-2-7, which sets a 6-year time limit to bring such a claim. Claimant's Statement of Claim was filed in the summer of 2020, rendering claims related to trades prior to July 2014 time-barred (i.e., the trades at issue). [22]

## VII.     Negligent Supervision [*not asserted against Mr. Buck*]

## VIII.     Exemplary Damages

*Mr. Buck's Response*:

While not listed as a formal Cause of Action, Claimant seeks Exemplary Damages in her Statement of Claim.  However, Claimant, again, wrongly cites the law of a state in which the alleged wrongful conduct did not occur.  All of the alleged wrongdoing that Claimant seeks damages for took place in Indiana.  Therefore, any attempt to obtain Exemplary Damages under

---

[21] *City of E. Chicago, Indiana v. E. Chicago Second Century, Inc.*, 908 N.E. 2d 611, 618 (Ind. 2009).
[22] While Mr. Buck reiterates that only Indiana law is applicable in this matter, Claimant's claims for fraud and breach of fiduciary are also time barred under Tennessee law.  Tenn. Code Ann. § 28-3-105(1) places a 3-year statute of limitation on these claims.  Therefore, Claimant is barred from seeking damages for any wrongdoing that took place prior to  July 31, 2017.

**KAUFMANN GILDIN & ROBBINS LLP**

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 16

the Tennessee statute are improper and must be denied.

### AFFIRMATIVE DEFENSES

Without admitting any of the allegations of wrongful conduct in the Statement of Claim or that Claimant will meet her burden of proof at the hearing, Respondent Thomas Buck asserts the following Affirmative Defenses.  He reserves his right to amend his Answer to include any applicable defenses that may become available or apparent during the course of this arbitration:

**First Affirmative Defense** – The Statement of Claim and each of the causes of action contained therein are barred because they fail to state facts sufficient to constitute a cause of action against me or any of the Respondents. The truth, the facts, are to the contrary.

**Second Affirmative Defense** – Claimant's causes of action are barred by applicable statutes of limitation.  Here we are in 2020 and the Claimant is complaining about transactions in 2009 through 2013. They are also ineligible for arbitration at FINRA because of the passage of time since those transactions.

**Third Affirmative Defense** – Claimant is barred from recovery by the equitable doctrines of waiver, estoppel, unclean hands and laches.  Claimant approved the trading at issue.

**Fourth Affirmative Defense** – The damages, if any, allegedly suffered by Claimant were proximately caused or were the consequence of the conduct, actions, omissions, negligence or intentional acts of Claimant herself and/or parties other than Mr. Buck.  Indeed, by Claimant's own admission, there was a trading profit of almost $4 million.  There are no guarantees in the securities markets and when Claimant regularly reviewed her account statements, she could see that the causes of her profits and losses were multi-faceted.

**Fifth Affirmative Defense** – Tom Buck acted in good faith and did not know of and in the exercise of reasonable care could not have known of the facts from which liability is alleged to arise. He always had Claimant's best interest at heart in making investment recommendations.

**Sixth Affirmative Defense** – Any duty or obligation, contractual or otherwise, that Claimant claims that Tom Buck owed to her was fully performed, satisfied and discharged.

KAUFMANN GILDIN & ROBBINS LLP

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 17

**Seventh Affirmative Defense** – Claimant has expressly or implicitly consented to each and every action on Tom Buck's part of which she now complains.

**Eighth Affirmative Defense** – None of Tom Buck's acts  with regard to Claimant were willful, malicious, in bad faith or motivated by ill-will or fraud. To seek punitive damages on top of the millions of dollars of profits Claimant made, plus the $946,868 she received indirectly from Mr. Buck (through the SEC fund), is inequitable.

**Ninth Affirmative Defense** – Claimant is not entitled to an award of attorney's fees or costs because there is no basis for it under statute, contract or otherwise.

**Tenth Affirmative Defense** – Claimant's causes of action are barred, in whole or in part, by her acquiescence in the purported acts and/or omissions upon which they are predicated.

**Eleventh Affirmative Defense** – Claimant is barred from recovery to the extent she affirmed and ratified the investments, transactions and all actions and omissions of which she now complains.  She regularly received trade confirmations and monthly statements and, upon information and belief, had online access to her Merrill Lynch accounts.

**Twelfth Affirmative Defense** – Claimant knowingly and voluntarily assumed the risk of losing her invested assets when she chose and approved the subject investments.

**Thirteenth Affirmative Defense** – Claimant knew of and understood the basic operation and risks of the disputed investments and/or retained (or could have retained) outside advisors to advise her regarding the disputed investments before they were purchased. Indeed, the sales referenced above were a strategy discussed with Claimant's accountant.

**Fourteenth Affirmative Defense** – Claimant had actual and/or constructive knowledge of facts and investment risks and assumed any such risks associated with the investments.

**KAUFMANN GILDIN & ROBBINS LLP**

Steeve D. Encaoua
FINRA Dispute Resolution Services
October 15, 2020
Page 18

## PRAYER FOR RELIEF

On Claimants' Statement of Claim, Respondent Thomas J. Buck respectfully requests that:

1.     All causes of action be dismissed against him in their entirety;

2.     Claimant takes nothing further by way of her Statement of Claim;

3.     His portion of the forum fees be assessed against Claimant;

4.     He be awarded his costs and expenses, including reasonable attorney's fees and expert fees incurred in defending this arbitration; and,

5.     He be granted any other relief that the Panel deems just and proper.

Respectfully Submitted,

*/David E. Robbins/*

David E. Robbins


*Sam A. Silverstein*

Sam A. Silverstein

# EXHIBIT 1

**Award**
**FINRA Office of Dispute Resolution**

---

In the Matter of the Arbitration Between:

Claimant                                          Case Number: 17-00449
Adolfo Cordero

      vs.

Respondents                                     Hearing Site: Miami, Florida
Merrill Lynch, Pierce, Fenner & Smith, Inc.
Simon David Kopel

---

Nature of the Dispute: Customer vs. Member and Associated Person

## REPRESENTATION OF PARTIES

For Claimant Adolfo Cordero: Luis F. Biason, Esq., Luis F. Biason, P.A., North Miami Beach, Florida.

For Respondents Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS") and Simon David Kopel ("Kopel"): Tanya S. Lambrechts, Esq., Bressler, Amery & Ross, P.C., Fort Lauderdale, Florida.

## CASE INFORMATION

Statement of Claim filed on or about: February 14, 2017.
Adolfo Cordero signed the Submission Agreement: February 14, 2017.

Statement of Answer filed by Respondents MLPFS and Kopel on or about: May 25, 2017.
Respondent MLPFS signed the Submission Agreement: May 25, 2017.
Respondent Kopel signed the Submission Agreement: May 25, 2017.

Motion to Dismiss the Statement of Claim as Ineligible for Arbitration Pursuant to FINRA Rule 12206(a) ("Motion to Dismiss") filed by Respondents MLPFS and Kopel on or about: July 10, 2017.
Response in Opposition to Respondents' Motion to Dismiss ("Response to Motion to Dismiss") filed by Claimant on or about: August 9, 2017.
Reply in Support of Motion to Dismiss filed by Respondents MLPFS and Kopel on or about: August 14, 2017.
Response to Respondents' August 14, 2017, Reply ("Sur-reply") filed by Claimant on or about: August 18, 2017.

## <u>CASE SUMMARY</u>

Claimant asserted the following causes of action: unauthorized trading; churning; and omission of facts. The causes of action relate to the alleged unauthorized trading of mutual funds held in Claimant's account by Respondent Kopel while working for Respondent MLPFS.

Unless specifically admitted in the Statement of Answer, Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## <u>RELIEF REQUESTED</u>

In the Statement of Claim, Claimant requested: approximately $50,000.00 in compensatory damages; unspecified punitive damages; interest; costs (forum fees, witness and production fees) and attorneys' fees.

In the Statement of Answer, Respondents requested that: the Statement of Claim be denied with prejudice; the FINRA costs associated with the arbitration proceeding be assessed against Claimant; and all references to this proceeding be expunged from Respondent Kopel's Central Registration Depository ("CRD") records.

## <u>OTHER ISSUES CONSIDERED AND DECIDED</u>

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On or about, July 10, 2017, Respondents MLPFS and Kopel filed a Motion to Dismiss in which they argued, among other things, that Claimant's claims were ineligible for arbitration pursuant to Rule 12206(a) because Claimant sold the subject investments and closed his account at MLPFS over 15 years ago. On or about August 14, 2017, Claimant filed a Response to Motion to Dismiss in which he argued, among other things, that the eligibility of his claim was subject to equitable tolling under New Jersey State law because Claimant was prevented from asserting his rights in an extraordinary way (i.e., during a period of incarceration in New Jersey, he was attacked and injured by a prison gang). On or about August 14, 2017, Respondents MLPFS and Kopel filed a Reply in Support of Motion to Dismiss in which they argued, among other things, that even if everything stated in Claimant's Response to Motion to Dismiss were true, his claims were still ineligible for arbitration and time barred by statutes of limitation. On or about August 18, 2017, Claimant filed a Sur-reply in which he reiterated that he was prevented from asserting his rights in an extraordinary way as a result of his incarceration and subsequent detention by U.S. Immigration and Customs Enforcement upon his release from prison.

On August 21, 2017, the Arbitrator heard oral arguments on Respondents' Motion to Dismiss and granted the Motion to Dismiss pursuant to Rule 12206 of the Code of Arbitration Procedure (the "Code"). The Arbitrator granted Respondents MLPFS and Kopel's Motion to Dismiss and provided the following explanation:

FINRA Office of Dispute Resolution
Arbitration No.  17-00449
<u>Award Page 3 of 6</u>

FINRA Rule 12206 (the "Eligibility Rule") bars the arbitration of claims arising more than six years prior to the filing of the Statement of Claim. The Eligibility Rule acts as a statute of repose and prohibits the instant claims from proceeding in FINRA arbitration – the purpose being to protect parties from litigating stale claims without adequate documentation and witness recollection. Additionally, even if Claimant's claims were eligible, they are time-barred by the applicable statutes of limitations. Accordingly, the claims are ineligible for arbitration, time-barred, and should be dismissed.

Claimant's claims are clearly ineligible for arbitration before FINRA. According to the Eligibility Rule, "[n]o claim shall be eligible for submission to arbitration under the code where six years have elapsed from the occurrence or event giving rise to the claim." FINRA Rule 12206(a). This provision "serves as an absolute bar to claims submitted for arbitration more than six years after the event which gave rise to the dispute." *Paine Webber v. Farnam*, 870 F.2d 1286, 1292 (7th Cir. 1989). As an absolute bar, the Eligibility Rule does not depend on when Claimant supposedly became aware of his alleged claims, as "[t]he date of the occurrence or event does not under any circumstances depend on the date when the aggrieved investor first discovers that he or she has suffered a financial loss." *Dean Witter Reynolds, Inc. v. McCoy*, 853 F. Supp. 1023, 1030-1031 (E.D. Tenn. 1994).

Claimant argues that the Eligibility Rule is subject to equitable tolling and applies New Jersey state procedural law to support his position. He cited a series of cases under New Jersey law in furtherance thereof. He asserts that "the guiding principle of equitable tolling is whether a plaintiff is prevented from asserting rights in an extraordinary way."

Claimant contends that while in prison he was attacked and, due to an extended recovery period, he was unable to pursue his claim. Claimant was attacked on September 30, 2010 – nine years after his account was closed at Respondent MLPFS.

Claimant admits in his Statement of Claim and response to Respondents' Motion to Dismiss that he was aware of the fact that he had a claim against Respondent MLPFS on or around 2001. There was nothing offered to suggest why a claim could not have been filed during this period of time.

Respondent's Motion to Dismiss pursuant to Rule 12206 of the Code is granted by the Arbitrator without prejudice to any right the Claimant has to file in court; the Claimant is not prohibited from pursuing his or her claims in a court pursuant to Rule 12206(b) of the Code.

To the extent that Respondent Kopel did not pursue his request for expungement of this proceeding from his CRD records at the August 21, 2017, hearing, the Arbitrator deemed Respondent Kopel's request withdrawn and did not make a determination on the request.

FINRA Office of Dispute Resolution
Arbitration No.  17-00449
<u>Award Page 4 of 6</u>

## <u>AWARD</u>

After considering the pleadings, the testimony and evidence presented at the recorded telephonic hearing, the Arbitrator has decided in full and final resolution of the issues submitted for determination as follows:

1.  Claimant's claims are hereby dismissed pursuant to Rule 12206.

2.  Any and all claims not specifically addressed herein are hereby denied.

## <u>FEES</u>

Pursuant to the Code, the following fees are assessed:

### <u>Filing Fees</u>
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

| | | |
|---|---|---|
| Initial Claim Filing Fee | =$ | 600.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### <u>Member Fees</u>
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as party, Respondent MLPFS is assessed the following:

| | | |
|---|---|---|
| Member Surcharge | =$ | 750.00 |
| Member Process Fee | =$ | 1,750.00 |

### <u>Hearing Session Fees and Assessments</u>
The Arbitrator has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s) that lasts four (4) hours or less. Fees associated with these proceedings are:

Two (2) pre-hearing sessions with a single arbitrator @ $450.00/session  =$   900.00
Pre-hearing conferences:   July 25, 2017            1 session
                           August 21, 2017         1 session

_____

| | | |
|---|---|---|
| Total Hearing Session Fees | =$ | 900.00 |

The Arbitrator has assessed $450.00 of the hearing session fees to Claimant.

The Arbitrator has assessed $450.00 of the hearing session fees jointly and severally to Respondents MLPFS and Kopel.

FINRA Office of Dispute Resolution
Arbitration No.  17-00449
Award Page 5 of 6

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

FINRA Office of Dispute Resolution
Arbitration No.  17-00449
<u>Award Page 6 of 6</u>

## <u>ARBITRATOR</u>

Richard Carl Smukler                    -            Sole Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument which is my award.

## <u>Arbitrator's Signature</u>

_____        _____
Richard Carl Smukler                                         Signature Date
Sole Public Arbitrator

_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

FINRA Office of Dispute Resolution
Arbitration No.  17-00449
<u>Award Page 6 of 6</u>

## <u>ARBITRATOR</u>

Richard Carl Smukler                    -              Sole Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein
and who executed this instrument which is my award.

### <u>Arbitrator's Signature</u>

_____                    September 20, 2017
                                                    _____
Richard Carl Smukler                                Signature Date
Sole Public Arbitrator

                    September 27, 2017
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)