# EXHIBIT 5

**IN ARBITRATION PROCEEDINGS BEFORE**

**FINRA DISPUTE RESOLUTION**

---

| | | |
|---|---|---|
| IN THE MATTER OF ARBITRATION BETWEEN: | ) | |
| | ) | |
| JANICE J. COMPTON | ) | |
| | ) | |
| CLAIMANT, | ) | |
| | ) | **CASE NO. 20-02468** |
| vs. | ) | |
| | ) | |
| THOMAS J. BUCK | ) | |
| | ) | |
| RESPONDENT. | ) | |

---

**CLAIMANT'S PRE-HEARING BRIEF**

---

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................... 4

    A.  CLAIMANT—JANICE COMPTON. ........................................................... 4

    B.  RESPONDENT—THOMAS BUCK. ........................................................... 5

    C.  THE COMPTONS MEET THE BUCKS. ...................................................... 6

    D.  JANICE OPENS AN ACCOUNT WITH BUCK AND THE FRAUD BEGINS. .......... 6

    E.  EXACT TARGET. ....................................................................................... 9

    F.  BUCK'S TERMINATION, BARS FROM THE SECURITIES INDUSTRY AND

       CRIMINAL PROSECUTION. ....................................................................... 9

III. BUCK'S FRAUDULENT SALES PRACTICES AT ISSUE .......................................... 11

A. MS. COMPTON'S INVESTMENT OBJECTIVES, RISK TOLERANCE AND LIKELY FREQUENCY OF TRADING..........................................................................11

B. FINRA'S SUITABILITY REQUIREMENTS .................................................12

C. BUCK'S OVER- TRADING SLOW CHURN OF MS. COMPTON'S ACCOUNTS WAS FRAUDULENT ...........................................................................................13

    1. BUCK'S IN AND OUT AND SHORT TERM TRADING. ...............................18

    2. SHORT TERM TRADING OF BONDS AND PREFERRED SECURITIES. ......19

    3. SHORT TERM TRADING OF STOCKS. ..........................................................21

    4. SHORT TERM TRADING OF MASTER LIMITED PARTNERSHIPS ("MLPS"). .............................................................................................................22

    5. SHORT TERM TRADING OF A SHARE MUTUAL FUNDS & CLOSED END MUTUAL FUNDS ...................................................................................................22

IV. MS. COMPTON'S CAUSES OF ACTION AGAINST BUCK .....................................23

A. CONSTRUCTIVE FRAUD UNDER INDIANA LAW .................................23

B. VIOLATION OF THE FEDERAL "RICO" STATUTE.................................26

    1. Buck was both employed by Merrill—an "enterprise" that affected interstate commerce—and participated in the conduct of Merrill's affairs. .........................27

    2. Buck engaged in a "pattern of racketeering activity"............................................28

    3. Ms. Compton squarely fits the so-called "Conviction Exception" for RICO claims based on securities fraud because Buck was first criminally convicted of securities fraud and that fraud was "connected with" the securities fraud now at issue here in this Arbitration. ..................................................................................................29

    4. Buck's pattern of racketeering injured Ms. Compton ...........................................32

C. VIOLATION OF INDIANA'S CORRUPT BUSINESS INFLUENCE ACT .............. 33

   1. The elements of a claim under the Indiana Corrupt Business Influence Act ........ 33

   2. Buck was employed by Merrill—an "enterprise"—and conducted/participated in

     Merrill's activities. ............................................................................... 34

   3. Buck engaged in a "pattern of racketeering activity" ............................................. 34

   4. Ms. Compton is an "aggrieved" person directly resulting from Buck's trading .... 35

V. DAMAGES ...................................................................................................... 35

  A. WELL MANAGED ACCOUNT DAMAGES ............................................. 36

   1. Well Managed Account Damages are Available in State and Federal Securities

     Cases ......................................................................................................... 37

  B. MS. COMPTON IS ENTITLED TO COMPLETE DISGORGEMENT OF THE

   COMMISSIONS CHARGED ......................................................................... 39

  C. OFFSET OF COMPENSATORY DAMAGES FROM PRIOR SETTLEMENTS. ..... 40

  D. MS. COMPTON IS ENTITLED TO TREBLE DAMAGES UNDER INDIANA'S

   CORRUPT BUSINESS INFLUENCE ACT & THE FEDERAL RICO STATUE ...... 40

  E. ATTORNEY'S FEES ....................................................................................... 41

  F. PRE-JUDGMENT INTEREST ........................................................................ 41

  G. PUNITIVE DAMAGES .................................................................................. 42

  H. POST JUDGMENT INTEREST ...................................................................... 43

VI. OTHER LEGAL ISSUES ................................................................................. 43

  A. MS. COMPTON'S CLAIMS ARE TIMELY. ................................................. 43

   1. Indiana constructive fraud—6 year statute ............................................................. 43

   2. Federal  RICO claim—4-year statute that only began to run in 2019 ................... 43

3. Indiana Corrupt Business Act claim—10-year statute. ........................................... 44

B. MS. COMPTON ASKS FOR A SPECIFIC FINDING OF FRAUD TO PREVENT MR. BUCK FROM DISCHARGING AN AWARD IN BANKRUPTCY ................... 45

C. PURPORTED RATIFICATION, WAIVER, ESTOPPEL AND COMPARATIVE FAULT BY MS. COMPTON ARE INAPPLICABLE ................................................ 46

VII. CONCLUSION .......................................................................................................... 47

## IN ARBITRATION PROCEEDINGS BEFORE
## FINRA DISPUTE RESOLUTION

---

| | |
|---|---|
| **IN THE MATTER OF ARBITRATION BETWEEN:** ) | |
| ) | |
| **JANICE J. COMPTON** ) | |
| ) | |
| **CLAIMANT,** ) | |
| ) | **CASE NO. 20-02468** |
| **vs.** ) | |
| ) | |
| **THOMAS J. BUCK** ) | |
| ) | |
| **RESPONDENT.** ) | |

---

## CLAIMANT'S PRE-HEARING BRIEF

---

Claimant Janice J. Compton ("Ms. Compton", "Janice" or "Claimant"), submits the following Pre-Hearing Brief to assist the Panel with some of the factual and legal issues it may confront during the upcoming hearing. This Brief will address certain background facts, discuss Tom Buck's actionable mishandling of Ms. Compton's accounts, provide relevant law regarding Ms. Compton's several causes of action, and finally, focus on the still unreimbursed damages Ms. Compton has incurred, as well as her entitlement to treble and /or punitive damages due to the egregiousness of Mr. Buck's conduct.

## I.       INTRODUCTION

The facts of this case are remarkable. As the Panel will shortly learn in person, Tom Buck was a rogue of a broker who shamelessly took advantage of his clients' trust in order to

methodically defraud them.  Indeed, the following facts will go totally *undisputed* at the final hearing:

- *Over 100* of Buck's customers complained about his handling of their accounts, including that he took discretion, made unsuitable trades, lied about performance and/or lied about the benefits of using fee-based (rather than commission-based) accounts. These complaints resulted in over $9 million in settlements (excluding Ms. Compton's)—all of which were paid by Merrill; none of which were paid by Buck;

- Buck, in his own hand, wrote a narrative in which he specifically confesses to cheating his customers—particularly the customers who trusted him the most.

- Buck was charged with—and later plead guilty to—securities fraud. Ms. Compton was one of the four customers specifically identified as victims of this fraud in his criminal prosecution and Buck's plea was for the exact same types of conduct Ms. Compton complains of here in this case;

- Buck was barred by FINRA from ever being employed by a regulated entity in the securities industry; and

- Buck was barred from further employment in the securities industry in general by the SEC;

- Buck has spent the better part of the last three years in **a federal prison** for his crimes.

It is against this factual backdrop that Mr. Buck now appears before this Panel claiming that he did not lie to, cheat and defraud Janice Compton, one of his largest and most trusting customers.[1]

This case originally also included Merrill Lynch, which claimed that Buck had lied to it, too, about his years-long frauds. Merrill, however, also simultaneously made many of the same specious arguments that Mr. Buck is likely to make here at the final hearing—e.g. that Ms.

---

[1] Internal documents produced by Merrill indicate that Ms. Compton's accounts were Buck's 2nd largest during much of the time period at issue.

Compton had *no damages* because her accounts were profitable[2] or that she had already been *fully reimbursed* for any damages via the $946,868 she received from the SEC's Victim's Fund. However, on December 9, 2021, Merrill abandoned these defenses and instead agreed to pay Ms. Compton $5,500,000 to settle her claims.[3] While not insubstantial, the amount of these payments from the SEC and Merrill (collectively $6,446,868) still falls far short of fully compensating Ms. Compton for the damages Mr. Buck has caused. Indeed, they do not even equal the amount her account should have made if her accounts had been prudently managed. Moreover, this number does not include Ms. Compton's right to treble damages and attorneys' fees under two of her claims or, alternatively, for punitive damages due to the egregious nature of Buck's frauds, his on-going refusal to acknowledge his wrong-doing here and his obvious lack of true contrition.

While Ms. Compton's damages will be treated in depth toward the end of this Brief, the following chart generally reflects the minimum amount of damages Ms. Compton expects to prove up at the hearing:

---

[2] Excluding the profits from Exact Target, Ms. Compton's accounts made a total of $3,718,481 over a 5-and-a-half-year on an average equity of $13.5 million. During this same period the Dow Jones was up approximately 51%, the S&P 500 was up approximately 47% and the NASDAQ was up approximately 40%.

[3] The terms of Ms. Compton's settlement with Merrill fully allows this information to be shared with the Panel. Moreover, the settlement amount is also public and is reflected on Mr. Buck's publicly available BrokerCheck report.

| Summary of Ms. Compton's Damages | |
|---|---|
| Well Managed Damages i.e. account underperformance | $7,183,000 |
| Commissions charged to Ms. Compton | $1,404,188 |
| - Less what Ms. Compton has been paid to date from settling with Merrill ($5,500,000) and from the SEC Victim's Fund ($946,868) | $6,446,868 |
| **Subtotal = Ms. Compton's Compensatory Damages** | **$2,140,320** |
| Trebling of Compensatory Damages per her RICO or Indiana Corrupt Business Influence Act causes of action ($2,140,320 x 3) [4] | $6,420,960 |
| Pre-judgment Interest at 10% from 3/2015 through the final hearing for Ms. Compton's Well Managed Damages + Commissions | $4,309,800 |
| Attorney's fees and expenses through December 2021 | $1,967,068 |
| **Preliminary Total owed to Ms. Compton** | **$12,697,828** |

## II.     FACTUAL BACKGROUND

What follows is a truncated discussion of some of the relevant facts. Ms. Compton refers the Panel back to her Statement of Claim (*see* ¶¶ 1-45) for a more fulsome rendition. Additionally, Ms. Compton has created two demonstrative timelines (one covering the period before Buck's termination and one after) to aid the Panel in tracking some of the more important events in this matter. A copy of those timelines is attached collectively as **Exhibit 1**.

### A.   CLAIMANT—JANICE COMPTON.

Janice Compton is 63 years old, now divorced, and the mother of two daughters. Although she has been active as a mother and a volunteer, Ms. Compton has not been employed for the last 30 years. Prior to their divorce, the family's investment decisions were handled by her husband.

Ms. Compton graduated from college in 1981 and thereafter worked at IBM in technical sales. In 1984, she married Bob Compton, following his graduation from Harvard Business School.

---

[4] Alternatively, Ms. Compton seeks a punitive damage award at the maximum allowed under Indiana law which is also equal to three times her compensatory damages which total $6,420,960.

4

Bob went on to become a venture capitalist and was an early investor in a number of startups—including Exact Target (more on that below). Over time, Bob's work made the family wealthy.

After working for approximately 11 years at IBM, Ms. Compton left the workforce to raise her two children, Elizabeth (1992) and Meredith (1994). In addition to the normal challenges of managing a family, both girls experienced serious health issues. Elizabeth developed Type I diabetes in her pre-teens, which required constant monitoring, special diets, and frequent shots. Meredith was born with club feet which required several operations early in her life.

In 2009—after nearly 25 years of marriage—Janice's husband asked for a divorce. This was emotionally devastating to her. The divorce, moreover, was acrimonious and was not resolved until the June 2011. The divorce resulted in Janice receiving significant assets from her husband—some $6.8 million in August 2009 and an additional $5 million in cash in June 2011 plus 1,500,000 shares of Exact Target, a startup that Bob had invested in years earlier which was still not public. Prior to receiving these assets, Ms. Compton had virtually no experience with investing. Indeed, even the investment decisions for her work-funded retirement accounts—including a $13,000 IRA at Merrill—were handled by Bob.

### B.   RESPONDENT—THOMAS BUCK.

Tom Buck ("Buck" or "Mr. Buck") is 68 years old. For a majority of the last 40 months, Buck has been incarcerated in an Indiana federal prison for *securities fraud* based on the *exact conduct* that is at issue in this FINRA arbitration. Prior to that, Buck was a heavyweight at Merrill who was more than willing to throw that weight around. In fact, he was one of the biggest producers in all of Merrill Lynch—in the top 50 for commissions generated out of a total of some 14,000 Merrill brokers. Additionally, Buck was recognized as one of the best brokers in the *entire*

5

*country*, making the Barron's List of "Top 100 Financial Advisors"[5] in 2012, 2013 and 2014.[6] Those accomplishments were impressive to Janice and made her all the more comfortable with Buck managing her accounts.

### C.   THE COMPTONS MEET THE BUCKS.

In 1989, the Comptons moved to Carmel, Indiana to a house directly across the street from the Buck household. Both families had daughters the same ages, and they soon became close friends, with both families attending social and children's events, sharing meals and even vacationing together. After roughly eleven (11) years of being neighbors, the Comptons moved to Memphis for Bob's work. Despite this move, the families stayed close and even went on an African safari together in 2006—just three years before the conduct at issue in this arbitration began.

As an outgrowth of this personal relationship, a business relationship ultimately developed between Tom Buck and Bob Compton. In 1999, Bob opened the first of several family accounts at Merrill. Each of these accounts were opened in Bob's name only. Janice had no knowledge of the particulars of the accounts—other than to know that Bob was pleased with Buck's performance.

### D.   JANICE OPENS AN ACCOUNT WITH BUCK AND THE FRAUD BEGINS.

In 2009, Bob announced that he wanted to end their marriage of nearly 25 years. This betrayal was devastating to Janice and effectively left her as a single parent to her girls, then aged

---

[5] Barron's is one of the top financial services publications in the country and it is highly sought after to be featured in it.

[6] This "success" made Buck very wealthy and his W-2's reflect that he was making over $4 million *annually* from Merrill before his termination.

14 and 16. Bob's exit also thrust investment responsibilities upon Janice for which she was not prepared. The initial division of the couple's assets occurred in August 2009, when BOB split one of his Merrill accounts down the middle with Janice. This resulted in approximately $6,860,000 in securities and cash being transferred from an account that Buck managed for Bob, to a new account that Buck was to manage for Janice. Bob had strongly recommended that Janice use Buck, stating: "Tom Buck is a very good, conservative money manager."[7] given how little she knew about investing, it gave Janice comfort that a close friend—someone she thought truly cared about her and her girls—would be managing her money.

Buck had set up the account that received these assets months earlier, in March 2009. The only thing Buck sought from Janice to establish that account was her signature on a one-page document sent from Buck's office. While she did not know it at the time, this was an inauspicious start since this one-page document gave none of the critical information that Buck should have gathered in order to "know his customer"—such as her risk tolerance, investment objectives, investment experience, income needs and her estimated tax bracket. Similarly, Buck failed to gather all required critical information for the other four accounts he later opened for her. In addition, internal documents produced by Merrill show that most of the information collected was inaccurate—such as Ms. Compton having 20+ years of investment experience (when she essentially had none) and listing her work experience as a former "IBM executive", when she had simply worked in sales.

While Janice's exact risk tolerance and investment objectives changed over time, Janice considered herself overall to be a moderate to conservative investor. She had two primary goals:

---

[7]*See* March 23, 2009 email from Bob to Janice attached as Exhibit D to Janice's Statement of Claim.

1) to generate enough income to support her day to day living; and 2) to see her money grow so that she could leave a legacy to her girls, as well as support the charitable causes she cared about. She had no idea how to reach these goals and she gladly left the mechanics of doing so to Buck, whom she fully trusted.

As soon as Janice's first account was funded in August 2009, Buck assumed control. Within a year and a half, Buck had sold nearly all the securities that had been transferred from Bob and was engaged in a course of aggressive trading—selling long-term positions prematurely and trading other positions speculatively. Over the course of the 5+ year relationship, Buck and Janice spoke fairly often. Buck, however, only kept Janice loosely apprised of what he was doing—explaining only in general terms what he wanted to do—or what he had already done. Janice described these calls with Buck in her Victim's Statement that she submitted to the Court prior to Buck's sentencing as follows:

> Every call from Tom Buck would start the same way. I would ask, "How are you?" And he would answer, "Well, I'm just sitting here looking at how great your accounts are doing." Then we would talk about what his daughters and wife were doing and I'd update him on what my daughters were up to. Only after that discussion would he discuss the next purchases and sales he wanted to make with my accounts. We never discussed anything regarding the risk of the trades or the commission involved. Why would I question the actions of someone who had been doing this for so long and with such success?

(*See* Janice's Victim Impact Statement at p. 2, attached as Exhibit E to the Statement of Claim.) Although he would sometimes solicit her input, this was largely for show. Given Janice's trust in him—and her lack of confidence in herself—Buck knew that Janice would defer to him.

From the period from August 2009 through his termination in March of 2015, Buck maintained firm control of Janice's accounts—with her having no idea of the fraud that he was conducting. Janice did not know that her explicit permission was required prior to a trade, and she

8

therefore thought nothing of the fact that Buck frequently made trades on his own. [8]Buck also explicitly lied to Janice, telling her, for example, that she was better off paying commissions rather than being in a fee-based account—knowing that if she switched to a fee-based account this would eliminate his ability to profit from his over-trading of Janice's accounts.

### E.     EXACT TARGET.

While she otherwise relied upon Buck, Ms. Compton never relinquished control over her position in Exact Target. By-and-away her largest position, it always had her attention. She had received these shares as part of divorce from Bob, who had been bullish on its prospects. By the time it went public in the spring of 2012—and Janice was permitted to sell his restricted shares in August of 2012—the 1,500,000 shares she had received were worth an amazing $34,000,000. Such a concentrated position frightened her, as did the fact that Congress was raising the capital gains tax. She therefore chose to hedge her bets – selling her whole position and then buying half of it back. While Buck placed these trades, this transaction was not pursuant to his recommendation. Indeed, he marked all the trade tickets "unsolicited. The following summer, Salesforce acquired Exact Target—resulting in her forced sale of Janice's remaining shares. That Buck now claims that his management was responsible for this windfall is yet another attempted fraud by Mr. Buck.

### F.     BUCK'S TERMINATION, BARS FROM THE SECURITIES INDUSTRY AND CRIMINAL PROSECUTION.

Buck was terminated from Merrill on March 4, 2015, following an investigation that revolved around 1) whether he had lied to clients in order to keep them in commission-based

---

[8] The proof will show that Buck placed upwards of 200 trades without ever speaking to Janice—direct proof that Buck assumed discretion over and had control over her accounts.

accounts; 2) whether he had engaged in "unauthorized trades" in client accounts, and 3) whether he had falsely marked solicited orders as "unsolicited trades."[9]

On the day after his termination, Merrill searched Buck's office and came across a diary that was authored by Buck. This included a full-blown confession to the fraud, cheating and lying that Ms. Compton's claims are predicated upon. A copy of the relevant section of Buck's diary (also referred to as his "confession") along with a transcribed copy is attached as **Exhibit 2**. While the Panel has seen it in prior filings by Ms. Compton, the importance of Buck's confession is hard to overstate. Specifically, Buck wrote as follows:

> And **I would cheat**. **I lied** about fees. I **over-traded** accounts for commissions. **I lied** about hidden fees. **I took discretion** in accounts. **I lied** about performance.
>
> #####
>
> There are two ways that **I cheat**. One is charging commissions that are higher than a client would need to pay if they were on a fee-based system. While I can justify and explain our reasoning for using one payment system or another, and I sometimes have to do this for compliance purposes, the fact is that **some clients who trust me explicitly are being charged more** than they need to pay. …. The other way that **I cheat is through discretion**. I take discretion from time to time as a short cut to getting the goal accomplished.

*Id.* (emphasis added). Unfortunately, Janice was one of the clients who "explicitly" trusted Buck and always believed he was acting in her best interest. While Buck will undoubtedly attempt to come up with some way to spin this confession at the final hearing, he cannot deny the fact that he admits in his *own hand* to assuming discretion, lying about account performance and cheating —all for his own benefit.

---

[9] Ironically and unbeknownst to Janice, Buck had been on heightened supervision for some of this same activity in 2006/2007

Moreover, the regulators of the securities industry felt the same way. On July 15, 2015, FINRA received a copy of this handwritten confession and within 10 days, it barred him from the securities industry for life[10]. A few years later, the SEC followed suit and barred him from ever acting again as an investment advisor. Additionally, the SEC imposed $5.1 million in fines and restitution, which Buck personally paid.[11] At the same time, as discussed in more detail below (*see* pp. 26-33, infra) Buck plead guilty to defrauding his customers—including Ms. Compton. Although he argued that he should get no prison time because—according to him—his clients were not damaged by his fraud, the court found otherwise and sentenced Buck to 40 months. (Ironically, Buck now attempts to make that same type of argument here.)

### III.  BUCK'S FRAUDULENT SALES PRACTICES AT ISSUE

While Ms. Compton's accounts were generally discussed above, below highlights some of the abuse that Buck conducted in Ms. Compton's accounts.

### A.  MS. COMPTON'S INVESTMENT OBJECTIVES, RISK TOLERANCE AND LIKELY FREQUENCY OF TRADING.

Any analysis of the trading in an investor's account begins with the identification of the investment objectives, risk tolerance and anticipated frequency of trading of the investor. FINRA Rules required Buck to obtain sufficient information about Ms. Compton so that he could properly

---

[10] This is FINRA's most extreme penalty and one that is only rarely used. To give the Panel some idea of how rare, consider that while there were 643,322 people registered with FINRA in 2015, there were only 496 barred from the industry.

[11] Roughly half of that money was used to establish a Victim's Fund, from which Janice obtained a partial recovery of the commissions she paid ($782,220), plus pre-judgment interest ($131,209) and post-judgment interest ($33,439) on this amount, albeit at the (low) rates that apply to SEC disgorgement actions.

"know [his] customer".[12] As noted above, the requisite *internal* forms were apparently not properly completed. In addition, Ms. Compton herself was never given the opportunity to fill in missing information, correct misinformation, or otherwise approve Buck's selections. Not that such a review would have made any difference here. Indeed, the proof will show that Buck's cavalier treatment of his obligation to accurately record the information necessary to fully "know his customer" is a clear indication that this information made no difference to him. It was always Buck's intent to manage Ms. Compton's accounts for his benefit rather than hers. It thus made no difference to him if he listed her investment experience inaccurately (i.e. 15-20 years of experience with mutual funds, equities and bonds) or that her investor profile showed that her trading frequency was expected to be "Seldom" (when in fact it was through the roof).[13] Also, noticeable in its absence is any indication of "tax loss harvesting" or "tax loss swapping" was ever considered by Ms. Compton as an investment objective.

## B.   FINRA'S SUITABILITY REQUIREMENTS

FINRA Rule 2111 directs that the registered person, in this case Buck,

> …must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer based on the information obtained

---

[12] *See* FINRA Rule 2090 which requires firms to exercise "reasonable diligence…to know (and retain) the essential facts concerning every customer."

[13] Buck executed 813 trades in total across Janice accounts as follows, per year:

2009 – 51
2010 – 147
2011 – 163
2012 – 231
2013 – 130
2014 – 91
2015 – 0

Because many of these transactions were accomplished in two or more blocks or "fills", Buck actually executed approximately 1,100 individual trades in Ms. Compton's accounts.

> through the reasonable diligence of the member or associated person
> to ascertain the customer's investment profile. A customer's
> investment profile includes, but is not limited to, the customer's age,
> other investments, financial situation and needs, investment
> objectives, investment experience, investment time horizon,
> liquidity needs, risk tolerance and any other information the client
> may disclose to the member or associated person in connection with
> such recommendation.

The evidence will show that Buck never spoke to Ms. Compton about all the elements making up her investment profile. In actuality, Ms. Compton, in 2009, was about to be separated from her husband and ultimately divorced in 2011, had little to no investment experience, had been out of the workforce for decades, was a full-time mother to two daughters in high school, and was going to be solely dependent on the securities transferred to her for her support for the rest of her life.

Except for those involving Exact Target, the evidence will show that Buck was responsible for all the trades in Ms. Compton's accounts—either by way recommending them to Ms. Compton or by simply entering them by way of an assumption of discretion. It will also be demonstrated that the level of trading was categorically "unsuitable" for Ms. Compton's "investment profile" and resulted in substantial damage to Ms. Compton in the form of underperformance of her portfolio during a long running bull market. The securities traded were traded excessively, solely for the purpose of generating commissions for Buck and Merrill.

## C.    BUCK'S OVER- TRADING SLOW CHURN OF MS. COMPTON'S ACCOUNTS WAS FRAUDULENT

As described more fully below, Buck "managed" Ms. Compton's accounts through a series of excessive trades that, when in viewed in the aggregate, were wholly unsuitable and can be best described as a slow motion "churn" of her accounts. In short, Buck traded municipal bonds, mutual funds, closed end funds, and Master Limited Partnerships—investments that were designed to be held for the long term—in order to generate unnecessary commissions. Such a scheme of

fraudulent over-trading is known as "churning." Because these investments typically paid high commissions, Buck could execute sales at a more leisurely pace than is normally associated with churning—and still benefit handsomely. When each new purchase generates a commission of between 1% - 4%, the broker churning the account can afford to wait longer than may be typical between purchases.

Churning occurs when "a broker, exercising control over the volume and frequency of trading, abuses his customer's confidence for personal gain by initiating transactions that are excessive in view of the account*." In re: Thomas McKinnon Secs*., 191 B.R. 976, 982 (Bankr. S.D.N.Y. 1996) (quoting *Carras v. Burns*, 516 F. 2d 251, 258 (4th Cir. 1975)) (finding that the broker assumed de facto control over a non-discretionary account). "Churning, or overtrading, is a type of securities fraud." Norman S. Poser, Options Account Fraud: Securities Churning in A New Context, 39 Bus. Law. 571 (1984) (discussing in part churning generally). Churning "denotes a course of excessive trading through which a broker advances his own interests (e.g., commissions based on volume) over those of his customer." *Costello v. Oppenheimer & Co*., 711 F.2d 1361, 1367 (7th Cir. 1983). A broker's wrongful collection of commissions generated by intentional, excess trading of an account constitutes a "compensable violation of both the federal securities laws and the broker's common law fiduciary duty, regardless of whether the investor's portfolio increased or decreased as a result of such trading." *See Miley v. Oppenheimer & Co., Inc*., 637 F.2d 318, 326 (5th Cir. 1981). "There is no single test or formula for proving that churning has occurred, but it is generally said that a [claimant] must show (1) that the broker *exercised control* over the transactions in the account and (2) that the amount of *trading was excessive*." *Costello*, 711 F.2d at 1368 (emphases added).

14

**A. Churning: Proof of Buck's Control Over the Transactions in Ms. Compton's Accounts**.

In determining whether an advisor has assumed/usurped control of the claimant's non-discretionary account, courts look to a number of factors, including how often the client followed the advisor's advice. *See e.g. Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 906 F.2d 1206, 1217 (8th Cir. 1990) (stating "if for all practical purposes the broker exercised de facto control over a nondiscretionary account and the client routinely followed the recommendations of the broker, then a finding of fiduciary duty may be warranted.").   The court in the seminal case of *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951 (E.D. Mich. 1978), aff'd, 647 F.2d 165 (6th Cir. 1981) looked to the following factors:

> **First**, **the courts examine the age, education, intelligence and investment experience of the customer. Where the customer is** particularly young, *Kravitz v. Pressman, Frohlich & Frost*, 447 F. Supp. 203 (D.Mass.1978), old, *Hecht v. Harris*, supra, or **naive with regard to financial matters**, *Marshak v. Blyth Eastman Dillion & Co., Inc.*, 413 F. Supp. 377 (N.D.Okl.1975), the courts are likely to find that the broker assumed control over the account. **Second, if the broker is socially or personally involved with the customer, the courts are likely to conclude that the customer relinquished control because of the relationship of trust and confidence.** *Kravitz v. Pressman*, supra; *Hecht v. Harris*, supra. Conversely, where the relationship between the broker and the customer is an arms-length business relationship, the courts are inclined to find that the customer retained control over the account. *Shorrock v. Merrill Lynch*, supra. **Third, if many of the transactions occurred without the customer's prior approval, the courts will often interpret this as a serious usurpation of control by the broker**. *Hecht v. Harris*, supra. **Fourth**, if the customer and the broker speak frequently with each other regarding the status of the account or **the prudence of a particular transaction**, the courts will usually find that the customer, by maintaining such active interest in the account, thereby maintained control over it. *Robinson v. Merrill Lynch*, supra.

*Leib*, at 954-955 (emphasis and italicized case names added)).

15

Applying the above 4 factors to the facts of this case, it is clear that Buck controlled Ms.

Compton's accounts:

1. **Ms. Compton's Lack of Investment Experience.**  As already discussed herein, Ms. Compton lacked the experience necessary manage her own accounts—hence why she relied so heavily on Mr. Buck. While she maintained a 401k from her days at IBM, that account was controlled by her ex-husband.

2. **Ms. Compton's Close Personal Relationship with Buck.**   As described above, Buck was first Ms. Compton's family friend and only later her advisor. Ms. Compton's and Mr. Buck's families were close and prior to 2009, their relationship was always personal. Even after Buck began managing Ms. Compton's account, the relationship between the two continued on a personal level. The proof will show that Ms. Compton placed her full trust in Mr. Buck and allowed him to direct the accounts as the result of this close personal relationship.

3. **Buck's usurpation of control over Ms. Compton's Accounts**. Because of his far superior knowledge and experience, Ms. Compton gave great deference to Buck and routinely accepted his recommendations. In addition, the proof will show that frequently made trades wholly on his own. Acting as an informal manager, Buck made many trades without Ms. Compton's prior approval. Placing trades without first obtaining proper authorization was part of the fraud to which Buck plead guilty to. (*See* p. 30, infra) Buck's ad hoc assumption of discretion is itself enough to create a fiduciary relationship. Courts recognizes that if a broker assumes discretion over an investment account, the broker also assumes broad duties to the client. (*See e.g. Lieb 953-54; Johnson v. John Hancock Funds*, 217 S.W.3d 414 (Tenn. App. 2006) (in such a situation, the broker "is required to exercise the utmost good faith, loyalty, and honesty toward the client," while disclosing "facts that are material to the client's decision making.")).

4. **Buck's failure to disclose the risks, costs and true purpose of his trading during his conversations with Ms. Compton.**  While Buck and Ms. Compton did speak from time to time about her accounts, these conversations typically had little depth and were in fact used by Buck to perpetuate—not reveal—his fraud. Ms. Compton described the substance of a typical conversation with Buck in the Victim Impact Statement she submitted in conjunction with Buck' criminal sentencing, as follows:

> Every call from Tom Buck would start the same way. I would ask, "How are you?" And he would answer, "Well, I'm just sitting here looking at how great your accounts are doing."

*See* Compton SOC, Exhibit E, p. 2. In short, Buck did not give Ms. Compton honest guidance about the costs, risks or the performance of his "management" and instead actively mislead her. The fact that there was periodic communication between the parties hardly shows "control" by Ms. Compton.

The facts here thus compel a finding that Buck owed Ms. Compton all of the duties inherent in a discretionary account.  Ms. Compton reposed trust and confidence in Buck and he, in turn, took advantage of that trust to (mis)manage her accounts in order to benefit himself.

**B. Churning: Proof that Buck's trading was excessive.**

A determination of *when* the trading in an account is excessive depends on the facts of the case—i.e. whether the trading was necessary in light of the customer's objectives. A pattern of in-and-out trading, for example is a hallmark of an account that is being excessively traded. *Costello v. Oppenheimer & Co.*, 711 F.2d 1361, 1369 (7th Cir. 1983). Moreover, it is well recognized that there is no minimum numerical ratio to establish excessive trading. *See e.g. Thomas McKinnon Secs.*, 191 B.R. at 983 (citing *Jenny v. Shearson, Hamill & Co.*, 1978 WL 1115 (S.D.N.Y. 1978) (refusing to hold that a turnover ratio of 1.84 could never constitute excessive trading). There, the court held that "[l]ower turnover ratios may still give rise to viable churning claims," and the law does not recognize a minimum turnover ratio required for a churning claim. (*Id*). In *Costello*, the Seventh Circuit commented that in addition to the standard numerical values, patterns of in and out trading[14] as well as cross trading could be used to establish churning. *Costello v. Oppenheimer & Co*., 711 F.2d at 1369. Per the court, while "none of these tests by itself necessarily demonstrates churning, each may aid the factfinder by introducing some measure of objectivity or certainty into an otherwise recondite subject." *Id.* (internal citation omitted).

This approach makes sense given FINRA's view of suitability regarding the trading activity in an account. Per FINRA guidance on suitability:

---

[14] The *Costello* court notes the "term 'in and out' trading denotes the sale of all or part of a customer's portfolio, with the money reinvested in other securities, followed by the sale of the newly acquired securities. It is a practice extremely difficult for a broker to justify." 711 F.2d at 1369.

> Quantitative suitability requires a [broker] who has **actual or de facto control** over a customer account to have a **reasonable basis** for believing that **a series** of recommended transactions, even if suitable when viewed in isolation, are not excessive and unsuitable for the customer **when taken together in light of the customer's investment profile, as delineated in Rule 2111(a)."**).

FINRA Rule 2111.05(c) (emphases added). As discussed below, the proof will show that the trading in Ms. Compton's accounts was indeed excessive—with Buck, among other things, using the same pools of money over and over to generate commissions by buying and prematurely selling securities meant to be held as long-term investments.

### 1.    BUCK'S IN AND OUT AND SHORT-TERM TRADING.

During the five and one half (5½) year period that Buck was responsible for Ms. Compton's accounts, he engaged in at least 813 securities transactions. This involved no less than 274 different securities (not counting Exact Target).[15] To be clear, it is not the nature of the investments that is at issue for the most part. Rather, it is the nature of the trading and the type of the accounts (commission vs fee-based) that are at issue.

Moreover, Buck's trading is not consistent with an income producing investment objective. The industry, including Merrill itself recognizes that when an investor wishes to generate income, the advisor should generally hold long term investments to maturity and not focus on market movements.[16] Buck, however, did just the opposite, routinely selling securities meant to be held

---

[15] Exact Target is excluded in this count because Buck had nothing to do with either Ms. Compton's acquisition of this investment (it was received from her ex-husband as part of her divorce) or its sales (Buck merely executed Ms. Compton's orders). Indeed, Buck correctly marked each of the Exact Target trades as "Unsolicited"—meaning that the customer (Janice) sought out the transaction without any recommendation from Buck.

[16] *See* Merrill article on "Investing for Income—Not Just Growth" attached as **Exhibit 3**.

for years. Indeed, the average holding periods for the five largest asset types in Ms. Compton's accounts are striking:

| Type of Security | Average Holding Period By Month |
|---|---|
| Bonds | 8.3 months |
| Closed End Funds | 7.7 months |
| Mutual Funds | 18.1 months |
| Preferred and Corporate Securities | 5.8 months |
| Stocks | 10 months |

These numbers speak for themselves. For all but mutual funds, Buck was trading Ms. Compton's accounts so frequently that the positions on average were not even held for a year. Even as to mutual funds—which were mostly A shares and were thus long term investments—Buck's holding period was on average, only 1 ½ years. Such rapid trading was unsuitable and fraudulent.

## 2.     <u>SHORT TERM TRADING OF BONDS AND PREFERRED SECURITIES.</u>

Prior to the sale of Exact Target, Ms. Compton was primarily an income investor. She relied on the income generated from her accounts for her living expenses and originally the majority of her assets were in income producing bonds and preferred securities.  Both of these types of securities provide a regular source of income with the promise of a return of principal at maturity.  As FINRA stated in a recent regulatory settlement regarding bonds,

> **municipal bonds typically are long-term investments**, which, when held until their maturity date or an earlier call date, allow an

> investor to preserve capital while generating tax-advantaged or tax-free income. Purchase of a municipal bond generally involves costs to the investor in the form of a mark-up. Sales can also involve costs in the form of a mark-down. **A recommendation that an investor engage in short term trading of municipal bonds may be unsuitable due to these costs.**

*See* FINRA Department of Enforcement v. NEXT Financial Group AWC, No. 2019063058701 (July 13, 2021), p. 3, attached as **Exhibit 4** (emphasis added). As FINRA goes on to note, the *harm* in the frequent trading of municipal bonds is the "*repeated payment of upfront costs that would decrease any investment returns.*" *Id.* at 4 (emphases added).

With Ms. Compton, however, Buck chose to rapidly buy and sell bonds. Buck would use the proceeds from the sale of the bonds—held for only a short term—to fund the purchase of yet other bonds. Those bonds, in turn, would then be held for a short term, and then sold to fund yet the next set of bonds; and so on. The average holding periods for bonds was 8 months. The following are but a few examples of Buck's hyperactive bond trading:

- Buck's rapid sale of nearly all the bonds originally transferred into Janice's account from her estranged husband in August 2009. This transfer included 26 municipal bonds— valued at approximately $4,165,000— all of which had been purchased *by Buck* himself for Bob Compton between April 2000 and July 2009. By the end of 2009, Buck had sold 9 of these positions; a number that increased to 21 by the end of 2010. By the end of 2011, only 2 of the original 26 positions remained in Ms. Compton's portfolio.

- Buck's re-sale of certain municipal bonds so rapidly that Janice did not receive even a single interest payment.

- Buck's purchase and re-sale of so called "zero coupon" bonds within a matter of months. Zero coupon bonds do not make interest payments, but rather, are bought at a deep discount from face value and then increase in value over time until at maturity, the investor receives the face amount of the bond. When sold after only a short period of time, a zero-coupon bond has no chance to accrete in value. Moreover, in addition to such rapid sales, one should also ask why Buck was buying such bonds at all in an account seeking "income"—since, as noted above, such bonds, by design, never generate income.

Buck's trading of tax-free municipal bonds was also unsuitable from a tax perspective. Any gain realized upon a sale was subject to federal taxation as short term or long term gain, depending on the holding period. However, if the bonds had simply been held, the interest received would have been exempt from federal taxation and there could have been no Tennessee tax.[17] Moreover, to the extent these sales created gains, they contradicted the "tax loss swapping" investment objective claimed in Buck's Answer. (*See* Buck's Answer at p. 7).

Preferred securities are a "hybrid" that includes features of both equities (common stock) and bonds. Preferred shares represent an equity stake in the issuing company but do not have voting rights. Preferred shares have a preference over common shares in the event of a liquidation and pay a regular dividend like a bond. Also, like bonds, they can be part of an income producing portfolio. In August 2009, 10 preferred security positions transferred into Ms. Compton's account, representing a market value of $1,052,175. All 10 had been purchased in June 2009—some 2 months prior to transferring into Ms. Compton's account. Within a little more than a year, all 10 positions were sold, and her accounts no longer held preferred securities.

3.    <u>**SHORT TERM TRADING OF STOCKS.**</u>

Buck also traded stocks on a short-term basis, generating gains and losses and triggering taxable events. The average holding period for these investments was 10 months, actually longer than for the bonds. The trading in Ms. Compton's accounts shows a pattern of selling to fund other purchases and then re-purchasing the stock sold, usually with the proceeds of other sales.

---

[17] Tennessee has no general income tax. It did, however, levy a tax on non-Tennessee investment income—including out of state bonds—at the rate of 6% at the time in question. *See* the "Hall Income Tax", T.C.A. § 67-2-102 (amended 2016).

4. **SHORT TERM TRADING OF MASTER LIMITED PARTNERSHIPS ("MLPS").**

MLPS are hybrid investments combining potential tax benefits in the form of partnership treatment with publicly traded nature of a stock. Buck traded many different MLPS on a short-term basis. Because of their hybrid nature, these securities can be complicated and therefore labor intensive at tax time. Buck traded 15 different MLPS in Ms. Compton's accounts. Such trading took what would normally be a long-term investment and turned it into a short-term trading vehicle. Commissions are generated on each trade regardless of the result.

5. **SHORT TERM TRADING OF A SHARE MUTUAL FUNDS & CLOSED END MUTUAL FUNDS**

Buck also engaged in short term trading of A share mutual funds ("A Shares") and closed end funds ("CEFs"). A Shares are mutual funds with large upfront costs for the client and are meant to be held longer, usually five, ten or more years. Buck charged up to 4.5% percent in commissions on A Shares and then only held them a fraction of time necessary. CEFs are like mutual funds except that these investments are capped as to the number of shares but are like A Shares in that they are to be held long term and are not short-term trading vehicles. Buck held these in Ms. Compton's accounts for less than eight months while charging up to 3.1% in commissions—totaling some $124,00—while Ms. Compton *lost* approximately $36,000 on these investments.

## IV.   MS. COMPTON'S CAUSES OF ACTION AGAINST BUCK

### A.   CONSTRUCTIVE FRAUD UNDER INDIANA LAW

Ms. Compton's first claim is for constructive fraud under Indiana law.[18] The elements of

constructive fraud are:

    a.   The existence of a duty;

    b.   The violation of that duty by remaining silent when there is duty to speak or by making material misrepresentations of past or existing facts;

    c.   Reliance by the claimant on such omission/misrepresentation;

    d.   Injury to the claimant as a proximate result of that reliance; and

    e.   An advantage gained by the respondent at the claimant's expense.

*Siegel v. Williams*, 818 N.E.2d 510, 515-16 (Ind. Ct. App. 2004).

The first two of the *Siegel* elements—that of the existence of a duty and its violation by the

defendant—spring from the *control* that Buck exercised over Ms. Compton's accounts. While Ms.

Compton's accounts were technically non-discretionary, the proof will show that Buck exercised

*de facto* control over her accounts due to her naivete as an investor, the trust she lodged in due to

their long personal relationship, and Buck's assumption of discretion to make trades in her

accounts without her advance consent.[19] While Buck will likely argue that there is no cause of

---

[18] While Ms. Compton cited to Tennessee law for the elements of fraud in her SOC, she will be traveling under Indiana law at the hearing. There is no material difference between what constitutes fraud in Tennessee versus Indiana and there is thus no prejudice to Mr. Buck. Moreover, a claim for fraud under Indiana law is already at issue since it is a necessary element of Ms. Compton's claim under the Indiana Corrupt Business Act, which was specifically plead at Count One of the Statement of Claim. (*See* pp. 29-31). Finally, Mr. Buck, himself invited this change of jurisdictions in several of his filings, including his Answer (at pp. 9 and 22) and his recently denied Motion to Dismiss (*See* Buck Motion to Dismiss, fn. 1), where he asserted that Indiana state law governs this matter. Ms. Compton will thus forego any argument over choice of law and proceed under Indiana law.

[19] (*See* pp. 16-17, supra)

action for "mismanagement" of a non-discretionary account (as he previously did in his Motion to Dismiss filings), this is clearly not correct. As the U.S. District Court for the Eastern District of Michigan stated in *Leib,*

> Between the purely non-discretionary account and the purely discretionary account there is a hybrid-type account which plaintiff claims existed in this case. Such an account is one in which the broker has usurped actual control over a technically non-discretionary account. **In such cases the courts have held that the broker owes his customer the same fiduciary duties as he would have had the account been discretionary from the moment of its creation**.

*Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 461 F. Supp. at 954. Buck's assumption of control thus made him a fiduciary, which in turn, required him to act scrupulously in his client's best interest—and not secretly for himself. In discussing the duties a broker owes when, like Buck, he controls a customer's account, the *Leib* Court stated:

> Such a broker, while not needing prior authorization for each transaction, must (1) **manage the account in a manner directly comporting with the needs and objectives of the customer** as stated in the authorization papers or as apparent from the customer's investment and trading history, *Rolf v. Blyth Eastman Dillon & Co., Inc*., 570 F.2d 38 (2d Cir. 1978); … and [4] **explain forthrightly the practical impact and potential risks of the course of dealing in which the broker is engaged**, *Stevens v. Abbott, Proctor and Paine*, 288 F.Supp. 836 (E.D.Va.1968).

> Although no particular type of trading is required of brokers handling discretionary accounts, most concentrate on conservative investments with few trades usually in blue chip growth stocks. **Where a broker engages in more active trading, particularly where such trading deviates from the customer's stated investment goals or is more risky than the average customer would prefer, he has an affirmative duty to explain the possible consequences of his actions to his customer. This explanation should include a discussion of the effect of active trading upon broker commissions and customer profits.**

*Leib* at 953–54 (emphasis added).

24

In short, Buck had an obligation to manage Ms. Compton's accounts directly in line with her "needs and objectives", while fully explaining the impact of his "active trading." The proof, however, will show that Buck did nothing of the sort. Rather, among other things, it will show that he committed fraud by unsuitably over-trading Janice's accounts for the purpose of generating commissions and misleading her into remaining in a commission-based account so that his over-trading could continue.[20] Buck also misrepresented the impact of his overtrading and how it reduced her returns as compared to a prudently managed portfolio. As Ms. Compton told the court via her Victim Impact Statement, Buck repeatedly told her how great her accounts are doing, when in reality, they were under-performing the market as a result of Buck's management aimed at generating commissions for himself.

The third of the *Siegel* elements—that of reliance—is apparent from a number of facts, including the simple fact that Ms. Compton did business with Buck for over 5 years, during which time she repeatedly entrusted him all the new funds that she received. An account that started with the initial transfer in of $6.8 million in 2009 from her husband's accounts ultimately ended up at approximately $44 million due primarily to the infusion created by her receipt and sale of Exact Target. Ms. Compton could have invested these additional amounts with another financial advisor, but she chose instead to commit all of this money to Buck.

---

[20] As Ms. Compton told the Court in her Victim Impact Statement:

> I asked Tom specifically (because my accountant asked me to ask him) why I wasn't on a fee account and he replied, "Merrill Lynch has people looking at this all the time and no, a commission based account is better for you". I asked again in September 2012 and got the same response from Tom."

*See* Ms. Compton's Victim Impact Statement, attached to the SOC as Exhibit E.

The last two *Siegel* elements—injury to Ms. Compton and advantage to Buck—are apparent in a number of ways. This injury/advantage dichotomy includes the amount of excess commissions Buck charged Ms. Compton over 5 plus years (approximately $1,000,000). It also includes the market appreciation that Janice missed if her accounts had been prudently managed during the long-running bull market that existed at the time in question. While net of Exact Target, her accounts earned approximately $3.7 million, the proof will show that a properly allocated portfolio would have earned some $10.8 million, resulting in a loss of some $7.2 million.

Buck was required to act scrupulously in Ms. Compton's best interest and his failure to do so constituted fraud for which the Panel should award Ms. Compton the full amount od damages outlined herein.

## B.      VIOLATION OF THE FEDERAL "RICO" STATUTE

Ms. Compton's second cause of action against Buck for violation of federal Racketeer Influenced and Corruption Organizations Act ("RICO") by committing numerous acts of securities fraud as to Ms. Compton. RICO provides a civil cause of action for any person injured by a pattern of racketeering activity, and *requires* an award of treble damages, attorneys' fees, and interest to persons so injured. *See* 18 U.S.C. 1964. To prevail on a federal RICO claim, a claimant must prove the following elements:

i.      That the respondent was employed by an enterprise (e.g. a corporation) that affected interstate commerce;

ii.     That the respondent participated in the conduct of that corporation's affairs;

26

iii.   That such participation by the respondent was conducted through a pattern of racketeering activity. *See* 18. U.S.C. 1962(c).[21] The term "racketeering activity" includes a number of federal crimes (so called "predicate acts"[22]) which specifically includes "fraud in the sale of securities" pursuant to 18 U.S.C. 1348. This is the same crime to which Buck plead guilty.

iv.   For cases like this one—where securities fraud is the predicate act – an additional element must also be shown. Called "conviction exception" this requires that the defendant in the civil claim must have actually been first *criminally convicted* of securities fraud and that fraud must have been at least "*connected with*" the fraud in the current civil action.[23]

As the following discussion will show, each of the elements are satisfied in the present case.

**1.   <u>Buck was both employed by Merrill—an "enterprise" that affected interstate commerce—and participated in the conduct of Merrill's affairs.</u>**

RICO elements (i.) and (ii.), above, are easily met. The "enterprise" requirement is met because RICO defines an enterprise to include a corporation and Merrill is such an entity.[24] The "affecting interstate commerce" requirement is also a low bar since Merrill operates in all 50 states and clearly conducts its securities business across state lines.  Further, Buck as a Managing Director of Merrill, was clearly "employed by the enterprise" (Merrill) and clearly participated in

---

[21] The specific RICO statute at issue here, found at 18 U.S.C. 1962 (c), reads in pertinent part as follows:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

[22] A predicate act or offense is an "act that must be completed before legal consequences can attach either to it or to another act or before further action can be taken. PREDICATE ACT, Black's Law Dictionary (11th ed. 2019).

[23] 18 U.S.C. 1964(c).

[24] Under the federal RICO statute, an "enterprise" is defined to include a "corporation, association, or other legal entity." 18 U.S.C. § 1961.

the conduct of its "affairs"—satisfying the requirement found in (ii.), above. Thus, all of the requirements of the first two elements listed above are clearly satisfied.

## 2.    Buck engaged in a "pattern of racketeering activity".

The third element—the requirement that Buck must have participated in the conduct of Merrill's affairs via a "pattern of racketeering activity"— is also easily met. This element has two parts: proof of "racketeering activity" and proof of a requisite "pattern." The requirement of "racketeering activity" is met by proof that Buck committed securities fraud, which under federal law is defined as obtaining "by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any …security." 18 U.S.C.A. § 1348. Indeed, the elements of securities fraud were summed up for Mr. Buck by the very Judge who sentenced him to prison, as follows:

> The elements are: First, that you, Mr. Buck, executed or attempted to execute a scheme or artifice to defraud any person or to obtain any money or property by means of false or fraudulent pretenses, representations, or promises, which were material; second, the scheme to defraud was in connection with any security of an insurer with a class of securities registered under the Securities Exchange Act; and, third, that you, Mr. Buck, did so knowingly with the intent to defraud.

Buck's Change of Plea Hearing Transcript, 11:18 – 12:9. Among other things, each of Buck's fraudulent trades in Janice's accounts constituted a separate and distinct act of securities fraud. The requirement for "racketeering activity" is thus easily established.

The requirement that this "racketeering activity" be part of a "pattern" is also not difficult to establish under the facts of this case. A "pattern" under RICO only requires two (2) instances of racketeering activity involving the same purposes, participants, victims or methods of

28

commission, as the U.S. Supreme Court so found *in Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479

(1985). There, examining RICO's legislative history, the Supreme Court stated as follows:

> Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: **"[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."** 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act.

*Id.* 497.

Here, Ms. Compton need only show that two of two (2) of Buck's trades for her were

fraudulent to establish the required pattern of racketeering activity. *See* 18 U.S.C. § 1961(5). The

proof, however, will show that Buck's fraud against Ms. Compton involved multiple schemes all

of which involved the same purpose (e.g. maximizing his commissions); the same victims (Buck's

customers), and the same methods (e.g. taking control of accounts to direct trading and lying about

fee based accounts to maintain the high level of commissions). This conduct spanned some five

plus years with one act inter-related to the others so as to allow his scheme to continue. Buck's

acts were indeed "interrelated by distinguishing characteristics and [ ] not isolated events."

Applying the Supreme Court's guidance quoted above to the facts in this case, a "pattern" of

defrauding Ms. Compton is clearly established.

> **3.** **Ms. Compton squarely fits the so-called "Conviction Exception" for RICO claims based on securities fraud because Buck was first criminally convicted of securities fraud and that fraud was "connected with" the securities fraud now at issue here in this Arbitration.**

In cases where securities fraud constitutes the racketeering activity, the respondent must

first have been "criminally convicted **in connection with** the fraud" that is complained of by the

claimant in the later civil action.[25] 18 U.S.C. § 1964(c) (emphasis added). This is known as the "conviction exception."  The conduct that Buck plead guilty to is as follows:

### The Scheme to Defraud

#### Overview of the Scheme

10.     Beginning in or before 2012, the exact being unknown, through March 2015**, BUCK devised, intended to devise, and executed a scheme to defraud by overcharging certain clients for his financial advising services and misleading those clients,** Merrill Lynch, and its compliance systems regarding those overcharges by concealing the overcharges.  **The object of the scheme was to generate increased revenues from clients; which in turn increased his personal compensation and professional reputation.**

#### Manner and Means

11.     As part of the scheme to defraud, in violation of NYSE Rule 408 and Merrill Lynch policy**, BUCK exercised discretion when placing certain trades on certain client accounts without obtaining authorization from the client.**  As a result, certain clients on a commission- based cost platform, which comprised 80% of BUCK's clients, paid commissions on these trades.

####

13.     As further part of the scheme to defraud, **BUCK intentionally failed to inform certain clients that a fee-based option was available, and that the fee-based option could be cheaper than the commissions the client was paying**.

*See* Buck Information at p. 5, attached as Exhibit F to the SOC (emphasis added). Here, the manner and means of the fraud which Buck was convicted of—assuming discretion while lying about fee-based accounts in order to maximize commissions—is clearly "connected with" the fraud at issue in this Arbitration.

---

[25] Buck argues that the fraud at issue in the criminal conviction must be "similar" to that in later civil action. (Answer, p. 11.) This, however, mis-quotes the statute which merely requires that the fraud in the criminal action be "connected with" the fraud in the civil action. *See* 18 U.S.C. 1964(c).

Buck also argues that because Ms. Compton was not mentioned by name in the Government's Information or in Buck's plea allocution, that Ms. Compton cannot take advantage of the Conviction Exception. (Buck Answer, pp. 11-12.) Ms. Compton, however, was very much an *identified victim*—both by Buck and the DOJ during the sentencing phase of the prosecution. Indeed, Ms. Compton was included in the list of identified victims that were at issue for purposes of sentencing,[26] and that list was even incorporated by Mr. Buck into his *own* Sentencing Memorandum.[27] Importantly, Buck accepted this list of victims the DOJ contended he defrauded—*never challenging the DOJ or the Court on whether he in fact committed the fraudulent conduct he plead guilty to as to Ms. Compton*. What Buck did challenge during his prosecution was whether his fraud caused any pecuniary loss to the listed victims –which, again included Ms. Compton. Ms. Compton's status as one of Buck's victims was thus front and center, even to the point that she was *specifically discussed by the DOJ [28], Buck's attorneys and the Court during Buck's sentencing hearing. See e.g.* relevant excerpt of Buck's Sentencing Hearing Transcript 94:14 – 95:4, attached as **Exhibit 5**, in which Ms. Compton is referenced as "Client D".

---

[26] The two sole matters pertaining to Buck's customers during sentencing was whether his fraud had caused any pecuniary losses to his victims and whether Buck's fraud could be considered "sophisticated." Central to these disputes was a list of victims identified by the Government, which prominently included Ms. Compton at that top of the list.

[27] Such a sentencing memorandum is known as an "allocution." It is the defendant's opportunity to argue for a more lenient sentence and can be submitted in writing—e.g. via Sentencing Memorandum by the defendant i.e. here, by Mr. Buck. It is not just the defendant that is permitted to make an allocution; the government is permitted to do so as well—as the government did here. Per the American Bar Association's guidance, the "court must provide not only the defendant, but also the defendant's lawyer and the government's lawyer, with opportunities for allocution." *See* https://www.americanbar.org/groups/public_education/publications/teaching-legal-docs/what-is-an-allocution-statement-/.

[28] Ms. Compton was not just at issue in Buck's sentencing memorandum but also highlighted in the government's allocution—its sentencing memorandum—as Victim D. *See* SOC at Exhibit I.

31

In fact, the Court's imposition of a 40-month prison sentence was based off *a specific finding that Buck had harmed Ms. Compton* plus the other three specifically identified victims. *See Id*. at 256:14 – 257:7.

There is thus no factual basis for Buck to deny that his guilty plea included his admission to defrauding Ms. Compton. There is also no legal basis for such an attempted denial since the law will estop a party from taking such inconsistent positions. "Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation. The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir. 1996). When faced with years in prison, Buck admitted his wrongdoing in order to seek a more lenient sentence and Ms. Compton was an identified victim of that wrongdoing. Yet now in this Arbitration, Buck seeks to disclaim all wrongdoing as to Ms. Compton. He cannot have it both ways, and Mr. Buck is thus judicially estopped from arguing that Ms. Compton was not an identified victim of his criminal fraud.

4.   **Buck's pattern of racketeering injured Ms. Compton**

As discussed herein, Buck's fraudulent conduct towards to Ms. Compton allowed Buck to manage Ms. Compton's accounts for his benefit—not hers. As a result, Ms. Compton incurred a number of damages, including missing out on the gains in the market that she would have otherwise experienced had Buck not been engaged in his pattern of fraud. Her other damages flow directly from Buck's fraud including, excessive commission charges and attorneys' fees.

RICO exists for instances such as this where criminal conduct has infiltrated wholly legitimate businesses and innocent people are harmed as a result.  Buck chose to engage in fraud against Ms. Compton and his other customers while knowing full well that it was wrong. By

applying the RICO statute against the facts in this case, the Panel has the opportunity to send a message that fraud on Buck's level will be dealt with the severest civil tools available.

## C.   VIOLATION OF INDIANA'S CORRUPT BUSINESS INFLUENCE ACT

Ms. Compton's third cause of action against Buck is for violating Indiana's Corrupt Business Influence Act (the "Indiana Corrupt Business Act") by defrauding Ms. Compton in the management of her accounts—an act that constitutes racketeering under Indiana law. The Indiana Corrupt Business Act is Indian's version of the federal RICO statute[29] and provides a civil remedy for anyone aggrieved by racketeering activity, including injury due to criminal fraud. Notably, the Indiana Corrupt Business Act does not contain the "conviction exception" found in federal RICO.

### 1.   The elements of a claim under the Indiana Corrupt Business Influence Act

A claim for violating the Indiana Corrupt Business Act requires the claimant to show that the respondent:

    (i)    was employed by an enterprise (e.g. a corporation);

    (ii)    knowingly or intentionally conducted or otherwise participated in the activities of that enterprise; and

    (iii)    did so via a pattern of racketeering activity, which includes criminal fraud.

*See* Indiana Code Ann. § 35-45-6-2. Anyone "aggrieved" by another's violation of the Indiana Corrupt Business Act has a private right of action against that person for, inter alia, mandatory

---

[29] While the Indiana Corrupt Business Act was patterned off of the federal RICO statue, there are distinct differences between the two statutes. These differences have been noted by courts applying the Indiana Corrupt Business Act as reasons not to follow caselaw interpreting federal RICO. See e.g. *Keesling v. Beegle*, 880 N.E.2d 1202, 1206 (Ind. 2008) (explaining that the culpable conduct under the Indiana Act is *broader* than that under federal RICO); *and In re E. Livestock Co., LLC*, 2013 WL 6048813, at *10 (Bankr. S.D. Ind. Nov. 15, 2013) (rejecting case law interpreting the federal RICO statute and finding that the plaintiff in an action under the Indiana Corrupt Business Act need not be the intended target of the RICO scheme).

treble damages and attorney's fees. Ind. Code Ann. § 34-24-2-6.  Ms. Compton easily meets these elements as discussed below.

**2.      Buck was employed by Merrill—an "enterprise"—and conducted/participated in Merrill's activities.**

As for the first two elements – the analysis is essentially the same as it was under the federal RICO claim. Merrill, which is a corporation, is a qualifying enterprise under the statute. [30]  Further, Buck clearly conducted the affairs of Merrill or otherwise participated in Merrill's activities in his role as a Managing Director. The first two elements are thus easily established.

**3.      Buck engaged in a "pattern of racketeering activity".**

The third element – a pattern of racketeering – is separated into two requirements: "racketeering activity" and a "pattern" of such activity. Under the Indiana Corrupt Business Act., "racketeering" includes a number of crimes, one of which is fraud. (Ind. Code Ann. § 35-45-6-1(1)(e).) Criminal fraud under Indiana law is "knowingly or intentionally engage[ing] in a scheme or artifice to" obtain property via "making a false or misleading statement" or "create[ing] a false impression in another person." Ind. Code Ann. § 35-43-5-4(a)(1) and (4). The various fraudulent acts committed by Buck discussed throughout this brief easily meets this definition of fraud.

As for the "pattern" requirement, the Indiana Corrupt Business Act defines a "pattern of racketeering activity" as "engaging in at least two (2) incidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission, or that are otherwise interrelated by distinguishing characteristics that are not isolated incidents. Ind. Code Ann. § 35-45-6-1)(d). This definition is similar to that used by the United State Supreme Court in

---

[30] Per Ind. Code Ann. § 35-45-6-1(c), "'Enterprise' means: (1) a sole proprietorship, corporation, limited liability company, partnership…. (Id.)

*Sedima*. (*See* pp. 29, supra). The pattern element of the Indiana Corrupt Business Act is thus satisfied for the same reasons as the federal RICO pattern element.


    **4.**     **Ms. Compton is an "aggrieved" person directly resulting from Buck's trading**

As detailed herein, Ms. Compton clearly falls within the class of persons that may bring an action under the Indiana Corrupt Business Act because she is an "aggrieved" person as the result of Buck's fraud. Buck's fraud robbed Ms. Compton of the ability to fully take part in the longest bull market in United States history, caused her hundreds of thousands of dollars in unnecessary commissions, and caused her to come out of pocket nearly $2 million in attorneys' fees to try and make herself whole.

The Indiana Corrupt Business Act was designed to punish criminal conduct like that at issue in this case—e.g. *corruption*—that damages innocent victims. By finding that Buck is liable to Ms. Compton under the Indiana Corrupt Business Act the Panel will not just make Ms. Compton whole but tell the would-be-Bucks that defrauding their customers is not worth the money.


    **V.**     **DAMAGES**

The damages Ms. Compton seeks exceed $12.5 million. This figure, as shown in the graphic below, is composed of the following elements: 1) well-managed account damages; 2) disgorgement of commissions; 3) trebling of her compensatory damages under the Federal and/or Indiana RICO claims or, alternatively, punitive damages; 4) prejudgment interest; and 5) attorneys' fees and expenses.

| Summary of Ms. Compton's Damages | |
|---|---|
| Well Managed Damages i.e. account underperformance | $7,183,000 |
| Commissions charged to Ms. Compton | $1,404,188 |
| -   Less what Ms. Compton has been paid to date from settling with Merrill ($5,500,000) and from the SEC Victim's Fund ($946,868) | $6,446,868 |
| **Subtotal = Ms. Compton's Compensatory Damages** | **$2,140,320** |
| Trebling of Compensatory Damages per her RICO or Indiana Corrupt Business Influence Act causes of action ($2,140,320 x 3)[31] | $6,420,960 |
| Pre-judgment Interest at 10% from 3/2015 through the final hearing for Ms. Compton's Well Managed Damages + Commissions | $4,309,800 |
| Attorney's fees and expenses through December 2021 | $1,967,068 |
| **Preliminary Total owed to Ms. Compton** | **$12,697,828** |

Further, Ms. Compton asks that all FINRA fees associated with this action be assessed solely against Buck since it was his conduct that necessitated the bringing of this action.  A short summary for each of these elements of damages is discussed more substantively below.


D.     **WELL MANAGED ACCOUNT DAMAGES**

The proof will show that Ms. Compton made only $3.7 million during the 5 ½ years Buck managed her accounts. The proof will also show that Ms. Compton's accounts drastically underperformed the market over the same period of time and, that this underperformance, was due to Buck's fraud. While Buck will apparently argue that the Panel should limit Ms. Compton's recovery to zero because he managed to make some profit in spite of his fraud, such an approach

---

[31] Alternatively, Ms. Compton seeks a punitive damage award at the maximum allowed under Indiana law which is also equal to three times her compensatory damages which total $6,420,960.

protects the perpetrator, not the customer nor the public. In fact, such an approach would even encourage fraud as long as the client makes a dollar.  The law, however, does not require such an unjust result. Rather, the imposition of so called "well-managed account damages"—i.e. the difference between the account's *actual performance* and what that account *would have been worth* under prudent management. Using this measure, the proof at trial will show that Ms. Compton's accounts underperformed by **$7,183,000** due to Buck's fraud. To assist the Panel in understanding the delta between what Ms. Compton's account *actually made* versus what they *should have made*, a summary chart created by Ms. Compton's expert is attached hereto as **Exhibit 6**.

### 1.      Well Managed Account Damages are Available in State and Federal Securities Cases.

At the hearing, Buck may argue that Janice's loss should be limited to "net out-of-pocket damages" and since she made money then no harm/no foul. This answer is directly contrary to FINRA's own guidance, as well as numerous federal securities cases. The FINRA Arbitrator's Guide, which is provided to each of its Arbitrators to give an overview of the arbitration process including rules and guidelines has a section titled "Types of Remedies." *See* FINRA Arbitrator Reference Guide (November 2019 Edition), p. 67. The intro to this section reads:

> Depending upon the relief parties request, there are **several types of remedies** arbitrators may consider. If the panel is satisfied by a preponderance of the evidence that the respondent is liable for the alleged loss, the panel **should determine an appropriate remedy**. Remedies may include:
>
> ***
>
> **Well-Managed Portfolio Account**
> This measure of damage allows the claimant to recover the difference between what the claimant's account made or lost versus what a well-managed account, given the investor's objectives, would have made during the same time period.

*Id.*[32] The fact that FINRA lists well-managed damages as a type of remedy in its own guide to train arbitrator should be conclusive on this issue.

In addition to FINRA's own guidance, numerous courts around the country have recognized the availability of well-managed damages for a claimant in Janice's position. One of the seminal cases in this regard is *Miley v. Oppenheimer & Co.*, 637 F.2d 318, 328 (5th Cir. 1981) (disapproved on other grounds). In *Miley,* the Court recognized that well-managed damages were the only means by which the plaintiff investor could be made whole for the financial advisor's misconduct. The *Miley* Court held that an investor is not just harmed by the out-of-pocket cost of the breach, *i.e.* unnecessary commissions, but the investor is also harmed because the advisor's breach of fiduciary duty and misconduct affects the accounts' ability to perform and earn money for the investor. *Id.* at 326-327.  This Court recognized that "when precise damage measurements are precluded by wrongful acts, the wrongdoer cannot insist upon exact measurements and the precise tracing of causal lines to an impractical extent; fair approximations are in order." *Id.* at 328. "In order to approximate the trading losses caused by the broker's misconduct, it is necessary to estimate how the investor's portfolio would have fared in the absence of the such misconduct." *Id.*

Further, well managed damages are the proper measure of damages even when an account makes money.  *Laney v. Am. Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1355-56 (M.D. Fla. 2003).  The Middle District of Florida in *Laney* allowed proof of well managed damages where a financial advisor had allegedly placed unsuitable trades and churned his client's account.  In doing

---

[32] "Well managed" damages have been known by several names in other forums include, *inter alia*, market adjusted damages, prudent management damages, prudently managed damages and benefit of the bargain damages. For ease of reference, "well managed" damages will be used through the remainder of this Brief.

so, the court reasoned that the "purpose of compensatory damages in a tort case is to restore the injured party to the position it would have been had the wrong not been committed" and to disallow well managed damages would "excuse fraudulent conduct just because an account was profitable." *Id.* at 1354 and 1356. In *Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 906 F.2d 1206 (1990), the 8th Circuit was faced with a similar situation when the customer's account profited over $53,000 during the period at issue. There the Court stated,

> If we were to adopt Merrill Lynch's view, securities brokers would be free to churn their customers' accounts with impunity so long as the net value of the account did not fall below the amount originally invested. **Churning is not excused by the fact that the account realizes a new profit**… Because Mrs. Davis paid over $40,000 in commissions and would have earned over $50,000 more than she did had her account not been churned, **it is nonsensical to argue that she did not suffer actual damages as a result of the churning**.

*Id.* at 1218 (emphasis added).

As the case law thus demonstrates, Ms. Compton is entitled to receive the amount her accounts would have appreciated if her accounts had been prudently managed. Thus, Ms. Compton asks for an award for $7,183,000 for the underperformance of her accounts due to Buck's mismanagement.

## E.    MS. COMPTON IS ENTITLED TO COMPLETE DISGORGEMENT OF THE COMMISSIONS CHARGED

Ms. Compton's losses also include the total amount she paid in commissions/production credits[33]. The FINRA Arbitrator Guide states the following regarding disgorgement of commissions:

---

[33] While the Panel may see/hear the terms "commissions" and "production credits" used throughout the final hearing, Ms. Compton will generally refer to "commissions" to refer to both as the amount of money she was charged to place the trades at issue.

> The arbitration panel may require the respondent to disgorge profits or commissions.   The goal of disgorgement is to make the wrongdoing unprofitable and therefore deter the wrongdoing. Disgorgement might be available even where the claimant has not suffered net out-of-pocket losses.

*See* FINRA Arbitrator's Guide, p. 66-67. As discussed throughout this Brief, Buck's mismanagement of Ms. Compton's accounts was pervasive and guided by his intent to defraud her and line his own pockets. As such, all commissions charged should be refunded. Moreover, Ms. Compton's "well-managed account" damages model has a reasonable management fee (at the competitive fee-based rate of .5%) *built in,* which would have generated some $400,000 in fees for Buck. (*See* **Exhibit 6**, at p. 4, FN 4). Since a fair fee has thus been accounted for, Ms. Compton thus asks the Panel for a full award of her commissions, which totaled $1,404,188.

## F.   OFFSET OF COMPENSATORY DAMAGES FROM PRIOR SETTLEMENTS.

Between the payment from the SEC Victim's Fund ($946,868) and the recent settlement she obtained from Merrill Lynch ($5,500,000), Ms. Compton has collected $6,446,868. As reflected in the above chart, Ms. Compton recognizes that these settlements should be deducted out of her claim for compensatory damage. With these deductions, Ms. Compton's outstanding compensatory damages comes out to **$2,140,320**—Well Managed Damages ($7,183,000) + Commissions ($1,404,188) - $6,446,868 (total of Ms. Compton's settlements) = **$2,140,320.**

## G.   MS. COMPTON IS ENTITLED TO TREBLE DAMAGES UNDER INDIANA'S CORRUPT BUSINESS INFLUENCE ACT & THE FEDERAL RICO STATUE

Under both the federal RICO (*see* pp. 26-32) and Indiana Corrupt Business Act (*see* pp. 33-35), treble damages are *mandatory* upon a showing that Buck engaged in a pattern of racketeering that damaged Ms. Compton or (under the Indiana Act) otherwise "aggrieved" her.

The purpose of mandatory trebles is clear—to punish the wrongdoer and deter others from engaging in the same conduct. Pursuant to this mandatory requirement, Ms. Compton thus asks the Panel to treble Ms. Compton's compensatory damages of $2,140,320 and award a total of $6,420,960 in compensatory damages.

## H.     ATTORNEY'S FEES

The cost of bringing this action has been enormous because of the scope, length and breadth of Buck's fraud, the coverup that ensued, and Merrill's gamesmanship in discovery, in which Mr. Buch participated. Ms. Compton cannot not be fully made whole without a *full award* of her attorneys' fees and expenses. Ms. Compton is entitled to such an award pursuant to two (2) statutes—the Indiana Corrupt Business Act and federal RICO. Ms. Compton should also get her fees because both sides have requested them, thereby invoking FINRA fee reciprocity rule.[34] Ms. Compton thus asks for an award of her attorney's fees, expenses, and costs in this matter which currently total $1,967,068, but will be updated at closing arguments and thorough an affidavit by Niel Prosser.

## I.     PRE-JUDGMENT INTEREST

Ms. Compton is entitled to an award of pre-judgment interest on her compensatory damages i.e. her well managed damages and the commissions. Interest is mandatory under federal

---

[34] Per FINRA's guidance to arbitrators:

> "There are three situations when parties may pursue attorneys' fees:
> (1) A contract includes a clause that provides for the fees; (2) the
> fees are required as part of a statutory clam; **(3) All of the parties
> request or agree to such fees.**"

*See* FINRA Dispute Resolution Basic Arbitrator Training at 128 (emphasis added).

RICO and permissive under Indiana law. See Ind. Code Ann. § 34-51-4-1. Under Ind. Code Ann.

Section 34-51-4-9, the calculated pre-judgment interest rate must be between 6% and 10% per year

in an award on a verdict. Ms. Compton seeks an award of $4,309,800 in pre-judgment interest

which is calculated by running interest from the time of Buck's termination (3/4/15) through the

final hearing at the 10% rate.

## J.    PUNITIVE DAMAGES

As an alternative to awarding treble damages, Ms. Compton seeks an award of punitive

damages. In Indiana, punitive damages are warranted when the respondent acted with malice,

**fraud**, gross negligence, or oppressiveness. *See e.g.* Bell v. Clark, 653 N.E.2d 483 (Ind. Ct. App.

1995), opinion adopted, 670 N.E.2d 1290 (Ind. 1996). Indiana courts look to many factors to assist

in determining a reasonable award for punitive damages, including, but not limited to, the

following: type and extent of the harm suffered by the victim, the wealth and finances of the

defendant,[35]  the need to vindicate the victim's rights, the objective of deterrence and punishment,

and the significance of the deterrence in the context of the type of harm suffered.[36]

Here, Buck has admitted to defrauding Janice in his criminal proceeding as well in a written

confession. Moreover, additional instances of Buck's fraud will be proven at the final hearing. An

award for punitive damages would squarely meeting the intent of punitives, which is to deter Buck

and other similar situated bad actors from committing similar bad acts. Therefore, Ms. Compton

requests that the Panel award her the maximum amount allowed under Indiana law i.e. three times

her compensatory damages which equals $6,420,960. *See* Indiana Code Ann. § 34-51-3-4.

---

[35] *Bright v. Kuehl*, 650 N.E.2d 311, 316 (Ind. Ct. App. 1995).

[36] *Gaffney v. Riverboat Servs. of Indiana, Inc.*, 451 F.3d 424, 466 (7th Cir. 2006).

**K.**     **POST JUDGMENT INTEREST**

Ms. Compton is entitled to interest on any judgment rendered in this matter upon conclusion of this hearing. Under Indiana law, interest on judgment for money whenever rendered shall be from the date of the return of the verdict or finding of the panel until satisfaction at an annual rate of 8%. Ind. Code Ann. § 24-4.6-1-101. Therefore, Janice asks for an award of post judgment interest to be determined upon conclusion of this hearing.

## VI.     OTHER LEGAL ISSUES

**A.**     **MS. COMPTON'S CLAIMS ARE TIMELY.**

**1.**     **Indiana constructive fraud—6 year statute.**    As recognized by Buck in his Answer (*see* p. 5 therein), fraud claims under Indiana law are governed by a six-year statute of limitations that begins to run on the date of accrual.[37] A claim for fraud only accrues when the claimant discovered or could have discovered than in injury had occurred as a result of another's wrongful conduct.[38] Ms. Compton's fraud claim, brought a little over 5 years after the earliest date that she could have discovered Buck fraud on March 4, 2015, is thus timely.

**2.**     **Federal RICO claim—4-year statute that only began to run in 2019.** Per the federal RICO conviction exception, the "statute of limitations [for a securities fraud based

---

[37] *See* Ind. Code Ann. § 34-11-2-7 (the "following actions must be commenced within six (6) years after the cause of action accrues…. Actions for relief against frauds").

[38] *See e.g. Estate of Kalwitz*, 717 N.E.2d 904, 914 (Ind. Ct. App. 1999) (stating fraud "cause of actions accrue and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another.").

RICO claim] shall start to run on the date on which the conviction becomes final." 18 U.S.C. 1964(c). Buck's conviction became final on February 13, 2019—the day he was actually sentenced.[39] Ms. Compton's federal RICO claim was thus brought well within the required time frame.

3.    **Indiana Corrupt Business Act claim—10-year statute.**        Claims under the Indiana's Corrupt Business Act are governed by a six or ten-year statute of limitations. *Walther v. Indiana Lawrence Bank*, 579 N.E.2d 643, 648 (Ind. Ct. App. 1991). The *Walker* court directly addressed the question of what statute of limitations is applicable for a claim under the Indiana Corrupt Business Act. There, the Indiana Court of Appeals noted that "the Indiana RICO provision is silent as to the applicable statute of limitations" and held that the statute of limitations was therefore either six (6) based upon statute of limitations for fraud (the underlying predicate act) or ten (10) years, based upon the catch-all statute of limitations set by the Indiana legislature. *Id.* Ms. Compton's Indiana Corrupt Business Act claim against Mr. Buck was brought a little over five years after she could have first discovered Buck's fraud and is thus unquestionably timely.

Buck, however, asserts in his Answer that the statute of limitations for civil claims under the Indiana Corrupt Business Act is only two-years. (*See* Buck Answer, p. 11). Buck's support for this position, however, is unsound. Buck cites to *Branham Corp. v. Newland Res.,* LLC, 17 N.E.3d 979, 987 (Ind. Ct. App. 2014). There, the question of which statute of limitation was applicable was *never litigated*. Rather, the parties *agreed* that a two-year statute of limitation applied—an agreement that the court rubberstamped. *Id.*

---

[39] *See e.g.  Est. of Gottdiener v. Sater*, 35 F. Supp. 3d 386, 401 (S.D.N.Y.) (stating "[c]riminal convictions generally do not become final until the imposition of the sentence").

Such language in an opinion is known as "dicta" and does not constitute law. *See Koske v. Townsend Eng'g Co.*, 551 N.E.2d 437, 443 (Ind. 1990) (stating that in "appellate opinions, statements not necessary in the determination of the issues presented are obiter dictum.[40] They are not binding and do not become the law" (emphasis added)). The argument that a two-year statute of limitation applies thus cannot withstand scrutiny and Ms. Compton's claim under the Indiana Corrupt Business Act is clearly timely.

**B.   MS. COMPTON ASKS FOR A SPECIFIC FINDING OF FRAUD TO PREVENT MR. BUCK FROM DISCHARGING AN AWARD IN BANKRUPTCY**

Per a recent study from the plaintiff securities bar, nearly 30% of all awards in customer cases in 2020 went unpaid due to, *inter alia*, the respondent's filing of bankruptcy.[41] Such an outcome can be avoided since  the law provides the Panel with the ability to give Ms. Compton more than just a Pyrrhic victory. Debts that are the result of fraudulent conduct perpetrated in a fiduciary relationship are not dischargeable in bankruptcy. *In re Peters*, 2012 WL 1035916 (Bankr. S.D. Ind. Mar. 27, 2012).   Moreover, per the United States Supreme Court, "'damages and attorneys' fees that are included within the relief resulting from the fraud are also non dischargeable." *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998). Nor are the treble damages awarded per a successful RICO claim dischargeable in bankruptcy so long as they flow from the same course of conduct as the compensatory damages. *See Int'l Telecommunications Satellite Org. v. Colino*, 1992 WL 151809, at 2 (D.D.C. June 9, 1992) (holding that treble RICO damages

---

[40] "Obiter dictum" is defined as a "comment, suggestion, or observation made by a judge in an opinion that is not necessary to resolve the case, and as such, it is not legally binding on other courts…" Legal Information Institute, *Obiter dictum*, CORNELL LAW SCHOOL, https://www.law.cornell.edu/wex/obiter_dictum (last visited Jan. 21, 2022).

[41]   (*See* FINRA Arbitration's Persistent Unpaid Award Problem, September 29, 2021, https://piaba.org/piaba-newsroom/piaba-report-finra-arbitrations-persistent-unpaid-award-problem-september-29-2021.)

stemming from defendant's fraudulent conduct are not dischargeable in bankruptcy. Ms. Compton

thus asks that any award rendered against Mr. Buck include a *specific finding* that Buck defrauded

her and that the fraud grew out of the same conduct for which Janice' RICO claims are based.


C.     **PURPORTED DEFENSES OF RATIFICATION, WAIVER AND ESTOPPEL BY MS. COMPTON ARE INAPPLICABLE**

In his Answer, Buck puts forth the affirmative defenses of waiver, estoppel, and

ratification. (*See* Buck's Answer, pp. 16-17.) These defenses are, however, <u>not favored</u> and may

not be used to bring about ends contrary to public policy." *Irvine v. Cargill Investor Servs, Inc.*,

799 F.2d 1461, 1462 (11th Cir. 1986) (collecting cases) (emphasis added).  In *Irvine*, a securities

case, the Eleventh Circuit reversed the District Court's jury instructions as to estoppel, waiver, and

ratification for numerous reasons, <u>including the presence of a fiduciary relationship between the</u>

<u>brokers and investors</u>." *Id.* at 1463 (emphasis added). After thoroughly analyzing each defense,

the Irvine Court found them each inapplicable since:

- "The person against whom waiver is invoked must be in possession of all material facts," and waiver requires "intentional relinquishment."
- "Estoppel is applied against wrongdoers and not against victims.  It is applied only when refusal to do so would be virtually to sanction fraud."
- "Neither failure immediately to suspect wrongdoing nor an attempt to cooperate with a broker demonstrates waiver of rights."
- Estoppel is "applied with great caution, and if the conduct is ambiguous and thus susceptible of two constructions," it should not be applied.
- Neither waiver nor estoppel are supported by "lapse of time alone."

*Id.* at 1463-64 (collecting cases). Courts also assign a heavy burden to arguments for ratification

or waiver in the context of churning. In *Davis v. Merrill Lynch, Fenner & Smith, Inc.*, 906 F.2d

1206 (8th Cir. 1990) for example, the court reminded Merrill Lynch that,

> It has been recognized that confirmation slips and monthly
> statements do not enable a customer to determine his or her overall
> position or the total amount of real profit or loss occurring, unless

> the customer is sufficiently skilled to elaborate upon them to make that determination.... When a customer lacks the skill or experience to interpret confirmation slips, monthly statements or other such documents, courts have generally refused to find that they relieve a broker of liability for its misconduct.

*Id.* at 1213. As a result, the 8th Circuit held that due to the investor's "lack of skill and reliance on her broker, it is clear that her alleged ratification or waiver was not given 'voluntarily and intelligently with full knowledge of the facts.'" *Id.* at 1213-1214.

In this case, Ms. Compton, was not aware of Buck's inappropriate trading—conduct that Buck admittedly kept from his customers—and supposedly even from Merrill.  Ms. Compton's confirmations and statements reflected little and did not even disclose the full amount of the commissions/ mark-ups/mark-downs and other costs  she was paying. Moreover, Ms. Compton who relied extensively on Buck, had neither the skills nor experience to analyze her statements in a manner that would have put her on notice of Buck's fraud. At the same time, Buck intentionally deceived Ms. Compton with respect to his management of the accounts. These facts simply are not effective to establish ratification, waiver, or estoppel by Ms. Compton.

## VII.   CONCLUSION

As the law discussed herein and the proof at the Hearing will show, Ms. Compton is entitled to the amounts requested about above due to the fraud masterfully conducted by Buck. Ms. Compton thanks the Panel for their time and commitment to her case.

47

Respectfully submitted this 25th  day of January, 2022,

Janice Compton
By her Attorneys

_____/s/ Niel Prosser_____

Niel Prosser (TN #11647)
James T. Ritt (TN #11787)
Rob Clapper (TN #34180)
Kyle Johnson  (TN #36066)
The Prosser Law Firm, PLC
Ridgeway Center Parkway, Suite 300
Memphis, Tennessee 38120
Telephone: (901) 820-4433
E-mail: np@prosserlaw.com
        jritt@prosserlaw.com
        kjohnson@prosserlaw.com
        rclapper@prosserlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the forgoing has been delivered to Buck by way of electronic mail and via the FINRA DR Portal this 25th day of January, 2022.

 _/s/ Kyle Johnson_____
Kyle Johnson

48

# Exhibit 1

# Relevant Events Pre-Termination



# Relevant Events Post Termination



**3/4/15**
Buck is terminated from Merrill Lynch.

**4/9/15**
Buck is hired by RBC.

**4/11/15**
Buck leaves Janice a voicemail asking her to follow him to RBC.

**6/5/15**
Janice submits written complaint to Merrill. Thereafter, Merrill tells her she has six years to file an arbitration.

**7/15/15**
FINRA receives Buck's handwritten "confession"; Within 10 days, Buck agrees to a permanent FINRA bar.

**7/24/15**
Buck is permanently barred by FINRA.

**7/29/15**
Buck is terminated from RBC.

**6/29/16**
Buck gives a deposition to the SEC.

**9/6/17**
The DOJ charges Buck with securities fraud via a criminal "Information." Buck agrees to plead guilty as charged in the Information.

**11/30/17**
Janice's Victim Impact Statement is submitted to the DOJ.

**1/18/18**
Buck pleads guilty to securities fraud for defrauding Janice and others.

**2/9/18**
Buck is permanently barred by the SEC.

**4/3/18**
Buck files his sentencing memo and expert report arguing that while Janice (and others) were defrauded, Buck's victims were not damaged. Buck seeks zero (0) prison time.

**1/11/19**
The DOJ files its sentencing memorandum featuring Ms. Compton as "Victim D."

**2/13/19**
Court rejects argument that Buck's fraud did not actually damage victims. Buck is sentenced to 40 months in a federal prison. Ms. Compton's federal RICO claim accrues.

**9/5/19**
Janice enters the first Tolling Agreement with Merrill Lynch.

**2/10/20**
Janice receives $946,668 from the SEC Victim's Fund.

**7/31/20**
Janice files her Statement of Claim.

2015   2016   2017   2018   2019   2020

# Exhibit

# 2

# TRANSCRIPT OF
# ML-COMPTON-00048476 THROUGH  ML-COMPTON-00048481

### ML-Compton-00048476

I was suspended from the club for a year. The irony is that by cheating I caused myself to endure the unspeakable shame, humiliation, and embarrassment that I would have gone to any lengths to avoid. While some at the club have forgiven me and welcome me into their games, no one will ever forget. Certainly not me, I still feel a temptation to cheat. It pulls at me and I fight it; I do not want to carry any of that baggage with me, but there are times when the temptation almost overwhelms me.

At Merrill Lynch, where I have worked for 33 years, my achievement oriented persona exploded with a fury. At Merrill, everything is about goals, drive, ambition, attainment, and moving forward. From my first days with the firm, there was a report card in front of you. And when you put an A on the card you are the hero. And, man, could I put A's on the card. I got the highest grade on the FIAT and series 7 tests that they had ever seen. I was in first quintile from the beginning of my career. I was #1 in my training class.

### ML-Compton-00048477

I have been in a recognition club every single year at M.L. I served as ACTM chair. I am rated the top financial advisor in Indiana by Barron's magazine and in the top 100 in the nation by Barron's. In Financial Times, I rank in their top 400 globally. I am personally in the top 10 at Merrill Lynch, and I am a cheat, and a liar, and I have abused and used people.

There are two ways that I cheat. One is charging commissions that are higher than a client would need to pay if they were on a fee-based system. While I can justify and explain our reasoning for using one payment system or another, and I sometimes have to do this for compliance purposes, the fact is that some clients who trust me explicitly are being charged more than they need to pay. Do I give good advice? Definitely. Do I care that their goals are achieved? Of course! Could I do it and charge less? Yes! But my addict wants my name in the top 10 in the firm, and in Barron's, and so on. And my insecurity about whether I am good enough just being who I am without cheating and winning keeps me going

### ML-Compton-00048478

from clearing all this up. The other way that I cheat is through discretion. I take discretion from time to time as a short cut to getting the goal accomplished. I only take discretion with clients with whom I have worked closely for years, whose goals and tastes I understand completely, and who I know would want me to execute the transaction I am making, and I always buy or sell assets for their benefit, however, discretion is a major violation. It is against the law. It would end my career in disgrace. And I only do it to the people who trust me the most. I tell myself that I am better, that I do it very rarely, but anything other than zero is wrong.

1

Compton_018625

So, while I am at the top of my field, and I received all of the concomitant accolades, I find myself always with a mighty bit of doubt in my heart about whether I'd be good enough if I didn't cheat.

The other area of character flaw at Merrill Lynch has been my treatment of women in the office. I have been an exploitative, abusive, disgusting pig in my treatment of women at Merrill. I would

**ML-Compton-00048479**

In October, 1981, I moved to Indianapolis to work for Merrill Lynch. And this is when all of my defects from childhood seemed to unleash.

My competitive instincts soared to new heights as I entered this meritocracy. I had to win; and win at all costs. I was as afraid of failure as I launch into this segment of my life and addiction. I believe that the most effective way of disclosing my morality would be to follow the major components of my life. Those are:
>-work
>-golf
>-social
>-extra-marital
>-Cathy
>-kids

I list them in that order because of the ease of description and understanding.

In my work life, M.L. is a pure meritocracy in my position. I am a salesman; there is no limit to what I can earn. The more I make, the happier my bosses are. For me, this is gasoline on the fire. My greed, my need for ego, gratification, my desire for reflected glory from the authority figure,

**ML-Compton-00048480**

are all available in big neon lights. And the more you do, the bigger the accolades, the bigger the praise, I launched in, so afraid of failure and being worthless on one hand, so in thrall of the glory on the other!

And I worked my ass off. I made all the necessary calls! I went to the appointments; I followed the program, and I was successful beyond belief. I was top in my training class. I was always top quintile in the firm. I know that I did a lot of good work, but I also know that I became obsessive. I had to win; I had to be at the top of my group. I always had to win the Masters.

I remember once calling my Dad after finishing 48th out of 14000 in the Masters. And his comment was, "well, what about the other 47?"

And I would get so upset if I did not get the ego stroke that I felt I deserved! I would rail at the boss for not paying enough attention. I had to have the reinforcement from an authority figure.

And I would cheat. I lied about fees. I over-traded accounts for commission.

2

**ML-Compton-00048481**

<mark>I lied about hidden fees. I took discretion in accounts. I lied about performance.</mark> But in doing all of these things, I always kept the investment suitable and appropriate for the client. Was this because I cared for the client's well-being or did I just want to protect myself in the event of a complaint or lawsuit. I have always lived in denial about my dishonesty, always telling myself that I am the best because others say so and because my clients love me. But in doing so, I betray people's most explicit trust, there is a point at which the hard work that I do, the passion and excellence that I bring to the business gives way to my abusive, manipulative, ego driven, greedy addiction. For so many years, I denied that transition. I know exactly where that lie is. To this day, I do not stay on the right side of it at all times.

In the office, I have been abusive and harassing to women for (39 or 30?) years. My first memory of abusing women is from about 1984. It was training the ESS class (a position of power for me) and there were two attractive women in the group. On

3

I was suspended from the club for a year. The irony is that by cheating I caused myself to endure the unspeakable shame, humiliation, and embarrassment that I would have gone to any lengths to avoid. While some at the club have forgiven me and welcome me into their games, no one will ever forget, certainly not me. I still feel a temptation to cheat. It pulls at me and I fight it. I do not want to carry any of that baggage with me, but there are times when the temptation almost overwhelms me.

At Merrill Lynch, where I have worked for 33 years, my achievement oriented persona exploded with a fury. At Merrill, everything is about goals, drive, ambition, attainment, and moving forward. From my first days with the firm, there was a report card in front of you. And when you put an "A" on the card, you are the hero. And, man, could I put A's on the card. I got the highest grade on the S7 and series 7 tests that they had ever seen. I was in first quintile from the beginning of my career. I was #1 in my training class,

I have been in a recognition club
every single year at M.L. I served as
ACTM chair. I am rated the top
financial advisor in Indiana by Barron's
magazine and in the top 100 in the
nation by Barron's. In Financial Times, I
rank in their top 400 globally. I am
perennially in the top 10 at Merrill
Lynch. And I am a cheat, and a
liar, and I have abused and used
people.

~~Forte~~
There are two ways that I cheat.
One is ~~████~~ charging commissions
that are higher than a client would
need to pay if they were on a fee based
system. While I can justify and
explain our reasoning for using one
payment system or another, and I
sometimes have to do this for compliance
purposes, the fact is that some
clients who trust me explicitly are
being charged more than they need to
pay. Do I give good advice? Definitely.
Do I care that their goals are achieved?
Of course! Could I do it and
charge less? Yes! But my addict
wants my name in the top 10 in the
firm, and in Barron's, and so on. And
my insecurity about whether I am good
enough just being who I am without
cheating and winning keeps me from

ML-Compton-00048477
CONFIDENTIAL

Confidential

Compton_018629

from blowing all this up. The other way that I cheat is through discretion. I take discretion from time to time as a short cut to getting the goal accomplished. I only take discretion with clients with whom I have worked closely for years, whose goals and tastes I understand completely, and who I know would want me to execute the transaction I am making. And I always buy or sell assets for their benefit. However, discretion is a major violation. It is against the law. It would end my career in disgrace. And I only do it to the people who trust me the most. I tell myself that I am better, that I do it very rarely, but anything other than zero is wrong.

So, while I am at the top of my field, and I received all of the concommitant accolades, I find myself always with a nagging bit a doubt in my heart about whether I'd be good enough if I didn't cheat.

The other area of character flaw at Merrill Lynch has been my treatment of women in the office. I have been an exploitative, abusive, disgusting pig in my treatment of women at Merrill. I would

ML-Compton-00048478
CONFIDENTIAL

In October, 1981, I moved to Indianapolis to work for ~~the~~ Merrill Lynch. And this is when all of my defects from childhood seemed to unleash.

My competitive instincts soared to new heights as I entered this meritocracy. I had to win; and win at all costs. I was so afraid of failure. As I launch into this segment of my life and addiction I believe that the most effective way of disclosing my morality would be to follow the major components of my life. Those are:

- work
- golf
- social - extra-marital
- Cathy
- kids

I list them in that order because of the ease of description and understanding.

In my work life, M.L. is a pure meritocracy in my position. I am a salesman; there is no limit to what I can earn. The more I make, the happier my bosses are. For me, this is gasoline on the fire. My greed, my need for ego gratification, my desire for reflected glory from the authority figure,

ML-Compton-00048479
CONFIDENTIAL

I lied about hidden fees. I took discretion in accounts. I lied about performance. But I doing all of these things, I always kept the investments suitable and appropriate for the client. Was this because I cared for the client's well-being, or did I just want to protect myself in the event of a complaint or lawsuit. I have always lived in denial about my dishonesty, always telling myself that I am the best because others say so and because my clients love me. But in doing so, I betray people's most explicit trust. There is a point at which the hard work that I do, and the passion and excellence that I bring to the business gives way to my abusive, manipulative, ego driven, greedy & addiction. For so many years, I denied that transition, I know exactly where that line is. To this day, I do not stay on the right side of it at all times.

In the office, I have been abusive and harassing to women for 30 years. My first memory of abusing women is from about 1987. It was training the ESS class (a position of power for me) and there were two attractive women in the group. On

# Exhibit

# 3

Bank of America Coronavirus Resource Center. See details.



Working with Us        Your Life Priorities        Research & Insights        Find an advisor

# Investing for Income—Not Just Growth

These ideas can help as you look to create a steady stream of income for retirement and other cash-dependent goals

DURING YOUR EARLY YEARS AS AN INVESTOR, you typically invest mainly for growth—you want your assets to increase in value. But as you get closer to retirement, you'll most likely want your investments to generate income as well, either to provide part of your "retirement paycheck" or to supplement your earnings from part-time or consulting work.

"Investing for income is quite different from investing for growth, and it could require you to think a little differently about your assets, especially in today's low interest rate environment," says Matthew Diczok, fixed income strategist for the Chief Investment Office at Merrill and Bank of America Private Bank. "Lower rates generally make it more difficult to generate income from investments, and that uncertainty could present a risk—especially as you start drawing down money to cover daily expenses."

If your objective is to get an income stream from your investments, there are a number of approaches you can take—for many people, a combination of the strategies below may work best.





# #2 Streamline investing via income funds

For a range of choices and cost efficiencies

## First, consider increasing your exposure to bonds and dividend-paying stocks

Here are several kinds of investments you might think about.

**Dividend-paying stocks** are shares of companies that make regular payments to stockholders.[1] Both the dividends and share price are tied to the company's current health and outlook, which means the value of these assets may rise or fall over time. Many investors choose dividend-paying stocks in the hopes that they'll provide both income *and* asset growth. During times when interest rates are rising, which generally means the economy is doing well, the likelihood is greater that a dividend-paying stock can do both. One note of caution, though: Some stocks with high-dividend yields can potentially drop in value when rates rise—if a company is highly leveraged, the cost of servicing their debt increases when rates go up, and that can have an impact on what their stock is worth.

"Investing for income is quite different from investing for growth, and it could require you to think a little differently about your assets."

— Matthew Diczok, fixed income strategist for the Chief Investment Office at Merrill and Bank of America Private Bank

**Treasurys** typically deliver a relatively low rate of return but are considered among the safest of income-generating investments because they're backed by the U.S. government, Diczok says. Depending on the type of Treasury instrument you buy, maturities range from four weeks to 30 years. Typically, the longer the maturity, the more interest the bond pays. But also be aware that longer-maturity bonds, and especially Treasurys, are more sensitive to interest rate risk. When rates go up, the value of the bond goes down. That's of less relevance if you plan to hold it to maturity, but you might want to ask yourself: Am I *sure* I won't need the money before then?

**Municipal bonds** are offered by state and local municipalities, and the income they generate is usually exempt from federal income taxes. "The trade-off for this federal tax-free status is a relatively modest rate of return," says Diczok. "This is why it's helpful to compare the *after-tax* return of other bonds with the interest you receive from municipals."

**Investment-grade corporate bonds** are issued by private companies with high credit ratings. They are generally less volatile than the stock market and offer higher rates of interest than Treasurys or municipal bonds, according to Diczok, but because they're backed by companies rather than the government, they're considered somewhat riskier.

**High-yield bonds** generally deliver higher returns than investment-grade corporate bonds but are considered riskier. Diczok warns that their price might fluctuate in a manner closer to that of stocks than of bonds with a less risky profile.

## 3 more tactics that can help you invest for income

**Build a bond ladder.** It's one of the most popular income-producing strategies and, as Diczok notes, can work in any type of interest rate environment. You can create a ladder by investing in a mix of bonds with short, medium and long durations. All bonds have what's called a maturity date, which is the day that the full value will be paid back to you, the investor. "Most income investors want regular, reliable payments, which means owning a range of different maturities," says Diczok. Doing so gives you predictable payments and the option to reinvest at current market rates as each bond matures. Plus, laddering helps to increase liquidity, says Diczok. The shorter-term bonds you purchase will offer access to cash as they mature, should you need it to supplement your income sooner rather than later.

**Streamline your investing by using funds.** "The most cost-efficient way to build an income portfolio for the average investor may be through ETFs and mutual funds," says Diczok. "These funds can give you access to a range of securities and cut down on transaction costs."

**Focus on your overall returns rather than short-term market movements.** When you're deriving the income you need from an investment, it doesn't matter as much if the value of the underlying asset fluctuates, regardless of whether it's a stock or a bond. "If you're still receiving regular income and there is no fundamental change in the borrower's creditworthiness, there's less reason to panic if the market value of your investment goes down somewhat," says Diczok, "especially if it's a bond you plan to hold till maturity."

Regardless of your approach, he adds, "make sure that your portfolio includes a range of income sources that are appropriate for your goals, timelines and risk tolerance."

Connect with an advisor and start a conversation about your goals.

1.866.706.8321

9am - 9pm Eastern, Monday - Friday

[1] Dividend payments are not guaranteed and are paid only when declared by an issuer's board of directors. The amount of a dividend payment, if any, can vary over time.

**Merrill, its affiliates, and advisors do not provide legal, tax, or accounting advice. You should consult your legal and/or tax advisor before making any financial decisions.**

**Diversification does not ensure a profit or protect against loss in declining markets.**

Investing involves risk including the possible loss of principal investment.

Investing in fixed-income securities may involve certain risks, including the credit quality of individual issuers, possible prepayments, market or economic developments and yields and share price fluctuations due to changes in interest rates. When interest rates go up, bond prices typically drop, and vice versa.

Investments in high-yield bonds (sometimes referred to as "junk bonds") offer the potential for high current income and attractive total return but involve certain risks. Changes in economic conditions or other circumstances may adversely affect a junk bond issuer's ability to make principal and interest payments.

Income from investing in municipal bonds is generally exempt from federal and state taxes for residents of the issuing state. While the interest income is generally tax-exempt, any capital gains distributed are taxable to the investor. Income for some investors may be subject to the federal alternative minimum tax (AMT).

Investments focused in a certain industry may pose additional risks due to lack of diversification, industry volatility, economic turmoil, susceptibility to economic, political or regulatory risks, and other sector concentration risks.

   

## Related Articles

### Do you have a retirement spending plan?

Read more

### What Dividend Stocks Can Offer

Read more

## Information for:

Corporations & Institutions

Job Seekers

Media & Journalists

Shareholders

## Discover Merrill:

About Us

Working With Us

Our Solutions

Research & Insights

Merrill Social Media

Form CRS & Other Resources

## Get in touch:

Contact Us

## Connect with ML®:

ML® Site Map

Privacy

Security

Web Accessibility

Legal Information

MLPF&S Financial

Brokercheck

Advertising Practices

**Investing involves risk. There is always the potential of losing money when you invest in securities.**

**Asset allocation, diversification and rebalancing do not ensure a profit or protect against loss in declining markets.**

Merrill, its affiliates, and financial advisors do not provide legal, tax, or accounting advice. You should consult your legal and/or tax advisors before making any financial decisions.

This material is not intended as a recommendation, offer or solicitation for the purchase or sale of any security or investment strategy. Merrill offers a broad range of brokerage, investment advisory (including financial planning) and other services. Additional information is available in our **Client Relationship Summary**.

Merrill Lynch, Pierce, Fenner & Smith Incorporated (also referred to as "MLPF&S" or "Merrill") makes available certain investment products sponsored, managed, distributed or provided by companies that are affiliates of Bank of America Corporation ("BofA Corp."). MLPF&S is a registered broker-dealer, registered investment adviser, **Member SIPC** and a wholly owned subsidiary of BofA Corp.

Insurance and annuity products are offered through Merrill Lynch Life Agency Inc., a licensed insurance agency and wholly owned subsidiary of Bank of America Corporation.

Trust, fiduciary and investment management services are provided by Bank of America, N.A. and its agents, Member FDIC, or U.S. Trust Company of Delaware. Both are wholly-owned subsidiaries of Bank of America Corporation.

Banking products are provided by Bank of America, N.A. and affiliated banks, Members FDIC and wholly owned subsidiaries of Bank of America Corporation.

Investment, insurance and annuity products:

| Are Not FDIC Insured |
| --- |
| Are Not Bank Guaranteed |
| May Lose Value |
| Are Not Deposits |
| Are Not Insured by Any Federal Government Agency |
| Are Not a Condition to Any Banking Service or Activity |

© 2022 Bank of America Corporation. All rights reserved.
3594760-EXP-2022-05-17

# Exhibit 4

### FINANCIAL INDUSTRY REGULATORY AUTHORITY
### LETTER OF ACCEPTANCE, WAIVER, AND CONSENT
### NO. 2019063058701

TO:     Department of Enforcement
        Financial Industry Regulatory Authority (FINRA)

RE:     NEXT Financial Group, Inc. (Respondent)
        Member Firm
        CRD No. 46214

Pursuant to FINRA Rule 9216, Respondent NEXT Financial Group, Inc. submits this Letter of Acceptance, Waiver, and Consent (AWC) for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against Respondent alleging violations based on the same factual findings described in this AWC.

## I.

## ACCEPTANCE AND CONSENT

A.      Respondent hereby accepts and consents, without admitting or denying the findings and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

## BACKGROUND

NEXT has been a FINRA member since 1999 and is headquartered in Houston, Texas. The Firm is a general securities broker-dealer and currently has approximately 540 registered persons.

On December 5, 2017, FINRA issued a Letter of Acceptance, Waiver and Consent (No. 2015043319901), in which NEXT was censured, fined $750,000 and was required to retain an independent consultant for, among other things, systemic supervisory failures relating to excessive trading and variable annuities.[1]

## OVERVIEW

From January 2012 through February 2019, NEXT failed to establish, maintain, and enforce a supervisory system, including written supervisory procedures (WSPs), reasonably designed to detect and prevent unsuitable short-term trading of mutual funds and municipal bonds in customer accounts and over-concentration of customer accounts in Puerto Rican municipal bonds. As a result of the misconduct, NEXT violated NASD Rules 3010(a) and (b), FINRA Rules 3110(a) and (b), MSRB Rules G-27(b) and (c), and FINRA Rule 2010.

---

[1] For more information about the firm, including prior regulatory events, visit BrokerCheck® at www.finra.org/brokercheck.

In addition, from approximately March 2013 through February 2017, the firm failed to establish a reasonable system of supervisory controls to test and verify that its supervisory procedures were reasonably designed to achieve compliance with applicable securities laws and regulations and FINRA rules. As a result, the firm violated FINRA Rule 3120, NASD Rule 3012, FINRA Rule 2010, and MSRB Rule G-27(f).

## FACTS AND VIOLATIVE CONDUCT

This matter originated from a tip to FINRA, a customer arbitration filed against NEXT, and an examination of the firm.

**NEXT Failed to Establish, Maintain and Enforce a Supervisory System Reasonably Designed to Supervise Mutual Funds and Municipal Bonds.**

FINRA Rule 3110(a) and its predecessor, NASD Rule 3010(a),[2] require that FINRA members establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules. FINRA Rule 3110(b) and its predecessor, NASD Rule 3010(b), require that FINRA members establish, maintain, and enforce written procedures to supervise the types of business in which they engage and the activities of their associated persons that are reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules. FINRA Rule 2010 provides that "[a] member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade." A violation of FINRA Rule 3110 is a violation of FINRA Rule 2010.

FINRA Rule 2111 and its predecessor, NASD Rule 2310,[3] require member firms or their associated persons to have a reasonable basis to believe that a recommended securities transaction or investment strategy is suitable for a customer, based on information obtained through the reasonable diligence of the firm or associated person to ascertain the customer's investment profile.

Mutual funds are composed of several classes of shares. Class A Shares usually include an initial or "front-end" sales charge levied upon the purchase of shares, as well as annual, ongoing distribution and service fees that are typically 0.25 percent. The majority of the front-end charge is paid to the selling broker-dealer as a concession.[4] Class A mutual fund shares (Class A Shares) are intended to be held long-term because there are significant up-front costs associated with the purchase of these products. A recommendation that an investor engage in short-term trading in Class A Shares is potentially unsuitable because of these significant up-front costs. Mutual fund switching occurs when a customer sells mutual fund shares and reinvests the proceeds in another mutual fund company, often incurring additional charges and commissions.

---

[2] FINRA Rule 3110 superseded NASD Rule 3010 on Dec. 1, 2014.
[3] FINRA Rule 2111 replaced NASD Rule 2310 effective July 9, 2012.
[4] Class B and C Shares typically do not carry a front-end sales charge but have significantly higher distribution and service fees (typically 1.00%) and may be subject to a contingent deferred sales charge (CDSC).

MSRB Rule G-27(b) requires municipal dealers to establish and maintain a supervisory system that is reasonably designed to achieve compliance with applicable securities laws and regulations and MSRB Rules. Rule G-27(c) further requires each municipal dealer to adopt, maintain, and enforce written supervisory procedures that are reasonably designed to ensure that the conduct of municipal securities activities complies with MSRB Rules and the Exchange Act.

MSRB Rule G-17 requires brokers in municipal securities to "deal fairly" with their customers and prohibits "any ... unfair practice." MSRB Rule G-19 requires that a broker "in recommending to a customer any municipal security transaction . . . shall have reasonable grounds . . .. for believing that the recommendation is suitable."

Like Class A Shares, municipal bonds typically are long-term investments, which, when held until their maturity date or an earlier call date, allow an investor to preserve capital while generating tax-advantaged or tax-free income. Purchase of a municipal bond generally involves costs to the investor in the form of a mark-up. Sales can also involve costs in the form of a mark-down. A recommendation that an investor engage in short-term trading of municipal bonds may be unsuitable due to these costs.

> *The firm's supervisory system was not reasonably designed or enforced to detect and prevent unsuitable mutual fund switching.*

From January 2012 through February 2019, NEXT relied upon an automated surveillance system to identify and flag for review Class A Share switches. This system generated alerts, and firm supervisors were responsible for reviewing the alerts to determine whether flagged transactions were suitable. The surveillance system was not reasonably designed to achieve compliance with applicable FINRA rules because it did not provide critical data to assist the supervisors in evaluating the transactions for suitability.

Review of alerts generated by the system did not provide information regarding holding periods of the Class A Shares sold or costs to the customer associated with the switch transactions. Without this information, the reviewing supervisor could not determine if short-term trading was taking place or the financial benefit or detriment to the customer of the transaction. In addition, when the system flagged a switch transaction prior to 2015, the firm provided supervisors with no guidance through its WSPs to assist in evaluating the suitability of the switch. The WSPs in place during that time also provided no information regarding appropriate holding periods for Class A Shares or other factors to be considered in determining the suitability of a Class A Share switch. Furthermore, after updates to the WSPs in 2015, the criteria to be used by supervisors was vague and did not provide sufficient guidance.

In instances in which a switch alert is missing information that would be significant to making a determination regarding whether a switch is suitable, it is unreasonable for supervisors to clear individual alerts without sufficient investigation. The firm allowed supervisors to clear individual alerts after obtaining an explanation from the registered representative, without any further investigation. This included instances in which red

flags should have put supervisors on notice that the explanations were incomplete or inaccurate.

> *The firm's supervisory system was not reasonably designed or enforced to detect and prevent unsuitable short-term trading and over-concentration in municipal bonds.*

From January 2012 through February 2019, NEXT's supervisory system was not reasonably designed or enforced to detect and prevent short-term trading of municipal bonds or over-concentration of these bonds in customer accounts. Additionally, the WSPs did not discuss suitability reviews specific to municipal bonds, address or provide any guidance regarding holding periods for municipal bonds, or address factors to be considered in determining appropriate levels of concentration. The WSPs also did not have any other additional suitability guidance that would be applicable and assist supervisors in analyzing the suitability of municipal bonds.

> *The firm failed to reasonably detect and respond to red flags in Broker A's trading.*

As a result of the conduct described above, the firm failed to detect and reasonably respond to red flags in the trading of Broker A prior to customers incurring significant losses.[5] These red flags included short term trading of mutual funds and municipal bonds, as well as over-concentration of Puerto Rican municipal bonds (PR Bonds) in customer accounts.

From 2012 until February 2019, Broker A employed a strategy of short-term trading of Class A Shares in 19 customer accounts, many of which belonged to seniors. This trading strategy resulted in the 19 accounts incurring unnecessary Class A Share sales charges totaling approximately $925,000.

From approximately June 2013 to November 2016, Broker A engaged in short-term trading of PR Bonds in 16 customer accounts and concentrated five customer accounts in PR Bonds. These bonds carried risks not associated with other municipal bonds because of concerns about the Puerto Rican economy and subsequent restructuring of Puerto Rican debt. The risk of such concentration was compounded by frequent trading in the PR Bonds because of the repeated payment of upfront costs that would decrease any investment returns. Broker A's customers suffered losses of approximately $4.1 million on investments in PR Bonds.

In late 2016, a trading desk employee raised questions about Broker A's Class A Shares trading. The firm then performed a review of Broker A's switching activity. That review highlighted the fact that Broker A was moving his customers in and out of mutual funds and PR Bonds, causing the customers to incur sales charges that affected the profitability of the accounts. When Broker A was questioned regarding this activity, he gave misleading explanations to justify the activity and no further review of the transactions was conducted. The firm's failure to conduct a further review to verify Broker A's

---

[5] Broker A was barred from associating with any FINRA member in a 2020 AWC for refusing to testify before FINRA.

explanations was not reasonable given the inconsistency of those explanations with the multitude of red flags in the customers' account information and in the firm's blotter.

Despite being aware of red flags regarding Broker A's trading through supervisory alerts and a special review of his trading in 2016, NEXT failed to conduct a continued heightened review of Broker A's trading activity. The firm did not address the red flags associated with the transactions again until after arbitrations were filed by customers in June and September 2018 regarding both the Class A Share and PR Bond transactions. As a result, Broker A continued to short-term trade Class A Shares and PR Bonds in customer accounts, causing customers to incur additional unnecessary fees and suffer losses until March 2019.[6]

Therefore, NEXT violated NASD Rule 3010(a) and (b), FINRA Rules 3110(a) and (b) and 2010, and MSRB Rule G-27(b) and (c).

**NEXT failed to establish, maintain and enforce a reasonable system of supervisory control policies and procedures to test and verify its surveillance systems.**

FINRA Rule 3120 and its predecessor, NASD Rule 3012,[7] require that a member firm establish, maintain, and enforce a system of supervisory control policies and procedures to test and verify whether the member's supervisory procedures are reasonably designed to achieve compliance with applicable securities laws and regulations and FINRA rules. A designated firm principal must submit an annual report to senior management that details the system of supervisory controls, the test results, and any amended procedures created in response to the test results. MSRB Rule G-27(f) imposes a similar requirement upon municipal securities dealers.

From March 2013 through February 2017, NEXT failed to have a reasonably designed system of supervisory control policies and procedures to test the firm's surveillance systems relating to mutual funds and municipal bonds. Although the firm performed annual tests of its supervisory procedures for these years and created a report regarding those tests, the tests were not reasonably designed. None of these tests examined whether the system to supervise two active business lines—mutual funds and municipal bonds— was reasonably designed to achieve compliance with FINRA and MSRB suitability rules. As an example, NEXT failed to test the surveillance system with regard to mutual funds and municipal bonds to determine whether it was operating effectively to identify potential unsuitable switching transactions.

Therefore, NEXT violated FINRA Rules 3120, NASD Rule 3012, FINRA Rule 2010 and MSRB Rule G-27(f).

B.    Respondent also consents to the imposition of the following sanctions:

▪      a censure;

---

[6] As a result of an action brought by the Texas State Securities Board in February 2020, customer arbitrations, and FINRA's investigation, NEXT has paid restitution to the affected customers of Broker A totaling $4,277,000.
[7] FINRA Rule 3120 superseded NASD Rule 3012 on Dec. 1, 2014.

- ▪ a $750,000 fine ($225,000 of which pertains to the violations of MSRB Rule G-27); and

- ▪ the following undertaking:

  - ▪ <u>Certification Regarding Implementation of Reasonably Designed Procedures</u>. Within no later than 120 days of the date this AWC is accepted, a senior officer and principal of NEXT shall certify in writing to FINRA that the firm has implemented supervisory systems and written supervisory procedures reasonably designed to address unsuitable short-term trading of mutual funds and municipal bonds in customer accounts and over-concentration of customer accounts in Puerto Rican municipal bonds. This certification shall be submitted by letter addressed to Laura Leigh Blackston, Senior Counsel, FINRA Enforcement Department, 1100 Poydras St, Suite 850, New Orleans, Louisiana, 70163 and to Laura.Blackston@finra.org.

Respondent agrees to pay the monetary sanction upon notice that this AWC has been accepted and that such payment is due and payable. Respondent has submitted an Election of Payment form showing the method by which it proposes to pay the fine imposed.

Respondent specifically and voluntarily waives any right to claim an inability to pay, now or at any time after the execution of this AWC, the monetary sanction imposed in this matter.

The sanctions imposed in this AWC shall be effective on a date set by FINRA.

## II.

## <u>WAIVER OF PROCEDURAL RIGHTS</u>

Respondent specifically and voluntarily waives the following rights granted under FINRA's Code of Procedure:

A.   To have a complaint issued specifying the allegations against it;

B.   To be notified of the complaint and have the opportunity to answer the allegations in writing;

C.   To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made, and to have a written decision issued; and

D.   To appeal any such decision to the National Adjudicatory Council (NAC) and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the Chief Legal Officer, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

**III.**
**OTHER MATTERS**

Respondent understands that:

A.     Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs (ODA), pursuant to FINRA Rule 9216;

B.     If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against Respondent; and

C.     If accepted:

1.     this AWC will become part of Respondent's permanent disciplinary record and may be considered in any future action brought by FINRA or any other regulator against Respondent;

2.     this AWC will be made available through FINRA's public disclosure program in accordance with FINRA Rule 8313;

3.     FINRA may make a public announcement concerning this agreement and its subject matter in accordance with FINRA Rule 8313; and

4.     Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. Respondent may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects Respondent's testimonial obligations or right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.     Respondent may attach a corrective action statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct.

7

Respondent understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this statement. This statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA.

The undersigned, on behalf of Respondent, certifies that a person duly authorized to act on Respondent's behalf has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; that Respondent has agreed to the AWC's provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth in this AWC and the prospect of avoiding the issuance of a complaint, has been made to induce Respondent to submit this AWC.

July 13, 2021
_____
Date

*Barry G. Knight*
_____
NEXT Financial Group, Inc.
Respondent

Print Name: Barry G. Knight
_____

Title: President
_____

Reviewed by:

*Jack D. Ballard*
_____
Jack D. Ballard, Esq.
Counsel for Respondent
Bressler, Amery & Ross, P.C.
3700 Buffalo Speedway, Suite 1020
Houston, TX  77098

Accepted by FINRA:

Signed on behalf of the
Director of ODA, by delegated authority

July 13, 2021
_____
Date

*Laura Leigh Blackston*
_____
Laura Leigh Blackston
Senior Counsel
FINRA
Department of Enforcement
1100 Poydras Street, Energy Centre
Suite 850
New Orleans, LA 70163

8

# Exhibit

# 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Cause No. |
| Plaintiff, | ) 1:17-cr-0172-JRS-TAB |
| | ) Indianapolis, Indiana |
| vs. | ) **February 13, 2019** |
| | ) 9:03 a.m. |
| THOMAS J. BUCK, | ) |
| | ) |
| Defendant. | ) |

**Before the Honorable**
**JAMES R. SWEENEY**

OFFICIAL REPORTER'S TRANSCRIPT OF
EVIDENTIARY HEARING and SENTENCING

Court Reporter:                David W. Moxley, RMR, CRR, CMRS
                              United States District Court
                              46 East Ohio Street, Room 340
                              Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

## I N D E X

**GOVERNMENT'S WITNESSES:**                               **PAGE**

PETER MALAFRONTE

Direct Examination by Mr. Linder ...............11
Cross-examination by Mr. Ridolfo ...............35
Redirect examination by Mr. Linder .............58
Recross-examination by Mr. Ridolfo ............62
Examination by The Court ......................63

ADAM BERRY

Direct Examination by Mr. Linder ...............65
Cross-examination by Mr. Ridolfo ..............105
Redirect examination by Mr. Linder ...........150
Recross-examination by Mr. Ridolfo ...........157

**DEFENDANT'S WITNESS:**                                  **PAGE**

ROSS TULMAN

Direct Examination by Mr. Robbins .............159
Cross-examination by Mr. Linder ...............187
Redirect Examination by Mr. Robbins ...........213
Cross-examination by The Court ................214

## I N D E X   O F   E X H I B I T S

**GOVERNMENT'S EXHIBITS:**                                **PAGE**

80 .........................................10
81 .........................................10

**DEFENDANT'S EXHIBIT:**                                  **PAGE**

A ..........................................149

*BERRY - DIRECT/LINDER*                    94

1   Q.  Is that contained in Exhibit 17?

2   A.  Yes, it is.

3   Q.  And the first account there, 8146, was that also contained

4   in an RMS report?

5   A.  Yes, it was.

6   Q.  And, again, the client would have been better off

7   switching to fee based by either $61,000 or $30,000, depending

8   on whether you used the discounted or list rates; right?

9   A.  That's correct.

10  Q.  Did you analyze other clients, as well?

11  A.  Yes, I did.

12  Q.  You mentioned you analyzed over 100; right?

13  A.  Yes.

14  Q.  All right.  And did one of those include Client D, who

15  submitted a victim impact statement in this case?

16  A.  Yes, it did.

17  Q.  The victim impact statement docketed at docket number 64;

18  is that right?

19  A.  That's correct.

20  Q.  If you'd turn to Exhibit 18, is that that analysis?

21  A.  Yes, it is.

22  Q.  And for this, under the discounted model for just the

23  first account, the client would have been better off by

24  $437,000; is that right --

25  A.  That's correct.

*BERRY - DIRECT/LINDER*                    95

1   Q.  -- had they switched to fee based?

2   A.  That's correct.

3   Q.  And even in an undiscounted model, they would have been

4   better off by $211,000; right?

5   A.  That's correct.

6   Q.  All right.  In looking at the client accounts you did,

7   over 100 of them, did you get a sense of the number of clients

8   who would have saved money by switching at least one of their

9   accounts to the fee-based option?

10  A.  Yes, I did.

11  Q.  Let's take a look at Exhibit 19.  What does that show?

12  A.  Exhibit 19 shows the number of clients analyzed who would

13  have saved money on a fee-based account option for at least

14  one account.

15  Q.  And can you kind of walk the Court through what the Court

16  is seeing here in Exhibit 19?

17  A.  Sure.  On the left-hand side, that axis represents the

18  number of clients.  And across the top, you'll see "MLPA,"

19  "PIA," "MLPA to IAP," and "PIA to IAP."  Those are --

20          THE COURT:  You don't have to look at me.

21          THE WITNESS:  I'm sorry.

22  A.  Those are the four rate scenarios I analyzed.  And within

23  each of those, a bar represents the number of clients; dark

24  blue, discounted; light blue, list rates.  Within each of

25  those scenarios, that would have saved money in a fee-based

*BERRY - CROSS/RIDOLFO*                    148

1   A.  That's correct.

2   Q.  And in Exhibit D, you looked at three out of the seven

3   accounts held by Client D?

4   A.  Yes.  It could have been 18, three --

5   Q.  Yes.

6   A.  -- accounts --

7   Q.  And, in fact, do you know how much assets were admitted in

8   those four out of seven accounts that were not included for

9   Client D?

10  A.  I don't have that in front of me.

11  Q.  Okay.

12          THE COURT:  I'm sorry.  You say that's four out of

13  seven?

14          MR. RIDOLFO:  Correct.  Four out of -- or, I'm

15  sorry, three out of seven.

16          THE COURT:  Okay.

17  BY MR. RIDOLFO:

18  Q.  The first question is:  You looked at three out of seven

19  here and you admitted four out of seven; correct?

20  A.  Can you ask that again just so I make --

21  Q.  Yeah.

22  A.  -- make sure I'm clear?

23  Q.  Exhibit 13 -- Exhibit 18 deals with three of the accounts

24  held by the -- of the seven accounts held by Client D?

25  A.  Yes, it does.

BERRY – CROSS/RIDOLFO                    149

1   Q.  And you don't know the asset value of the accounts that

2   were in the accounts that were not included in the analysis?

3   A.  Not sitting here today.

4   Q.  Okay.

5            THE COURT:  Just out of curiosity, can you tell from

6   this that there were seven accounts, or you just remember

7   that?  Any of these.

8            THE WITNESS:  I can't tell.  I'm relying on his

9   recitation and that previous document he showed that had the

10  table.

11           THE COURT:  Okay.

12  BY MR. RIDOLFO:

13  Q.  And, just briefly, when we talk about the three in

14  Exhibit 18, the gray line denotes a separate account?

15  A.  That's correct.

16  Q.  And so we know we've got three out of the seven?

17  A.  That's what I've been counting, yes, as we've gone through

18  it.

19           MR. RIDOLFO:  Okay.  And I move to introduce Exhibit

20  A.

21           THE COURT:  Any objection?

22           MR. LINDER:  None.

23           THE COURT:  Admitted.

24                        (Defendant's Exhibit A was

25                         received in evidence.)

1  reflects reality.  But, nonetheless, to show you that we think

2  our estimate was reasonable, we gave you a very conservative

3  set of assumptions.  That's why there are multiple scenarios.

4          THE COURT:  Okay.  All right.  Thank you.

5          All right, the Court will take a recess till 3:40.

6  Thank you.

7          THE COURTROOM DEPUTY:  All rise.

8          (Recess at 3:19, until 3:42.)

9          THE COURT:  We're back on the record.  The parties

10  are as before.

11          All right.  As an initial matter, great presentation

12  and arguments on both sides.  And it's a close call with

13  respect to enhancement for sophisticated means, but the Court

14  is going to deny the two-point enhancement for sophisticated

15  means.

16          Now, turning to the factual finding as to the amount

17  of loss, defense counsel seemed to concentrate on clients as a

18  household or alone or across the 800 and that $1.3 billion in

19  assets under management.  And there's no doubt in the Court's

20  mind, and I think in the record, I don't think anybody can

21  dispute, that Mr. Buck has done a lot of good, both for his

22  clients over three decades or more and the community, and the

23  Court will take that into account at sentencing, for sure.

24          However, the issue before the Court is the amount of

25  loss with regard -- or without regard to offsets.  And,

1  certainly, that is borne out by the admissions in the plea

2  agreement to what's set forth in the overcharging in the

3  information, as well as the evidence that was submitted, and

4  the volumes of information that the Court received before and

5  during this hearing, as well as even the indications of what

6  Merrill Lynch has paid out.

7          Looking at the calculations of -- in Exhibit 4 of

8  the government, which range from 6 to $7.6 million, 6.6 to

9  $7.6 million, which, again, in the range that Merrill has paid

10  out; and then going to the more conservative, I believe 7,

11  Exhibit 7, where it ranges from, roughly, one and three

12  quarters -- or 1,175,793 up to almost four, 3,955,918, gives

13  another indication.

14          Looking at just the four, just four, out of some

15  124 -- or, excuse me, 150, and not looking at the whole --

16  someplace there was 24 that were admitted to.  But looking at,

17  for example, Exhibits 13, which is Client A; 15, which is

18  Client B; 17, which is Client C; and 18, which is Client D,

19  just four, the Court comes up with losses there under the

20  discounted rates of 1,044,654; under the more conservative

21  list rates, about 486,619.  Now, again, that's just four

22  people, four clients.  And the -- those other exhibits, I

23  think 4 and 7, the Court has had the entire analysis.

24          So the Court believes that the government has

25  proven, by a preponderance of reliable evidence, that the loss

1   was in excess of $1.5 million, and the Court need only make a

2   reasonable estimate of the loss under the precedent, not one

3   rendered with scientific precision, which I think both sides

4   and both experts have agreed there are a lot of variables

5   here, so it would be hard to do.  But that's the Court's

6   ruling, that the government has proven, by a preponderance of

7   the evidence, that the end loss was more than $1.5 million.

8            So moving on, then, in the sentencing portion, any

9   questions about the Court's ruling on those two matters?

10           MR. LINDER:  No, Your Honor.

11           MR. HAMMERLE:  No, sir.

12           THE COURT:  Okay.  Now, the plea agreement

13   contemplates a one -- or a motion for a one-level reduction to

14   the offense level for acceptance of responsibility under

15   Sentencing Guideline Section 3E1.1(b).  Does the government

16   now make such a motion?

17           MR. LINDER:  The government would so move, Your

18   Honor.

19           THE COURT:  All right.  It's granted.

20           MR. LINDER:  Thank you.

21           THE COURT:  So -- and everybody keep track of me

22   here.  I want to make sure that I get these right.  And this

23   is the Court's guideline calculation as to the appropriate

24   offense level and criminal history category.

25           The Court finds that the total offense level is

# Exhibit

# 6

## CUMULATIVE GAIN(LOSS): ACTUAL VS BENCHMARK



Total Stock Market (VTI) + Muni (MUB)   =   $10,901,481*
Actual Accounts   =   $3,718,481
Underperformance =   ($7,183,000)

* Initial allocation 50% Stocks, 50% Munis;
  Rebalance annually in August;
  Adjust alloocation to 75% Stocks, 25% Munis October 31, 2012.

TOTAL STOCK MARKET + MUNI WITH FEE, $10,901,481

ACTUAL ACCOUNT, $3,718,481

JANICE J COMPTON - COMBINED MERRILL LYNCH ACCOUNTS (EXCLUDING EXACT TARGET & #38899) FEB 2015   Page 1 of 4

Confidential

Compton_019301

## BENCHMARK COMPARISON 50-50 to 75-25
### JANICE J COMPTON - COMBINED MERRILL LYNCH ACCOUNTS (EXCLUDING EXACT TARGET & #38899) FEB 2015

| No | Statement Date | Net Investment | | Actual Account | | Allocation Model[2] | | | VTI[2] | | MUB[2] | | Mgmt Fee[4] | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Monthly[1] | Cumulative[1] | Value (Equity) | Gain/ (Loss) | Value[3] | Gain/ (Loss) | Difference from Actual | Shares B/(S) | Share Balance[3] | Shares B/(S) | Share Balance[3] | | |
| 1 | Aug-31-09 | $ 6,818,772 | $ 6,818,772 | $ 6,891,485 | $ 72,713 | $ 6,964,966 | $ 146,194 | $ (73,481) | 68,092 | 68,092 | 33,531 | 33,531 | | |
| 2 | Sep-30-09 | 0 | 6,818,772 | 7,078,249 | 259,477 | 7,214,210 | 395,438 | (135,961) | 225 | 68,318 | 52 | 33,583 | 9,867 | |
| 3 | Oct-30-09 | (40,000) | 6,778,772 | 6,921,049 | 142,278 | 6,985,937 | 207,165 | (64,887) | (378) | 67,940 | (92) | 33,491 | | |
| 4 | Nov-30-09 | 0 | 6,778,772 | 6,953,285 | 174,513 | 7,205,512 | 426,740 | (252,227) | 0 | 67,940 | 101 | 33,592 | | |
| 5 | Dec-31-09 | (17,000) | 6,761,772 | 7,028,188 | 266,416 | 7,289,851 | 528,080 | (261,664) | 202 | 68,142 | (28) | 33,564 | 9,007 | |
| 6 | Jan-29-10 | 0 | 6,761,772 | 7,010,002 | 248,230 | 7,175,931 | 414,159 | (165,928) | 0 | 68,142 | 97 | 33,661 | | |
| 7 | Feb-26-10 | (49,500) | 6,712,272 | 7,018,560 | 306,288 | 7,282,617 | 570,345 | (264,057) | (448) | 67,694 | (136) | 33,525 | | |
| 8 | Mar-31-10 | (17,423) | 6,694,848 | 7,111,961 | 417,113 | 7,497,224 | 802,376 | (385,263) | 44 | 67,739 | (23) | 33,501 | 9,103 | |
| 9 | Apr-30-10 | (31,589) | 6,663,260 | 7,110,387 | 447,128 | 7,592,970 | 929,710 | (482,582) | (262) | 67,476 | (46) | 33,455 | | |
| 10 | May-28-10 | (52,158) | 6,611,102 | 6,897,866 | 286,763 | 7,246,795 | 635,692 | (348,929) | (446) | 67,030 | (147) | 33,308 | | |
| 11 | Jun-30-10 | (22,778) | 6,588,324 | 6,817,945 | 229,621 | 6,984,715 | 396,391 | (166,770) | 42 | 67,072 | (54) | 33,254 | 9,058 | |
| 12 | Jul-30-10 | (71,633) | 6,516,691 | 6,983,480 | 466,789 | 7,207,941 | 691,250 | (224,460) | (658) | 66,414 | (242) | 33,012 | | |
| 13 | Aug-31-10 | (27,518) | 6,489,173 | 6,976,749 | 487,576 | 7,083,889 | 594,716 | (107,140) | (2,650) | 63,764 | 1,210 | 34,222 | | R |
| 14 | Sep-30-10 | (60,110) | 6,429,064 | 7,114,005 | 684,942 | 7,335,859 | 906,796 | (221,854) | (281) | 63,482 | (220) | 34,002 | 8,855 | |
| 15 | Oct-29-10 | (8,657) | 6,420,406 | 7,145,192 | 724,786 | 7,447,092 | 1,026,686 | (301,900) | (73) | 63,410 | 59 | 34,061 | | |
| 16 | Nov-30-10 | (64,368) | 6,356,039 | 6,850,829 | 494,791 | 7,302,536 | 946,497 | (451,706) | (529) | 62,881 | (211) | 33,850 | | |
| 17 | Dec-31-10 | (82,482) | 6,273,556 | 6,722,102 | 448,545 | 7,380,333 | 1,106,777 | (658,231) | (384) | 62,497 | (351) | 33,499 | 9,128 | |
| 18 | Jan-31-11 | (17,865) | 6,255,691 | 6,670,675 | 414,984 | 7,449,718 | 1,194,027 | (779,043) | (136) | 62,361 | 13 | 33,512 | | |
| 19 | Feb-28-11 | (15,620) | 6,240,071 | 6,821,422 | 581,351 | 7,662,736 | 1,422,665 | (841,314) | (116) | 62,245 | 25 | 33,537 | | |
| 20 | Mar-31-11 | (56,451) | 6,183,620 | 6,718,960 | 535,340 | 7,574,150 | 1,390,530 | (855,190) | (224) | 62,021 | (227) | 33,310 | 9,578 | |
| 21 | Apr-29-11 | (10,698) | 6,172,922 | 6,884,133 | 711,211 | 7,778,292 | 1,605,370 | (894,159) | (77) | 61,944 | 48 | 33,358 | | |
| 22 | May-31-11 | (128,986) | 6,043,936 | 6,793,778 | 749,842 | 7,681,708 | 1,637,772 | (887,930) | (917) | 61,027 | (526) | 32,832 | | |
| 23 | Jun-30-11 | 4,586,935 | 10,630,871 | 11,327,376 | 696,506 | 12,146,673 | 1,515,803 | (819,297) | 33,336 | 94,363 | 22,161 | 54,992 | 9,602 | |
| 24 | Jul-29-11 | 587,521 | 11,218,392 | 11,855,065 | 636,673 | 12,616,026 | 1,397,634 | (760,961) | 4,344 | 98,707 | 2,996 | 57,989 | | |
| 25 | Aug-31-11 | (3,759,465) | 7,458,927 | 8,020,254 | 561,327 | 8,702,305 | 1,243,379 | (682,052) | (33,444) | 65,223 | (14,923) | 43,066 | | R |
| 26 | Sep-30-11 | (69,661) | 7,389,266 | 7,740,421 | 351,154 | 8,310,962 | 921,695 | (570,541) | (333) | 64,889 | (257) | 42,809 | 10,878 | |
| 27 | Oct-31-11 | (47,844) | 7,341,422 | 7,968,620 | 627,198 | 8,663,491 | 1,322,069 | (694,872) | (392) | 64,497 | (105) | 42,704 | | |
| 28 | Nov-30-11 | (78,875) | 7,262,547 | 7,854,444 | 591,897 | 8,597,902 | 1,335,355 | (743,458) | (615) | 63,882 | (254) | 42,450 | | |
| 29 | Dec-31-11 | (25,681) | 7,236,866 | 7,927,269 | 690,403 | 8,701,982 | 1,465,116 | (774,713) | 75 | 63,958 | (52) | 42,397 | 10,747 | |
| 30 | Jan-31-12 | (104,473) | 7,132,393 | 8,128,616 | 996,223 | 8,977,373 | 1,844,980 | (848,757) | (792) | 63,166 | (371) | 42,027 | | |
| 31 | Feb-29-12 | (6,685) | 7,125,708 | 8,214,647 | 1,088,940 | 9,100,195 | 1,974,487 | (885,547) | (48) | 63,117 | 76 | 42,103 | | |
| 32 | Mar-30-12 | (171,820) | 6,953,888 | 8,062,842 | 1,108,954 | 9,014,595 | 2,060,707 | (951,753) | (1,013) | 62,104 | (723) | 41,380 | 11,375 | |
| 33 | Apr-30-12 | (87,766) | 6,866,122 | 8,006,060 | 1,139,938 | 8,937,611 | 2,071,489 | (931,550) | (609) | 61,495 | (298) | 41,082 | | |
| 34 | May-31-12 | (72,843) | 6,793,279 | 7,706,554 | 913,274 | 8,645,038 | 1,851,758 | (938,484) | (524) | 60,972 | (230) | 40,851 | | |

Confidential

### BENCHMARK COMPARISON 50-50 to 75-25
### JANICE J COMPTON - COMBINED MERRILL LYNCH ACCOUNTS (EXCLUDING EXACT TARGET & #38899) FEB 2015

| No | Statement Date | Net Investment | | Actual Account | | Allocation Model[2] | | | VTI[2] | | MUB[2] | | Mgmt Fee[4] | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Monthly[1] | Cumulative[1] | Value (Equity) | Gain/(Loss) | Value[3] | Gain/(Loss) | Difference from Actual | Shares B/(S) | Share Balance[3] | Shares B/(S) | Share Balance[3] | | |
| 35 | Jun-29-12 | (31,625) | 6,761,655 | 7,758,811 | 997,156 | 8,735,827 | 1,974,173 | (977,017) | (3) | 60,969 | (93) | 40,759 | 10,806 | |
| 36 | Jul-31-12 | (20,066) | 6,741,589 | 7,884,092 | 1,142,503 | 8,845,523 | 2,103,933 | (961,430) | (143) | 60,825 | 9 | 40,768 | | |
| 37 | Aug-31-12 | (51,110) | 6,690,479 | 7,865,147 | 1,174,667 | 8,905,015 | 2,214,535 | (1,039,868) | 1,692 | 62,517 | (1,436) | 39,332 | | R |
| 38 | Sep-28-12 | 8,865,439 | 15,555,918 | 16,689,612 | 1,133,693 | 17,948,446 | 2,392,527 | (1,258,834) | 61,015 | 123,533 | 39,688 | 79,020 | 11,131 | 1 |
| 39 | Oct-31-12 | 2,068,562 | 17,624,480 | 18,761,296 | 1,136,816 | 19,880,263 | 2,255,784 | (1,118,968) | 21,257 | 144,790 | 4,802 | 83,823 | | 1 |
| 40 | Nov-30-12 | (42,331) | 17,582,149 | 18,896,653 | 1,314,504 | 20,074,460 | 2,492,311 | (1,177,807) | 60,706 | 205,496 | (39,131) | 44,691 | | 1,2 |
| 41 | Dec-31-12 | (79,955) | 17,502,194 | 18,732,412 | 1,230,217 | 20,021,542 | 2,519,348 | (1,289,131) | 454 | 205,949 | (136) | 44,555 | 25,093 | 1 |
| 42 | Jan-31-13 | (33,950) | 17,468,245 | 19,035,890 | 1,567,645 | 20,855,656 | 3,387,411 | (1,819,766) | (338) | 205,611 | 23 | 44,578 | | 1 |
| 43 | Feb-28-13 | (5,810) | 17,462,435 | 18,991,694 | 1,529,259 | 21,079,822 | 3,617,387 | (2,088,128) | (56) | 205,555 | 84 | 44,662 | | 1 |
| 44 | Mar-28-13 | (13,989) | 17,448,446 | 19,087,944 | 1,639,498 | 21,608,793 | 4,160,347 | (2,520,849) | 556 | 206,111 | 15 | 44,677 | 26,350 | 1 |
| 45 | Apr-30-13 | (16,911) | 17,431,535 | 19,190,554 | 1,759,019 | 21,945,959 | 4,514,424 | (2,755,405) | (155) | 205,955 | 62 | 44,739 | | 1 |
| 46 | May-31-13 | (45,736) | 17,385,799 | 18,986,803 | 1,601,004 | 22,161,354 | 4,775,555 | (3,174,551) | (412) | 205,543 | (1) | 44,738 | | |
| 47 | Jun-28-13 | (47,356) | 17,338,443 | 18,456,872 | 1,118,430 | 21,707,212 | 4,368,769 | (3,250,339) | 278 | 205,822 | (70) | 44,668 | 27,702 | |
| 48 | Jul-31-13 | (37,578) | 17,300,865 | 18,397,036 | 1,096,171 | 22,609,370 | 5,308,505 | (4,212,334) | (331) | 205,490 | 21 | 44,689 | | |
| 49 | Aug-30-13 | (20,859) | 17,280,006 | 18,081,846 | 801,840 | 21,970,155 | 4,690,149 | (3,888,309) | (11,877) | 193,613 | 9,845 | 54,534 | | R |
| 50 | Sep-30-13 | (171,404) | 17,108,602 | 18,377,306 | 1,268,703 | 22,565,116 | 5,456,514 | (4,187,811) | (771) | 192,842 | (343) | 54,192 | 27,463 | |
| 51 | Oct-31-13 | (33,144) | 17,075,458 | 18,789,025 | 1,713,567 | 23,321,264 | 6,245,806 | (4,532,239) | (278) | 192,565 | 58 | 54,250 | | |
| 52 | Nov-29-13 | 223,360 | 17,298,818 | 18,991,286 | 1,692,468 | 23,995,488 | 6,696,670 | (5,004,202) | 1,809 | 194,373 | 674 | 54,924 | | |
| 53 | Dec-31-13 | (39,211) | 17,259,607 | 19,063,544 | 1,803,936 | 24,384,046 | 7,124,439 | (5,320,502) | 462 | 194,836 | (23) | 54,901 | 29,994 | |
| 54 | Jan-31-14 | (66,597) | 17,193,010 | 19,100,843 | 1,907,833 | 23,887,067 | 6,694,058 | (4,786,224) | (529) | 194,306 | (15) | 54,886 | | |
| 55 | Feb-28-14 | (26,140) | 17,166,870 | 19,408,429 | 2,241,559 | 24,799,684 | 7,632,814 | (5,391,255) | (206) | 194,100 | 78 | 54,964 | | |
| 56 | Mar-31-14 | (23,697) | 17,143,174 | 19,515,746 | 2,372,572 | 24,845,693 | 7,702,519 | (5,329,947) | 422 | 194,522 | 11 | 54,975 | 31,000 | |
| 57 | Apr-30-14 | (37,109) | 17,106,065 | 19,773,280 | 2,667,214 | 24,893,223 | 7,787,158 | (5,119,943) | (285) | 194,236 | 45 | 55,020 | | |
| 58 | May-30-14 | 4,962,500 | 22,068,565 | 25,080,473 | 3,011,908 | 30,364,680 | 8,296,115 | (5,284,207) | 37,764 | 232,001 | 11,555 | 66,575 | | |
| 59 | Jun-30-14 | (10,739) | 22,057,827 | 25,140,601 | 3,082,775 | 30,910,012 | 8,852,186 | (5,769,411) | 602 | 232,603 | 42 | 66,618 | 37,956 | |
| 60 | Jul-31-14 | (95,435) | 21,962,392 | 24,825,464 | 2,863,073 | 30,375,682 | 8,413,291 | (5,550,218) | (710) | 231,892 | (67) | 66,551 | | |
| 61 | Aug-29-14 | (53,675) | 21,908,716 | 25,223,375 | 3,314,659 | 31,367,333 | 9,458,616 | (6,143,957) | (3,806) | 228,087 | 3,203 | 69,754 | | R |
| 62 | Sep-30-14 | (67,711) | 21,841,005 | 24,964,122 | 3,123,117 | 30,758,250 | 8,917,245 | (5,794,128) | 256 | 228,343 | (83) | 69,671 | 39,209 | |
| 63 | Oct-31-14 | (294,674) | 21,546,331 | 24,847,707 | 3,301,376 | 31,137,088 | 9,590,757 | (6,289,381) | (2,153) | 226,189 | (512) | 69,159 | | |
| 64 | Nov-30-14 | (5,352) | 21,540,979 | 24,969,348 | 3,428,369 | 31,724,171 | 10,183,191 | (6,754,822) | (38) | 226,151 | 138 | 69,297 | | |
| 65 | Dec-31-14 | (273,398) | 21,267,581 | 24,693,974 | 3,426,393 | 31,449,183 | 10,181,602 | (6,755,209) | (1,014) | 225,137 | (558) | 68,739 | 39,655 | |
| 66 | Jan-31-15 | (250,652) | 21,016,929 | 24,690,561 | 3,673,632 | 30,683,483 | 9,666,555 | (5,992,922) | (1,798) | 223,339 | (432) | 68,307 | | |
| 67 | Feb-27-15 | $ (65,687) | $ 20,951,242 | $ 24,669,723 | $ 3,718,481 | $ 31,852,723 | $ 10,901,481 | $ (7,183,000) | (465) | 222,874 | 2 | 68,309 | | |

413,559

BENCHMARK COMPARISON 50-50 to  / Prepared by: P Koetting

Confidential

Compton_019303

## BENCHMARK COMPARISON 50-50 to 75-25
### JANICE J COMPTON - COMBINED MERRILL LYNCH ACCOUNTS (EXCLUDING EXACT TARGET & #38899) FEB 2015

| No | Statement Date | Net Investment | | Actual Account | | Allocation Model[2] | | | VTI[2] | | MUB[2] | | Mgmt Fee[4] | Note |
| | | Monthly[1] | Cumulative[1] | Value (Equity) | Gain/ (Loss) | Value[3] | Gain/ (Loss) | Difference from Actual | Shares B/(S) | Share Balance[3] | Shares B/(S) | Share Balance[3] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | |

1 Actual deposits and withdrawals in account. Adjusted Net Investment and Equity Sep-Nov 2012 to exclude Exact Target shares and only include $16,891,345 net proceeds (total proceeds less re-purchased shares).
  Removed an additional $5.8M from Net Investment and Equity from Sep 2012 until actually paid in Jan 2013 ($4.5M) and Apr 2013 ($1.3M) as cash earmarked to pay taxes and not invested.

2 Benchmark Index ETFs: VTI for Total US Stock Market Index; MUB for Natl Municipal Bond Index. Initial allocation at 50% Stocks-50% Munis; adjust allocation to 75% Stocks-25% Munis on October 31, 2012.

3 Initial shares bought @ closing price on TD 8/18/09. Subsequent shares bought/sold @ avg month beg/end price. REBALANCED ANNUALLY IN AUGUST (ANNIVERSARY MONTH). Dividends/capital gains reinvested @ avg month beg/end price on previous month's share balance.

4 Calculated quarterly in advance on AUM (previous month end equity) using 50 basis points annually. Pro-rated first quarter.